A P P E A R A N C E S

FOR THE COMPLAINANT:

DONNA WILLIAMS RUCKER, Esq., 2001 L. Street, North West, Suite 902, Washington, D. C. 20036
202-787-1900 and FX. 202-640-2059

FOR THE WMATA:

MICHAEL K. GUSS, Esq., Senior Counsel, Washington Metropolitan Area Transit Authority, Office of General Counsel, 300 7th Street, North West, Legal Department 7E, Washington, D. C., 20024
MKGUSS@wmata.com





I N D E X


| WITNESS: | MS. RUCKER: | MR. GUSS: |
|---|---|---|
| Deputy Chief Alvarez | 4 | 0 |


E X H I B I T S


Alvarez Exhibit no. 1, pg. 26, (570-2013-00892)
Alvarez Exhibit no. 2, pg. 26, (531-2015-01481)
Alvarez Exhibit no. 3, pg. 26, (531-2015-01481)






P R O C E E D I N G S

Whereupon,

DEPUTY CHIEF ALVAREZ,

was called for examination by counsel for the Plaintiff and after having been first duly sworn, by the notary public, was examined and testified as follows:

DIRECT EXAMINATION:

BY MS. RUCKER:

Deputy Chief Alvarez, we are going forward now in the deposition in the matter of Amanda Betts. This is a Rule 30(b)(6) deposition that we will be speaking to you under today. You are aware that you have been identified as a Rule 30(b)(6) witness here today. Correct?
A That is correct.
Q Again, Donna Rucker, Counsel for Ms. Betts. And what I would like to do is ask some questions related to the specific Betts case.
Can you tell me what you did, Deputy Chief, to prepare for today?
A I reviewed the exhibits that were turned over to me by Mr. Guss.





Q Did you speak with anyone other than your Counsel?
A No, ma'am.
Q Thank you. Your indulgence for one moment.
I believe you answered yes to that question about being the 30(b)(6) witness. Correct?
A Yes.
Q When I ask you questions....
Now, I have taken your deposition before, Deputy Chief. But I will just go over again some of the rules, just to remind you. When I ask questions, I am going to allow you as well, a full opportunity to answer; okay. And so the Court Reporter is taking down what we are saying. So we will give her a chance to capture both the question and your answer. Is that fair?
A Yes, ma'am.
Q If you need to take a break, for any reason, just let me know and I will be happy to oblige. I will just ask that you finish answering any question that is pending at the time. Okay?
A Yes, ma'am.

Q Do you have any documents with you today?
A I do not.
Q Outside of the exhibits, did you review any other documents, for example, the complaint that Ms. Betts filed in this case?
A Briefly, I believe; yes.
Q How do you know Ms. Betts?
A We worked, for a short period of time, while I was an officer and detective.
Q You worked where?
A At the Metro Transit Police Department.
Q Tell us where you are speaking to us from today?
A I am at my office at 4100 Garden City Drive, in Hyattsville, Maryland.
Q Are you at a location where your testimony can not be over heard by others?
A Yes, ma'am.
Q And where you are there, are you alone?
A Yes, ma'am. I am.
Q You do not have any recording devices going;





do you?
A I do not, ma'am.
Q We are going to begin by asking you just to give me a general idea of your role or duties at the time that the matters we are talking about here concerning Ms. Betts would have been.
A Okay. I believe at the time I was in the Criminal Investigation Division as a detective.
Q Did you work, as a colleague, with Ms. Betts at the time in this capacity?
A We shared a position. I don't recall if we ever worked any cases together.
Q Just for this record, what do you mean, "we shared a position?"
A We were both detectives at the time, ma'am.
Q What were your duties as a detective at the time?
A We would get assigned cases by our sergeants and the expectation was that we would investigate those cases to the fullest, interview witnesses, interview arrestees if we needed to, review video, conduct





interviews; things of that nature.
Q Understood. Would that be the same or similar type work that Ms. Betts would do in her position as detective?
A That is correct.
Q Can you tell me how performance evaluations worked for a detective at that time?
Q If I recall at the time, we would be evaluated on how we were in interviews, our demeanor within interviews, clearance and closure... clearance rates, closure rates. And then some safety... we'd always have a safety goal we had to meet. And that's all I can remember at this time.
Q Understood. What did the safety goal entail? What did that entail?
A It was usually a WMATA wide goal, if I recall correctly. We would have to keep injuries or something of that nature, under a certain amount.
Q Understood. And injuries to whom are we speaking?
A Employee... it would be like employee injury





rate.
Q I see. How would you... how were you expected to keep that down?
A Just bringing to light any safety issues that we may observe by using proper personal, protective equipment when needed.
Q Understood. Can you tell me the levels of a score someone would receive on their evaluation?
A I believe then it was a 1 through 7, were the numbers you would be evaluated on.
Q Okay.
A The scale you would be evaluated on.
Q And 1 would be the lowest you could receive?
A Correct.
Q Were supervisors provided any kind of guide or scale to use when evaluating, for example, a detective like Ms. Betts?
A When... what do you mean by, "scale?"
Q Let me... that's a good question. So were you aware of whether or not anyone, who was conducting an evaluation, had sort of a, I guess, a rating scale or

some measure that they were going by, to determine how someone was performing in a particular area?

A I am not sure if they had a formal scale they would go off of.

Q Do you know how someone was able to determine whether a person was at the lower end or the higher end of a rating scale?

A At the time, 5 was a... a score of 5 was considered average. So if you had met your goals, if you had solely met your goals, 5 would have been the average score. Anything above that would have increased. Anything below that would have decreased your score.

Q And the goals that you are speaking about, are those goals... were those goals outlined and given to, for example, a detective like Ms. Betts?

A They should have been; yes.

Q So there is a measure to determine whether a particular goal was met?

A Yes. You would be given... say you had to make or you had to close ten cases for the year. A detective would be told how many, you know, what the





closure rate for that year they would have to meet. And anything above that would raise your score for that category. Anything below that would lower your score for that category.

Q And pretty much, the detectives were rated in the same way?

A Yes.

Q Can you tell me how did case management work?

A At the time it was... we had... the sergeants would maintain their record of the cases that were submitted and they would keep track of whether cases were closed or suspended and how they were closed.

Q When you say, "sergeants," would that have included Ms. Betts?

A No. Ms. Betts would have been a detective.

Q So that is what I am asking about. I should have been more clear. How does case management work as it relates to a detective?

A Okay. I am sorry. I misunderstood.

Q That's okay.

A So you would get assigned your case and many





of us would keep our own Excel spread sheet of the cases that we were assigned. We would work those cases and we would submit them to a sergeant for disposition; whether that case was going to be suspended, meaning there were no other workable leads at the time and... or it would be closed. And that could be closed by arrest, closed exceptionally, which there are certain criteria you need to meet for that. You could also unfound a case, meaning that you determined the offense did not occur or you could close a case administratively, meaning that no crime occurred and you had to close the case out that way.

Q As the detective, someone like Ms. Betts would be making that recommendation when they are terminated as to which of these it should be looked at under?

A That is correct. We make the recommendation, as detective. The sergeant reviews the case and determines whether he or she agrees with that recommendation.

Q Was there any particular closure rate or





completion rate expected for the detectives?

A Yes. I don't recall what it was at the time, but there was a closure rate goal.

Q How did the officials track cases?

A I am trying to remember the name at the time. It wasn't an Excell spread sheet. It was an older program that they used that was similar to Excel is how they would track the cases.

Q What were they tracking?

A They would track the MTP... the case number. MTP, is Metro Transit Police number. They would track the case number, the type of case that it was, who it was assigned to and any other information that we may have had, whether that is suspects, victims, witnesses. And then they would track the disposition of the case.

Q Understood. Thank you.

And then looking at a particular disposition of a case, that's what we were talking about would be a part of what was expected under the goals for a detective to complete and have the disposition known?

A Correct. Your clearance rate is comprised of

your total number of cases and then you close by arrest or closed exceptionally. And that is the form - - you would use that to get the formula for your clearance rate.

Q Thank you. Are there any policies and procedures... were there any policies and procedures in place governing how that should be handled; how that process or consideration should be handled?

A At the time, I don't believe there were.

Q What is it that a detective could do like Ms. Betts, if they received a performance evaluation that they believed was low?

A Was low, ma'am?

Q Yes.

A They could speak to the sergeant, who did the evaluation. And then they could appeal the score, if they were not satisfied.

Q What is the appeal process like?

A They would appeal through their sergeant, appeal to the sergeant initially that they were not happy with their score. The sergeant would then reevaluate,





make a determination whether they felt anything needed to be changed on that evaluation.

Q The appeal process, does it happen in a particular required chain of command?

A We always follow the chain of command. You would appeal to your sergeant. If you did not get satisfaction, you can then request to have your appeal escalated up your chain of command, yes, ma'am.

Q Are there any consequences for not following the chain of command for an appeal?

A Yes. Going outside of your chain of command can result in discipline.

Q What would that discipline likely be?

A That would be... the range for that would probably be a dereliction.

Q Is that discipline discretionary or does it have to issue; if you go outside of the chain of command?

A A violation that is investigated will lead to discipline. If it is sustained; I should say.

Q Understood.

Do you recall the evaluation score or rating that





Ms. Betts received as to why she felt that she had received a low evaluation?

A Yes. I believe the score on that eval was a 5.05.

Q Would that be an indication of a low evaluation on your scale?

A No. That would fall in the average range.

Q At the time that this rating at issue was under way, the evaluation was given by a, I think it is Sgt. Paige; correct?

A Yes, ma'am.

Q And Sgt. Paige, was he also supervising a... I may pronounce this wrong, but I think it is a Peter Waxmonsky?

A Yes; he would have been.

Q How about a Michael Morehouse?

A Yes.

Q And I believe Detective Brandon... and I am not recalling his last name.

A Um, it would probably be Twentymon.

Q Okay. Can you spell that?





A T-W-E-N-T-Y-M-O-N.

Q Would he have also supervised a Bo Caridzo (ph)?

A Yes.

Q And how about Detective Dorrity?

A Yes.

Q Do you know what evaluation scores these individuals received around the same time as Ms. Betts?

A I do not, ma'am.

Q The evaluations or the ratings, when they are given, what did WMATAs policies and procedures say about how an individual is rated? Is it annually? Is it every 6 months? How would it have been for Ms. Betts then?

A We received annual evaluations. Prior to getting your annual evaluation, you would get what we called... what was called a 90 day evaluation. So that was given to you 90 days prior to your final, annual evaluation.

Q And the 90 day evaluation, what was its purpose?

A The purpose was for who ever received the

evaluation to know what their standing was prior to their annual evaluation being issued.
Q Do you know whether Ms. Betts received a 90 day evaluation before the evaluation when she received the 5.05?
A I don't recall, ma'am. I am sorry.
Q What happens if a person doesn't receive the 90 day evaluation?
A They would just receive their yearly evaluation at their anniversary date.
Q Is there any penalty or price for the rating official who failed to give it timely?
A If it was determined that it was negligent, yes. There could be an investigation into that sergeant.
Q The review for the absence of a 90 day eval does not occur automatically. Is that what you are saying?
A If it is determined that you missed the deadline, an investigation should be initiated.
Q Do you know whether there was any investigation initiated concerning Ms. Betts not





receiving a 90 day eval?
A I don't recall one being initiated.
Q Would you have known?
A No. I would not have known.
Q In Ms. Betts' case, she received this evaluation that she believed was low in 2013. Correct?
A Yes.
Q And so that rating would have been for what period?
A It would have been 2013 to her anniversary date starting in 2014, I believe. So her anniversary, 2013 to the anniversary, 2014.
Q So if she received - - what I am asking is if she received a performance evaluation in 2013, would it be evaluating her for the prior year?
A I am sorry; yes. It would be - - yes, it would be. I apologize.
Q That's all right. And so for the 2012 period, isn't it true that Ms. Betts was out on maternity leave for a significant period in 2012?
A Yes.





Q Isn't it true that she was also out on administrative leave in 2012?
MR. GUSS: Objection as to the form of the question. You can answer if you want - - answer if you can; sorry. I didn't mean that. I am sorry.
MS. RUCKER: That's okay.
THE WITNESS: I am not sure about the admin.
MS. RUCKER: And, Mr. Guss, just for this record, what was the reason for objecting to the question about admin?
MR. GUSS: You are asking leading questions. It is your deponent.
MS. RUCKER: He's actually not. He is your 30(b)(6). But I can rephrase the question if you are thinking it is leading.
BY MR. RUCKER:
Q Did she take administrative leave in 2012?
A I am not sure.
Q Would that be contained in her employment records?
A It would have been in payroll records.





Q So payroll records would be the only place the administrative leave would be recorded?
MR. GUSS: I am sorry, Donna. Before we go, we are turning somewhat off topic, off your topic list. I mean, but - -
MS. RUCKER: Let me just rap this up.
BY MS. RUCKER:
Q Where are the notifications regarding leave recorded?
A Leave could be reported - - recorded in multiple places. It could be on a schedule. If you are taking leaving, it would definitely be on your pay stubs. Um - -
Q Okay. Does - - I am sorry. Were you done?
A Yes, ma'am.
Q What happens if an employee is absent during a significant part of the rating period?
A Usually, you would... an official would pro-rate the evaluation. So they would take the numbers that were required for the entire year, but they would adjust them based on the time frame that the officer was

actually at work.
Q That would include for a detective like Ms. Betts?
A That is correct.
Q There are specific policies and procedures in place, that were in place in fact with WMATA at the time that deals with individuals who are considered to be in violation of WMATA's procedures for behavior by a detective. Is that correct? It is a little convoluted. If you need me to rephrase it.
A Yes, if you could rephrase it.
Q So WMATA has disciplinary policies and procedures in place; correct?
A Yes, ma'am.
Q And those procedures are located in - - where, for WMATA?
A We abide by general orders.
Q Are there specific policies and procedures - - and I may have asked you this. Excuse me if I have and we will move on, policies and procedures regarding the issuance of performance evaluations?





A Yes, there is.
Q Would that also be a general order?
A Yes, ma'am. I believe it is General Order 240.
Q Thank you. There will be policies and procedures regarding the entitlement to appeal, correct?
A I believe so; yes.
Q Can you tell me what you know about Ms. Betts engaging in - - engagement in prior protected EEO activity?
A I just know that there were additional complaints. I don't know much more than that.
Q When you say, "additional," tell me what you mean?
A I just believe there was a total of two or three.
Q These complaints you have knowledge of how?
A There was reference made in the materials that I reviewed.
Q Thank you. Prior to reviewing those materials, you were aware that Ms. Betts had filed EEO





complaints; correct?
A Was I aware?
Q Correct.
MS. GUSS: I object. This would be a 30(b)(1) question, not 30(b)(6), because you are asking if - -
MS. RUCKER: With that objection; he can answer, Guss. Thank you.
MR. GUSS: Right, right.
THE WITNESS: I can answer?
MR. GUSS: Yes, you can answer, but you answer what your knowledge was, not WMATA's.
THE WITNESS: Okay. I was aware of one.
BY MS. RUCKER:
Q Which one?
A There was one, I believe where it was a... hold on. I forgot the sergeant's name real quick.
Q Take your time.
A Sgt. Muller had referenced female detectives in the office in a disparaging manner.
Q Do you know about what year that was?





A That, I don't know, ma'am.
Q Can you tell me about the EEO complaints that WMATA is aware that Ms. Betts filed? You mentioned that you were aware of a prior one. You answered that through your counsel, on your own knowledge. I am now interested in WMATA's knowledge of EEO complaints filed by Ms. Betts.
A Um, this one.
Q When you say, "this one," please clarify?
A Um, it will be disparate treatment with the evaluation and - -
MS. RUCKER: Am I the one that is losing video stability?
MR. GUSS: Yeah.
MS. RUCKER: It looks like my internet may be unstable here. Hold on one second.
(Brief pause for technical difficulties, afterwhich the following occurred.)
BY MS. RUCKER:
Q With respect to the EEO complaints that you previously testified you saw when you were reviewing

documents. Are those complaints, complaints WMATA was aware of?
A Yes.
MS. RUCKER: What I will do for the Court Reporter... exhibits in this case, will be the EEO complaint for Ms. Betts, which is under charge number... first charge file, under charge number 570-2013-00892. The second charge file under EEOC charge number 531-2015-01481 and the third EEOC charge file under charge number 531-2015-01481. They will be marked Exhibits 1, 2 and 3, respectively.
(Alvarez Exhibits 1,2 & 3 were marked for ID.)
BY MS. RUCKER:
Q Can you tell me what WMATA knows about Ms. Betts' efforts to appeal the February 15, 2013 negative evaluation that she received?
MR. GUSS: Objection as to characterization of negative. You can answer.
MS. RUCKER: I am just reading what the topic is in the notice.





MR. GUSS: Understood. Just, you know....
MS. RUCKER: Okay; Thank you.
THE WITNESS: I am sorry. The appeal, I believe she made the appeal directly to then Chief Taborn that she was not satisfied with the evaluation she received.
BY MS. RUCKER:
Q What was Chief Taborn supposed to do, according to policies and procedures?
A He should have reviewed the evaluation that was issued to her and then he could have made a determination whether he was going to change that evaluation or not.
Q When a decision to not change is made, is there an explanation that should be provided to the person, in this case, Ms. Betts, who appealed?
A Normally, you would want to explain to whom ever is appealing the evaluation, why there will be no change made.
Q When you said, "normally," I am basically asking is there a policy that would have required him to





explain?
A I'm not sure if there's specific policy that an explanation needs to be provided.
Q Do you know, therefore WMATA knows, does WMATA know whether... is it chief or sergeant or lieutenant Taborn?
A It would have been chief at the time.
Q Does the record show whether Chief Taborn in fact gave an explanation?
A I don't believe there is an explanation.
Q After the decision is issued as to whether there will be a change - - and before I get to that question. Did Chief Taborn change the evaluation?
A No. I believe at the time Chief Pavlik wound up addressing the evaluation issue.
Q Did the evaluation ever change?
A It changed from an annual evaluation to a 90 day evaluation.
Q What you mean by that is what was issued as an annual, based on the appeal, was changed to a 90 day?
A Yes. To have... I believe it was to have no





adverse actions against Ms. Betts.
Q Did Ms. Betts ultimately receive an annual evaluation?
A I believe the agreement that Chief Pavlik put in place was that 90 day would take the place... would become in essence, the annual evaluation.
Q Did that have a rating of either high or low, the 90 day?
A I believe it stood the same.
Q What was the purpose for changing it to a 90 day?
A When you receive 2 scores, I believe 2 or lower on your annual evaluation, it could hold up a pay increase for 30 days. With the evaluation being changed to a 90 day evaluation, it would not have had an impact on Ms. Betts receiving a raise that was due to her.
Q She did, in fact, receive the raise?
A Yes.
Q Now, the evaluation that Ms. Betts challenged before it was changed to the 90 day, did that evaluation consider the fact that she had been out on maternity

leave?

A I believe it listed the days that she was out, but I am not sure if there was a prorated... if any prorating was used doing it.

Q I am not really talking about a prorate for the days off, as you testified to earlier. I am saying in reaching the decision as to how to evaluate Ms. Betts, didn't that evaluation reference the time off that she had for her maternity leave?

A I believe it did; yes.

Q Is WMATA's policy to consider the time that an employee uses for maternity leave in deciding whether they will receive a high or low rating?

A I don't believe so.

Q Did Chief Taborn receive any form of discipline or counseling for considering... excuse me. I think it was Sgt. Paige who originally did the eval.

Did Sgt. Paige receive any kind of discipline or counseling for referencing maternity leave as a consideration?

A Not that I am aware of.





Q There was a performance evaluation, a second evaluation that Ms. Betts received regarding... it's actually March 14, 2013, by Sgt. Cowans-Minor. Can you tell me about what you understand the concerns were that Ms. Betts had about the second performance evaluation?

A I saw the reference to that, but I did not have... I wasn't able to... I didn't have the document and anything that I reviewed.

Q So you are saying this is not in WMATA's records?

A Not that I recall reviewing; no.

Q Did you look for it?

A Yes, ma'am. We discussed, but I was unable to find the document.

Q Understood.

Do you know whether or not the reference to Ms. Betts using... having excessive leave, was that - - due to her maternity leave, was that ever taken off of her evaluation?

A I don't believe it was.

Q When evaluations are... well, when promotions





are being considered, evaluations are used in the promotion process; correct?

A Correct.

Q Did Ms. Betts' evaluation also indicate that she had poor judgement?

A I don't remember a specific mention of poor judgement.

Q Are you able to explain what was meant by or what is meant when the term, "poor judgement," is used in an evaluation?

A If it is not related to a specific incident, it would be hard to state what the sergeant would be mentioning in that situation.

Q Understood.

Do you know whether or not the sergeant indicated to Ms. Betts that she used poor judgement in getting pregnant and being out on leave so much?

A No. I am not aware of that.

Q For 2023, did Ms. Betts receive the - - I said '23. So strike that.

In 2013, did Ms. Betts receive her step increase on





the anniversary of her hire date?

A Yes.

Q What have you reviewed to cause you to say yes to that?

A There was a declaration from someone within Payroll or Accounting that stated the step increase was paid on time.

MS. RUCKER: Let's go off the record for 10 minutes.

(Whereupon, a 10 minute recess was taken at 12:44 o'clock p.m., afterwhich the following occurred at 12:55 o'clock p.m.)

BY MS. RUCKER:

Q The pay check for Ms. Betts is, as far as WMATA is concerned, is going to reflect the fact that she received a 2013 step increase on her anniversary... the anniversary of her hire date?

A Yes.

Can you all hear me?

Q Yes.

A My audio is going in and out a little bit.

Q Okay. Can you tell me what you know about Chief Pavlik's April 24, 2013 order on the final performance evaluation to be issued to Ms. Betts?
A Yes. I believe he had... he turned that evaluation into a 90 day evaluation.
Q What evaluation is that, that he turned it in, because we have talked about a number of them?
A I am sorry; the one that she had... the one that Ms. Betts had gotten from Sgt. Paige.
Q The February 15, 2013 evaluation?
A Correct... was made into a 90 day evaluation in order to have no adverse effect on Ms. Betts.
Q What impact if any, did it have on the one that... the evaluation that Ms. Betts received from Sgt. Cowans-Minor that was March 14th of 2013?
A I am not sure, ma'am. I was not - -
Q You did say you could not find that. I am sorry.
A Yes, ma'am.
Q All right. Thank you.
What about the final evaluation, issued on January





17, 2014? What do you know about that evaluation?
A Was that the one by Sgt. Clayton?
Q I don't have that name in my notes right at this moment. I just have the dates. If you want, I can try and check that, but it is January 17th, of 2014.
A Because I know there - - is that the one where there is a contention on when it was signed?
Q Give me your indulgence; one moment.
(Pause)
I am not sure about Clayton, but I am sure of the date, January 17, 2014.
MR. GUSS: If you don't mind the interjection, it would be the one by Clayton.
MS. RUCKER: Okay. That's the January - - so, that's the one I am looking at, January 17....
BY MS. RUCKER:
Q Tell me what you know about the rating received there?
A I believe that one was a 58, 5.85.
Q Was this evaluation, in any way, connected to the earlier ones in 2013 or was this a separate





evaluation of her performance for the year?
A It should have been separate and distinct.
Q Was there a delay in issuing the final performance evaluation as to why it came out on January 17, 2014?
A I believe that one was signed on an anniversary date by Sgt. Clayton. Ms. Betts' signature is later on.
Q Does WMATA have in place what we call, "progressive," disciplinary policies and procedures?
A We do have the ability to discipline progressively; yes.
Q Tell me what that means?
A We have, within our disciplinary matrix, a policy that allows for someone to be disciplined progressively if they have multiple of the same infraction, sustained infraction repeatedly occurs.
Q Is there sort of a grid or a chart that a supervisor follows or is it discretionary?
A Now, we have a matrix.
Q When did that matrix come into use?





A A few years back. I am not sure if it was in place during the time we are speaking of.
Q Would it have been in place in 2014?
A Without - -
THE WITNESS: I lost you, Ms. Rucker.
MS. RUCKER: Oh, I am sorry.
BY MS. RUCKER:
Q Was it in place, 2014 or 2015?
A Without being able to check the date, I would not be sure.
Q Do you want to take a moment and check the date?
A Sure; if that's fine.
Q Yes.
MS. RUCKER: We will go off the record until the Chief has had a chance to check the date.
(Whereupon, a break was taken at 1:07 o'clock p.m. afterwhich the following occurred at 1:08 o'clock p.m.)
BY MS. RUCKER:
Q Back on the record.
A General Order 216, the Discipline Matrix, has

an effective date October 7, 2014.

Q Thank you.

Can you tell me your understanding of WMATA's policy regarding the maintenance of case files and taking of case files home by employees to work on them?

A Case files were expected to be kept within CID, due to the nature of the information that is contained in the case files. We have NCIC information, juvenile information. We could have audio, video recordings.

Q When you say, "expected," is there a policy that required it?

A I don't believe at the time there was one.

Q Did several officers often take files home or detectives rather?

A Not that I am aware of.

Q Can you tell me if you are aware of any detective who took files home?

A I know Ms. Betts was disciplined for taking files home.

Q Is it your testimony or WMATA's testimony





that Ms. Betts is the only officer ever disciplined for taking files home?

A No. I believe there was one other detective in that case, Elana Watkins. There may be another detective. I am not sure.

Q Is it WMATA's testimony that besides Elana Watkins, Ms. Betts, and this other person you can not recall, no one else has ever been disciplined by WMATA for taking files home?

A Not that I am aware of, ma'am.

Q What about keeping files in one's vehicle? Can you tell me whether a number of officers have in fact, done that?

MR. GUSS: Donna, are you asking him as WMATA or as - -

MS. RUCKER: I am asking him as WMATA now; yes.

THE WITNESS: I can answer?

MR. GUSS: Yes. Sorry.

BY MS. RUCKER:

Q Yes.





A I am aware of the one incident as well with Ms. Betts and Ms. Watkins keeping or being disciplined for keeping files in their vehicle.

Q What I am trying to do here, Chief, is distinguish between whether someone actually did it, whether or not they got disciplined.

A No.

Q So my question is: Whether there - - you, meaning WMATA, has knowledge of any detectives who kept files in their vehicle?

A They would... detectives would routinely put... routinely have files in their vehicle if they were out during their tour. As far as storing files in their vehicle, I am not sure.

Q I want to make sure that my question is clear. So I know that to go from point A to B, a detective may have to take a file with them. But I am talking about files remaining in a vehicle over night or in a vehicle unrelated to any particular route or run that they are doing on a particular day. Can you tell me whether it is WMATA's testimony that only Ms. Watkins and





Ms. Betts were detectives who did that?

A I can't say that they are the only ones. I am not aware.

Q Are you aware of any other detectives who had files in their vehicles and not just simply as they move from point A to point B?

A No, I am not.

Q Are you familiar.... Okay. Let me strike that.

Just so that I am reaching as far as I can in terms of your recall. I am talking about any detective who has worked in the capacity as Ms. Betts. Besides her, no other detectives, that you are aware of, ever had files in their vehicle over night or maintained in their cars?

A I can't say for 100% assurity; no.

Q Did you ever hear about a Lt. Boehm having cases in his vehicle?

MR. GUSS: I would - - I would object, Your - - um, Donna. This is - -

MS. RUCKER: You can state your objection, but I don't want it to be a speaking one. It is unfair

to Ms. Betts.
MR. GUSS: No, it's - - well, the objection is that it is off topic. It is not one of the topics.
MS. RUCKER: Oh, it is.
MR. GUSS: About Boehm? About Boehm, no. Boehm is not - - I don't see Boehm as a topic here.
MS. RUCKER: Hold on. I am asking about whether or not - - I am asking on Topic 15 and as it relates to Topic 15, I am asking about whether he is aware that Lt. Boehm may have had files in his vehicle.
MR. GUSS: You are asking whether WMATA is aware or whether Deputy Chief Alvarez is aware?
MS. RUCKER: I would like to know whether WMATA is aware about Lt. Boehm having files in his vehicle; yes.
MR. GUSS: Okay. Okay. Answer if you can.
BY MS. RUCKER:
Q And just so you know, all of these are if you can.
A I understand. No, I was not aware.
Q There was no... let me ask about another





officer, another detective. How about Detective Dorrity?
A I was not.
Q If Lt. Boehm had files maintained in his vehicle, he would be in violation for doing such, just as Ms. Betts and Ms. Watkins were called out for; correct?
A Correct, ma'am.
Q About how many detectives worked for WMATA during the time that Ms. Betts was employed there?
A I am not sure. It probably fluctuated between 14 to 20.
Q Thank you.
Can you tell me about other detectives who were facing similar discipline as the discipline that Ms. Betts received while employed at WMATA?
A No, ma'am.
Q Let's talk about the discipline that she received for dereliction. Any other - -
MR. GUSS: Your Honor - - I mean - - sorry. Donna, I just want to put on the record that we are objecting to topic 9.
MS. RUCKER: I understand. Topic 9 is out.





That's why I skipped over it, based on the judge's order.
MR. GUSS: Okay.
MS. RUCKER: I am just talking about discipline.
BY MS. RUCKER:
Q How about not following the chain of command? Has anybody been disciplined for not following their chain of command?
A Yes.
Q Let's narrow that a little and ask about people who were disciplined for not following their chain of command regarding ann appeal?
A I'm not sure if it is specific to appeal or not.
Q Have others filed appeals... have filed an appeal of their performance evaluation other than Ms. Betts; other detectives?
A Yes, ma'am.
Q Do you know whether any of those individuals failed to follow their chain of command?





A I am not sure.
Q Is it your testimony that if they did, they would have been disciplined? If they failed to follow the chain of command they would have been disciplined?
A Yeah. They should have been disciplined.
Q Ms. Betts was also disciplined for failing to... allegedly failing to cooperate with an investigation. Correct?
A Yes, ma'am.
Q Any other detectives working with Ms. Betts disciplined for failure to cooperate with an investigation?
A Not that I am aware of.
Q What was the alleged failure to cooperate?
A I believe she would not answer additional questions that were asked after she submitted a written statement.
Q Did Ms. Betts appear to be questioned for additional questions?
A Yes.
Q Did she offer what she believed to be a

response to those questions or did she refuse to offer anything?

A I believe she kept stating that we had to make reference to the written statement she provided.

A So the refusal to answer additional questions was because she referred you to her earlier statement?

A Correct. Well, no, the... it was for not answering the additional questions that were asked.

Q I thought you just testified that she answered saying, "see my earlier statement."

A I believe it was... the expectation was that these questions needed to be expounded upon, which is the reason they were asked.

Q No. I understood the expectation, but I am trying to understand the failure. And so the failure wasn't a refusal to answer. But it was referring for an answer to the original statement. Correct?

MR. GUSS: Objection.

MS. RUCKER: What's the basis?

MR. GUSS: Leading and assuming facts not in evidence.





MS. RUCKER: So we are going to have the Court Reporter read his answer, because I don't want to assume it. He just answered this. So Madam Court Reporter, can you take a moment and read the answer where I asked what was the failure.

(Whereupon, the Court Reporter read back the requested answer of the witness, afterwhich the following occurred.)

BY MS. RUCKER: As you can see, Counsel, he said she continued to make reference. So what I am trying to understand is were there any questions where she refused to give you a response at all. That is what my question is.

MR. GUSS: Well, yeah; okay. Well then, if that is your question, then that's the question. That is not what you asked.

MS. RUCKER: The reason I came back was because he said, "she kept referring us to." And so that is saying that she is answering. So in all fairness to him, I wanted to come back and say... and that is what you objected to, that I was giving





statements not in the record. I am trying to get a clarification, because the statement is that she kept referring to her statement. So what I am trying to understand is did she do that every time or were there in some instances where she did not say anything.

MR. GUSS: Oh, yeah. I understand. I was just objecting to the question, because that is not what the question - - at least that is how I heard it - - not what was asked, but if that's the question, go ahead and answer it if you can; if you know what the - -

MS. RUCKER: And just for the record, every single one these is if you can.

THE WITNESS: Yes, ma'am.

BY MS. RUCKER:

Q Okay.

A I do not believe she was ever silent when asked a question.

Q Thank you.

So the decision to discipline was because of the answer that she gave?

A No. The decision to discipline was based on





the thought that she was not cooperating in the investigation.

Q Was this interview recorded?

A I believe the one with then Captain Gaddis was recorded. I don't believe the other ones were.

Q So there were multiple interviews?

A I believe the initial interaction, request for a statement was with Sgt. Paige. Then a subsequent attempt to get additional information was with Lt. Boehm and there was an interview with then Captain Gaddis and I believe Lt. Panna (ph) that was audio recorded.

Q And is it the audio recorded interview that she, meaning Ms. Betts, was disciplined for?

A I believe - - it would have been the totality, ma'am; each incident. When she - - I am sorry.

Q No. You go ahead. I am sorry to cut you off. Go right ahead.

A When she was initially asked to provide a statement was the initiation of one investigation. The interview conducted by then Captain Gaddis was the OPRI interview into Ms. Betts' failure to cooperate in the

investigation initiated by Sgt. Paige.
Q So who made the decision that she had, "failed to cooperate?"
A The recommendation was sent up by Captain Gaddis.
Q To make sure the record is clear. Was there ever in the multiple interviews that you have identified for this record, is there ever a time where Ms. Betts was silent and refused to answer a question?
A Not that I am aware of.
Q Had Ms. Betts provided any statement in Ms. Watkins' EEO case, which she had filed?
A I am not sure, ma'am.
Q Going back one moment to the discussion or testimony you have given regarding the files in the vehicles. Do you know whether a Detective Archer ever had case files remain in his vehicle?
A I am not sure; ma'am.
Q How about a Detective Bo Porizzo?
A I am not sure; ma'am.
Q Who supervised those officers, those





detectives that I just mentioned during the time that Ms. Betts was there?
A I think it was Sgt. Paige, Sgt. Muller, Sgt. Flynn, and Lt. Boehm would have been the supervisors.
Q Before Lt. Boehm was promoted to supervisor, he held the rank of detective?
A Yes, he did.
Q During the time that he was a detective, was he ever disciplined?
A I am not sure, ma'am.
MS. RUCKER: We are going to go off the record for about 5 minutes.
(Break taken at 1:32 o'clock p.m., afterwhich the following occurred at 1:45 o'clock p.m.)
BY MS. RUCKER:
Q Can you tell me about your knowledge, and therefore WMATA's knowledge, of the emergency suspension that Plaintiff received on February 19, 2014 by Lt. Boehm?
A Yes. I believe after Lt. Boehm attempted to - - then Lt. Boehm attempted to have Ms. Betts answer the





questions again, she referred Lt. Boehm to her statement. He reached out to, I believe it was Earl Brown at the time and emergency suspended Ms. Betts for failing to cooperate with the investigation.
Q Where is it found in WMATA's policies and procedures to issue an emergency suspension such as what Lt. Boehm did here?
A I don't remember the exact general order number, but emergency suspensions are covered within the GO.
Q Okay. Thank you.
The interview that was February 20th of 2014, which is by OPRI?
A Yes, ma'am.
Q What does that stand for?
A Office of Professional Responsibility and Inspections.
Q And Ms. Betts was a witness or a target?
A She was the focus of the investigation.
Q What was the investigation?
A For failing to cooperate in the previous





administrative investigation.
Q What was the result of this investigation?
A A recommendation was submitted for Ms. Betts to be terminated.
Q Who made the recommendation?
A That was then Captain Gaddis.
Q What is Captain Gaddis' race?
A He is a White male.
Q And Lt. Boehm?
A White male.
Q What is Detective Dorrity's race?
A White male.
Q And Bo Porizzo? (Ph)
A White male.
Q And how about Detective Archer?
A White male.
Q And the termination went into effect when? Ms. Betts was terminated when?
A Shortly after the initial interview; I believe in March.
Q And Ms. Betts actually grieved that

termination. Correct?
A I am sorry. You said grieved?
Q Correct. She filed a Union grievance. I am sorry. I should have been more clear.
A I am sorry. I thought you said agreed.
Q Okay. She filed a Union grievance; correct?
A That's correct.
Q And this Union grievance went forward with an arbitration hearing. That was one of the steps in the grievance process; correct?
A Yes, ma'am.
Q And in an arbitration hearing, you have an independent arbitrator who listens to testimony and evidence; correct?
A Yes, ma'am.
Q That arbitrator ruled that Ms. Betts had been wrongly fired and ordered her reinstatement. Correct?
A Correct.
Q Ms. Betts was reinstated. What does that mean?
A She's to be made whole and return back to





work. So back pay, full back pay for the time that she was not employed and full reinstatement after recertification.
Q After what? You broke up.
A I am sorry. After recertification.
Q What is recertification?
A With our officers needing to be certified in all 3 jurisdictions, we have to request recertification through the Maryland Police Training Commission for anyone that is reinstated.
Q If you can not get recertification, you can not resume your duties. Is that correct?
A Yes, ma'am.
Q With the arbitrator's decision for Ms. Betts to be reinstated, that was also a directive to WMATA to take what ever steps necessary to ensure her reinstatement. Correct?
A Correct.
Q The reinstatement ordered by the arbitrator, did it indicate a date by which Ms. Betts was to be reinstated?





A I believe... not that I... I believe it is immediate.
Q Was Ms. Betts immediately reinstated?
A No.
Q Can you please tell us why?
A I believe the arbitration agreement needs to be signed by all parties involved and there was a delay in Mr. Keating, (ph) the Union Attorney, signing the agreement.
Q So WMATA's testimony is that... it understood that the agreement was not in effect until all signatures were obtained?
A Yes, ma'am.
Q When did you get Mr. Keating's signature?
A I believe it was March 2nd or 3rd.
Q When was Ms. Betts reinstated?
A The 12th, I believe.
Q I am sorry. Say that again?
A I am sorry; March 12th.
Q Of 2015?
A Yes.





Q What was Ms. Betts able to do as of March 12th, 2015?
A While she was pending recertification, I believe she was placed in limited duty capacity in the parking lot.
Q Would that mean that on March 12th, Ms. Betts would have reported to work?
A Yes.
Q And who's duty was it to notify WMATA officials that Ms. Betts would be reporting to work?
A It would have been who ever was in charge of the administrative functions at that time. And I don't recall who that was then.
Q When Ms. Betts reported to work, she has to have identification. Correct?
A Yes.
Q She has to have keys?
A For the limited duty position?
Q To go to the bathroom for example. To access the restrooms?
A Yes. She would have needed keys.

Q Would she need a radio?
A It would be helpful; yes.
Q For reporting suspicious activity or anything like that?
A Yes, ma'am.
Q When Ms. Betts arrived on March 12th, 2015, she did not have identification. Correct?
A That is correct.
Q She did not have keys. Correct?
A That is correct.
Q She did not have a radio; correct?
A That is correct.
Q Did any WMATA official know to expect Ms. Betts on March 12th, 2015?
A I know she was listed on the schedule for District 1. I do not know what notifications were made that would allow her to be placed on the schedule.
Q So the way that you answered that, leads me to say that some notification had been made for her to get on the schedule?
A Yes. The schedule needs to be created and





the document I saw, Ms. Betts was on that schedule. So someone was notified. Who or by who....
Q So someone knew that Ms. Betts would have needed identification?
A Correct.
Q And someone knew that Ms. Betts would have needed keys.
A Correct.
MR. GUSS: You could....
MS. RUCKER: And someone - - I am sorry?
BY MS. RUCKER:
Q I am sorry. And someone knew that she would need a radio. Correct?
A Yes.
Q What did Ms. Betts report as to what happened when she reported on March 12th, 2015?
A I am sorry. I don't know what you mean, ma'am.
Q Didn't Ms. Betts advise WMATA that she arrived and was unable to function in her reinstated position?





Q Oh, yes. I believe she could not enter the District. And I believe she could not, like you stated earlier, could not use the facilities or enter, exit the parking lot.
Q Did Ms. Betts ever report for any assignment on March 12th?
A Yes. I believe she responded to District 1 for that limited duty assignment.
Q Do you know how she got there?
A Personal vehicle; I believe.
Q Is that how she was supposed to get there?
A Yes.
Q So all of these detectives use their personal vehicle?
A No. That limited duty position was not in CID.
Q So where she was going, anyone who went to that location had to use their personal vehicle?
A Limited duty assignments; yes, ma'am.
Q What are other limited duty assignments that WMATA has?





A There are parking lot assignments. You patrol the parking garages or parking lots and report suspicious activity.
Q And Ms. Betts was to use her personal vehicle and gas to do this for WMATA?
A Yes, ma'am.
Q Is there any kind of reimbursement or per diem, for individuals who have to use their personal vehicle, mileage and gas?
A Not that I am aware of, ma'am; no.
Q Just so I am clear. Any individual working limited duty assignment at the parking lot is required to use their personal vehicle and their personal gas?
A Yes, ma'am.
Q Did Ms. Betts also report that she was embarrassed and humiliated when she arrived on that day?
A Yes. I believe she could not enter and she felt that there was tension in the District, because the officers were not aware she was arriving.
Q Was there a fee or a charge to enter or exit the parking lot where Ms. Betts was assigned?

A Yes.
Q Was Ms. Betts required to pay that out of her personal pocket?
A Yes.
Q Is that something that every employee assigned to limited duty at that location was required to do?
A Yes, ma'am.
Q Is there a policy or procedure within WMATA, that directs that employees are to use their personal vehicles and funds when assigned for limited duty?
A I believe it is discussed with them when they are placed in a limited duty assignment by the administrative personnel.
Q My question is different. Is there a policy or procedure that speaks to having employees pay for their... to use their personal vehicle, gas and pay out of their personal funds?
A I don't believe it is stated.
Q To your knowledge, has any employee sent for light duty ever received reimbursement for any





expenditures associated with that?
A Not that I am aware of.
Q Are there policies and procedures, in your general orders, for how a person is to be reinstated?
A Not that I am aware of.
Q Is it WMATA's position that it complied with the reinstatement orders for Ms. Betts?
A Yes.
Q Why is that stated?
A We brought Ms. Betts back to work. We began a background process to get reinstatement started and without the completion of that background process, we were not able to finish the process to apply for recertification.
Q Was Ms. Betts' health benefits or other benefits restored to her upon reinstatement?
A I believe they were.
Q Do you know whether they were in fact?
A I do not.
Q Was that supposed to occur on her reinstatement?





A Yes, it would have needed to occur.
Q Would Ms. Betts... was she supposed to have her leave restored?
A Yes. She should have been made whole as of what she was before termination.
Q To your knowledge, was her leave restored?
A I am not sure; ma'am.
Q Can you tell me about WMATA's policies and procedures related to background investigations?
A Yes, ma'am. We follow the Maryland Police Training Commission standard. So any background that needs to be conducted on anyone over 90 days has to be a full background process. Anything prior to 90 days or shorter than 90 days will be a more truncated version of the background process. So Ms. Betts' situation would have been a full background as if she was a new hire.
Q And this process that you have just spoken about would not have had to occur had she not been away from the job for 90 days?
A That is correct.
Q Had Ms. Betts not been terminated, she would





not have had to go through this process again?
A That is correct.
Q Can you tell me what specifically was done in terms of conducting the background check for Ms. Betts?
A I believe they gave Ms. Betts the personal history questions, requested the documents that need notarization and the request for all other documents such as driving record, any college transcripts, references, criminal history; things of that nature.
Q In going back a moment to when Ms. Betts was trying to come back to work on I believe it was March 12th of 2015, couldn't she have been given an ID card that would have allowed her to enter - - to make entrance... to make - -
A Normal practice - - I am sorry, ma'am. I didn't mean to cut you off.
Q I was changing a word... to make entry.
A Normal practice is an employee would respond to the ID Office to pick up their ID.
Q And how about for getting in and out of the gate at the parking lot? Couldn't Ms. Betts have been

given an ID card to enter and exit?
A I think at the time they may have utilized Smart Trip Cards for that, but I am not 100% sure.
Q And if they had utilized that, she could have been given a card that would get her in and out of the parking lot?
A That is correct.
Q As a part of Ms. Betts' reinstatement, the notice of termination was supposed to be removed from her personnel file. Correct?
A Yes.
Q Was that done? Excuse me. Was that done?
A As far as I am aware; yes.
Q When was the last time you checked to see if it was done?
A I have not checked Ms. Betts' file.
Q So you don't know whether they actually ever did that?
A I do not.
Q And for the record, that they actually removed the termination from her record?





A Correct. I am not aware of that; ma'am.
Q When we are talking about people getting this recertification, I believe you testified that there are things that the individuals would have to do. Is there some kind of time that is given to the employee while they are on the record or the clock, in order to carry out what is needed?
A Yes. They usually give them several weeks to fill out the PHQ and get the attached documents. We routinely give extensions also, if needed to get some documentation.
Q And what my question was is are they paid while they are trying to gather information during work hours?
A Oh, I am sorry. Yes, yes, they are.
Q And if they were to pay, what ever the fees are, are they reimbursed?
A No.
Q And just so that I am clear. They are paid while they are trying to gather the information, but if they incur an expense associated with getting records or





documents, they are not reimbursed.
A That is correct, ma'am.
Q Was Ms. Betts in fact paid while she was trying to gather the information needed for recertification?
A As far as I am aware; yes.
Q Can you tell me what you know about William Burmingham getting recertification in going through a full background check?
MR. GUSS: Objection as to this being off topic. You can answer if you can.
MS. RUCKER: Well, I would disagree that it is off topic, but I thank you for letting him answer.
MR. GUSS: Well, again, I just want to state that it kind of is off topic, but okay. Go ahead and answer if you can, Deputy Chief.
THE WITNESS: I don't know much about that process. I don't know anything about his recertification process.
BY MS. RUCKER:
Q Let me ask you. Was he somebody who was





terminated?
MR. GUSS: Continuous objection.
THE WITNESS: I believe he was.
BY MS. RUCKER:
Q Was he reinstated? Is he currently an employee, for example, at WMATA?
A He is not an employee.
Q Was he reinstated at some point though, after being terminated?
A I believe he was.
Q Did Ms. Betts indicate any difficulty to WMATA that she experienced trying to get her recertification?
A Not that I am aware of. Um, I believe she was given opportunities to turn in the documentation and just failed to do so.
Q What do you base that belief on?
A The notes by back ground investigator Salsman.
Q What is the first name?
A Christin, C-H-R-I-S-T-I-N.

Q And what is the last name? Spell it.
A S-A-L-S-M-A-N.
Q And based on your review of the notes, from this individual, you believe what occurred, in terms of Ms. Betts' efforts to get reinstated?
A That Ms. Betts failed to turn in required documentation that she had received an extension from then Sgt. Roberto Stokes, S-T-O-K-E-S. And even had a meeting with Captain Gregory Hanna, H-A-N-N-A, regarding what would occur if she failed to turn in that documentation, which would be failure to obtain recertification.
Q Ms. Betts has contended that she was constructively discharged on or around May 6, 2015. What is WMATA's position with regard to that?
MS. GUSS: Objection. It is off topic. So he won't be answering that.
MS. RUCKER: You are instructing the witness not to answer?
MR. GUSS: Yes. It is off topic. We are not prepared to talk about it. It is not one of the





topics we were - -
MS. RUCKER: Number 30 is talking about the disparate treatment, which she was - -
MR. GUSS: Yeah, but it doesn't mention constructive discharge though, ma'am.
MS. RUCKER: I know. It doesn't mention it, but it doesn't mean it is off topic, if that is a part of what she has claimed in her complaint. As well as number 31. It talks about Defendant's awareness of Plaintiff's complaint of unfair and discriminatory treatment.
So just for the record, my question is related to Ms. Betts alleging that she felt that she was constructively discharged, which is part of the unfair and discriminatory treatment that she is alleging here. So I just would like to know what is WMATA's position regarding that.
MR. GUSS: Continuous objection that it is off topic. You can answer if you can, Deputy Chief.
THE WITNESS: I am sorry. I don't even know what constructive discharge means.





BY MS. RUCKER:
Q Well, I don't want to give you a legal definition, but I can ask you this way: Ms. Betts stopped working for WMATA eventually. Correct?
A Yes.
Q And why was that?
A What I reviewed was a resignation.
Q What was the reason for her resignation?
A I did not review the letter. I just know in the background investigation note; stated that Ms. Betts resigned.
Q And what background investigation are you speaking of?
A The notes that Ms. Salsman had put together.
Q Thank you.
And so it is WMATA's position - - well, why don't you tell me. What is WMATA's position as to why Ms. Betts no longer works there?
MR. GUSS: You - - if I can answer is she resigned.
MS. RUCKER: Well, you know you can't do





that.
MR. GUSS: You asked us both - -
MS. RUCKER: That is inappropriate. That is highly inappropriate. I am surprised at you.
MR. GUSS: You asked us both. You said one of us can answer. So I answered. She resigned.
MS. RUCKER: I don't know what your computer had you hear, but the questions that I have been asking have been directed, all day, to the witness. I would not dare ask you a question on the record. That is a real unfortunate incident there.
BY MS. RUCKER:
Q But I am asking you what is WMATA's position or understanding as to why she no longer works there?
A That Ms. Betts resigned from her position.
MS. RUCKER: Let's go off the record.
(Whereupon at 1:32 o'clock p.m. a break was taken, afterwhich the following occurred at 1:45 o'clock p.m.)
MS. RUCKER: Back on the record. I do not have any further questions. Thank you.
MR. GUSS: Okay. I have no questions. And

we will waive signature. Thank you, Deputy Chief.

THE WITNESS: No problem, sir.

(Whereupon, the deposition was concluded at 1:45 o'clock p.m.)

(By stipulation of counsel, in the Presence of the witness, reading and Signature waived.)





CERTIFICATE OF NOTARY PUBLIC/REPORTER

I, Sharon L. Banks, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me, that the testimony of said witness was taken by me in stenotype, at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision, that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

My Commission Expires January 31, 2027

Sharon L. Banks, C.R.
Notary Public in and for
THE DISTRICT OF COLUMBIA