CONFIDENTIAL

# M E M O R A N D U M

Metro Transit Police Department

SUBJECT: Letter of Termination DATE: March 6, 2014

FROM: MTPD – Chief Ronald A. Pavlik Jr.

TO: MTPD – Detective Amanda Betts

On Wednesday, February 19, 2014, an MTPD Official with the rank of Lieutenant asked you questions as part of an internal administrative investigation. You refused to answer or cooperate with the investigation. The Lieutenant ordered you to cooperate and advised you of the possible discipline to include termination if you failed to do so. You refused. On Thursday, February 20, 2014, the OPRI Commander, a Captain, interviewed you and asked you questions relating to an internal administrative investigation. The Captain advised you he was a ranking official, informed you that you had to cooperate and answer his questions, and informed you of the possible discipline up to and including termination if you refused. You acknowledged that you understood. You then refused to answer the questions or cooperate.

The internal investigation involved the improper storage of sensitive confidential criminal investigation files. You were asked questions that were directly and specifically related to your duties as a Detective with the Metro Transit Police Department. Two ranking MTPD Officials ordered you to cooperate and advised you of the consequences if you did not. You refused. You intentionally violated MTPD General Order 231, *Investigation of Employee Misconduct Allegations* and the MTPD Oath of Office.

The investigation was comprehensive and the report is sufficiently documented to support both its findings and recommendations. Accordingly, your employment with the Metro Transit Police Department is hereby terminated; effective immediately.

I have read the above report
and I am aware that a copy will
be placed in my personnel folder.

3/6/14 14:50

Date Time Signature

**LAW ENFORCEMENT SENSITIVE**
**NOT FOR GENERAL RELEASE**

# M E M O R A N D U M

Metro Transit Police Department

SUBJECT: Letter of Termination DATE: March 6, 2014

FROM: MTPD – Chief Ronald A. Pavlik Jr. [signature]

TO: MTPD – Detective Amanda Betts

On Wednesday, February 19, 2014, an MTPD Official with the rank of Lieutenant asked you questions as part of an internal administrative investigation. You refused to answer or cooperate with the investigation. The Lieutenant ordered you to cooperate and advised you of the possible discipline to include termination if you failed to do so. You refused. On Thursday, February 20, 2014, the OPRI Commander, a Captain, interviewed you and asked you questions relating to an internal administrative investigation. The Captain advised you he was a ranking official, informed you that you had to cooperate and answer his questions, and informed you of the possible discipline up to and including termination if you refused. You acknowledged that you understood. You then refused to answer the questions or cooperate.

The internal investigation involved the improper storage of sensitive confidential criminal investigation files. You were asked questions that were directly and specifically related to your duties as a Detective with the Metro Transit Police Department. Two ranking MTPD Officials ordered you to cooperate and advised you of the consequences if you did not. You refused. You intentionally violated MTPD General Order 231, *Investigation of Employee Misconduct Allegations* and the MTPD Oath of Office.

The investigation was comprehensive and the report is sufficiently documented to support both its findings and recommendations. Accordingly, your employment with the Metro Transit Police Department is hereby terminated; effective immediately.

I have read the above report
and I am aware that a copy will
be placed in my personnel folder.

3/6/14 14:50 [signature]

Date Time Signature

**LAW ENFORCEMENT SENSITIVE**
**NOT FOR GENERAL RELEASE**

CONFIDENTIAL

# M E M O R A N D U M

SUBJECT: Administrative Inquiry – Detective Amanda Betts; PRI 14-044

DATE: March 5, 2014

FROM: MTPD – Captain Kevin P. Gaddis KP Gaddis 03.05.2014

TO: MTPD – Chief Ronald A. Pavlik Jr. Ronald Pavlik

**Prologue:**

This investigation was initiated after Lieutenant Stephen BOEHM, Criminal Investigation Division (CID), notified me that Detective Amanda BETTS was uncooperative with an administrative investigation, ADM-028, on Wednesday, February 19, 2014. Lieutenant Boehm notified the Watch Commander, Captain Earl P. BROWN, and Detective Betts was placed on emergency suspension.

The purpose of this investigation is to determine if Detective Amanda Betts:

- Was insubordinate to a MTPD Official.
- Failed to cooperate with an internal administrative investigation.

**Observations:**

On Thursday, February 6, 2014, Sergeant Charles PAGE, CID, initiated an internal administrative investigation, ADM 14-028, regarding the improper storage of CID case files by Detective Alanna WATKINS and Detective Amanda Betts. Sergeant Page directed Detective Betts to prepare a written statement explaining why she was taking over 30 CID case files home or storing the files in the trunk of her and Detective Watkins' assigned MTPD vehicle. CID case files are sensitive criminal investigative files and contain confidential information. Detective Betts e-mailed an unsigned statement to Sergeant Page. After reviewing the statement, Sergeant Page prepared four follow up questions for Detective Betts to answer. Sergeant Page directed Detective Betts to sign her statement and answer the four questions he prepared. According to Sergeant Page, Detective Betts took approximately five hours to answer the four questions. The five hours Detective Betts used to answer the four questions took her to the end of her tour of duty. The four questions were:

1. *What is the purpose of taking home or leaving in the cruiser trunk over thirty active case files on a daily basis?*

Metro Transit Police Department

2. *Are you aware that most of your case files pertain sensitive information i.e., NCIC printouts and juvenile information?*
3. *Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and your case file is needed? You were out sick and we needed to access your case files, you advised you had them with you.*
4. *Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and accessible if needed by a supervisor and or other Detectives?*

Sergeant Page realized that the answers Detective Betts provided did not answer the four questions he had prepared. She wrote something down underneath each question and then she redacted what she wrote. She then wrote, "*See Attached Statement*." A copy of what she gave Sergeant Page is included in this investigation report (Attachment #1). Sergeant Page brought this matter to the attention of Lieutenant Boehm. As a matter of information, Detective Betts was on sick leave and days off during the time between February 6, 2014 and February 18, 2014.

On Wednesday, February 19, 2014, Lieutenant Boehm and CID Sergeant Sean FLINN met with Detective Betts in the CID sergeant's office. Lieutenant Boehm asked Detective Betts if she would like a shop steward present and she declined. Lieutenant Boehm provided Detective Betts a copy of the four questions Sergeant Page had prepared for her on February 6, 2014. Lieutenant Boehm informed her that the answers she provided to Sergeant Page on February 6, 2014, were not acceptable and she did not answer the questions posed to her. Moreover, he told her she could refer to her previous statement if she liked so she would not contradict herself.

Lieutenant Boehm directed Detective Betts to write her answers to the four questions under each typed question. Detective Betts refused Lieutenant Boehm's directive saying she already answered them. Lieutenant Boehm informed Detective Betts he (not Sergeant Page) was now asking her the four questions and he wanted her to answer them in writing. She again refused, and she wrote, "*See Attached Statement*" for her answer to the first typed question. Lieutenant Boehm explained to her that this was a separate interview from her interaction with Sergeant Page on February 6, 2014. Therefore, he needed her to answer the questions. Again, Detective Betts refused by saying she already answered them. Lieutenant Boehm told Sergeant Flinn to notify Captain Earl Brown, the Watch Commander, for advice on initiating an emergency suspension. Lieutenant Boehm advised Detective Betts that refusing to answer the questions he was going to ask would result in discipline up to termination.

After he asked again, Detective Betts again wrote under each of the four questions, "*See Attached Statement*." Lieutenant Boehm provided me a written statement documenting his interaction with Detective Betts (Attachment #2).

I asked Sergeant Flinn to provide a written statement regarding the interview with Detective Betts on Wednesday, February 19, 2014, (Attachment #3). Sergeant Flinn corroborated Lieutenant Boehm's version of events to include his admonishment to her that refusing to answer questions during an internal investigation could lead to discipline up to termination. Sergeant Flinn also witnessed Lieutenant Boehm inform Detective Betts that her answers of, "*See attached statement*, or *I already answered that*" did not properly answer the questions, and that they were not satisfactory. Lieutenant Boehm told her she could use her previous statement as reference material to answer the questions. Sergeant Flinn witnessed Lieutenant Boehm tell Detective Betts that she had to answer the questions and his request was an order. She still refused.

On Thursday, February 20, 2014, I interviewed Detective Betts in my office at the Jackson Graham Building. Present during the interview was Lieutenant Greg Hanna, Office of Professional Responsibility and Inspections (OPRI), and Officer Nathaniel HERBERT, shop steward. I recorded the interview (Attachment #4). Detective Betts told me she had been on the department for eight plus years and had been assigned to CID since June 2010. She went on to state that she had received training in interview and interrogation techniques. During the interview Detective Betts acknowledged that Lieutenant Boehm asked her to hand write the answers to four questions that were about "*work*." Lieutenant Boehm did give her original statement to her to reference, or as she stated, "not to trip her up." She stated over and over to me that she already answered the questions in her written statement. During the course of the interview Detective Betts maintained a defiant attitude and would not cooperate. She continued to stick to a script that she already answered the questions in her written statement. I explained to her that even if that was true, if a ranking official asked her to answer the question she still had to answer them, and that saying, "*I already answered it in my statement*" was not acceptable.

I explained to Detective Betts that I was a ranking official with the rank of Captain. I told her that she not only had to answer my questions, but she was compelled to answer them. I told her that I was ordering her to answer the questions. I then read the following admonishment to her from MTPD General Order 231, *Investigation of Employee Misconduct Allegations*:

- *This is an internal, administrative investigation only.*
- *You will be asked, and are required to answer all questions*

*specifically related to the performance of your duties and your fitness for duty.*

- *If you refuse to answer these questions, you are subject to discipline up to and including termination. You are also subject to discipline for knowingly giving false statements.*
- *Your answers are to be used only for internal administrative purposes and may not be used in any subsequent criminal prosecution, should such occur.*

I asked Detective Betts if she understood what I read to her, and that I was a ranking official, and that she had to answer my questions. She responded that she understood. After the above admonishment, I asked her seven different times to answer my questions. Each of the seven times she refused to answer my questions by sticking to her script of, "*I need to refer to my statement*" or some similar phrase.

**Conclusions:**

Detective Amanda Betts intentionally did not cooperate with an internal administrative investigation. She was uncooperative by not answering questions specifically related to her position as a detective when asked by two ranking officials: Captain Kevin P. Gaddis and Lieutenant Stephen Boehm. Both officials gave Detective Betts direct orders to answer the questions and cooperate. She refused. Moreover, besides compelling Detective Betts to answer the questions and cooperate with the investigation, both officials told her that she would be subject to discipline up to and including termination if she refused. She was admonished that the questions were specifically related to her duties as a detective with the Metro Transit Police Department. She still disobeyed.

Detective Betts was given numerous opportunities to cooperate with the internal investigation and answer the questions asked. She steadfastly refused by sticking to a rehearsed script that she would have to refer to her statement, or that she already answered the questions in her statement. The questions were simple questions that she should have been able to answer, but she continued to use stall tactics to obstruct the investigation. She intentionally tried to keep the question and answer session going in a circuitous back and forth exchange to avoid direct questioning. As she stated, she has over eight years on the department with almost four of those years as a detective. She has received training in interviewing and interrogation and she knows what a proper answer to a question should be.

Detective Betts, as an employee under investigation, does not dictate or decide

what an appropriate answer to a question is, nor does she get to decide that something she wrote in a previous statement is acceptable enough to preclude her from verbally answering a question. When conducting investigations, the investigating official has broad knowledge of the case and has reasons to ask employees certain questions to fill in the missing gaps of information. As Detective Betts is well aware, proper questions and answers are crucial parts of every investigation. If every employee under investigation used the same uncooperative tactics that Detective Betts used in this investigation, the integrity of the department would suffer along with the public the department serves.

**FINDINGS:**

CHARGE #1: Violation of General Order #231, Section III, A., 3. Investigation of Employee Misconduct Allegations, ("**Employees who withhold information from, are untruthful, or fail to cooperate with an internal investigation are subject to disciplinary action up to and including termination, in addition to any other disciplinary action that may result from the investigation.**").

SPECIFICATIONS: Lieutenant Stephen Boehm gave Detective Amanda Betts notice that she had to answer his questions. Lieutenant Boehm told Detective Betts the consequences if she did not properly answer his questions. Lieutenant Boehm ordered Detective Betts to hand write the answers to four prepared questions. Detective Betts refused numerous times to comply.

CLASSIFICATION: SUSTAINED

RECOMMENDATIONS: Termination

CHARGE #2: Violation of General Order #231, Section III, A., 3. Investigation of Employee Misconduct Allegations, ("**Employees who withhold information from, are untruthful, or fail to cooperate with an internal investigation are subject to disciplinary action up to and including termination, in addition to any**

CONFIDENTIAL

**other disciplinary action that may result from the investigation."**).

SPECIFICATIONS: Captain Kevin P. Gaddis gave Detective Amanda Betts notice that she had to answer his questions. Captain Gaddis told Detective Betts the consequences if she did not properly answer his questions. Captain Gaddis ordered Detective Betts to verbally answer four prepared questions. Detective Betts refused numerous times to comply.

CLASSIFICATION: SUSTAINED

RECOMMENDATIONS: Termination

CHARGE #3: Violation of the Metro Transit Police Oath of Office, (**"I will abide by the rules and regulations of the Transit Authority and I will obey my superiors in all lawful matters of duty performance."**)

SPECIFICATIONS: Two ranking officials, Captain Kevin P. Gaddis and Lieutenant Stephen Boehm, ordered Detective Betts to cooperate in an internal investigation. This cooperation included answering questions related to her duties as a detective. Detective Betts refused to cooperate numerous times.

CLASSIFICATION: Sustained

RECOMMENDATIONS: Termination

CONFIDENTIAL



# Metro Transit Police Labor Committee, Inc.

711 4th Street, N.W
Washington, D.C. 20001

RECEIVED ON 4/2/14 [illegible] G. Adams

| | |
|---|---|
| DATE: | 04/02/2014 |
| TIME: | 0800 HRS. |
| MEMBER'S NAME: | Detective A. BETTS |
| ADDRESS: | -ON FILE- |
| EMPLOYEE #: | -ON FILE- |
| WORK LOCATION: | EOD K9 |
| SHOP STEWARD'S NAME: | Detective Colin DORRITY |
| POLICE OFFICIAL NOTIFIED: | Captain K. GADDIS |
| TYPE OF GRIEVANCE: | Arbitration Invocation |
| UNION CONTRACT VIOLATION: | Article 11 (Excessive Discipline) & all others that apply |

FACTS OF THE CASE:

The Union received a step 3 grievance response from management regarding Detective BETTS' termination on April 1st, 2014. The Union does not consider the remedy satisfactory at this time.

Accordingly, the Union invokes arbitration regarding this matter pending a vote of the Executive Board of the Metro Transit Police Labor Committee. The Union contends that Detective BETTS' discipline was a violation of the Excessive Discipline article contained with the Collective Bargaining Agreement. **Have WMATA's Labor Representative contact the Union's attorney to move the arbitration process forward.**

Colin H. Dorrity
Chairman / Metro Transit Police Labor Committee, Inc.

# Metro Transit Police Labor Committee, Inc.

711 4th Street, N.W
Washington, D.C.20001

Received 3/11/14 L.S. Boehm

DATE: 03-11-2014
MEMBER'S NAME: Amanda Betts
PHONE: On File
ADDRESS: On File
EMPLOYEE #: On File
WORK LOCATION: Criminal Investigation Division

SHOP STEWARD'S NAME: Nathaniel Herbert
POLICE OFFICIAL NOTIFIED: Lt. Boehm

TYPE OF GRIEVANCE: Step 3
UNION CONTRACT VIOLATION: Article 11(Excessive Discipline)

FACTS OF THE CASE: On Thursday March 6, 2014, the undersigned submitted a "Step 2" grievance in this matter to Detective Sergeant S. Flinn. On Monday March 10, 2014 the undersigned was advised that the "Step 2" was denied.

On Thursday February 6, 2014 Detective Betts was ordered to give a written statement regarding the storage of CID case files by Detective Sergeant C.L. Page. Detective Betts complied with that order and gave her written statement in memo format to Detective Sergeant Page. After giving her initial statement, Detective Betts left the office to continue following up on some active cases and was called back to the office at the request of Detective Sergeant Page. Once Detective Betts arrived back at the office she was ordered to answer four additional questions regarding the same internal administrative investigation. Detective Betts complied with the order and typed her response to the questions presented to her. Detective Betts was ordered to remain in the office until relieved, which resulted in her being unable to eat lunch, and stay in the office thirty minutes past her regularly scheduled work time. Detective Sergeant Page reviewed all written statements provided by Detective Betts, and Detective Betts was allowed to leave for the day.

Detective Betts was on leave from Friday February 7, 2014 until Tuesday February 18, 2014. On Wednesday February 19, 2014 Detective Betts arrived at to begin her evening tour, which started at 1430. Lieutenant Boehm met with Detective Betts and ordered her to answer the same four questions that she previously answered on February 6, 2014, but in her handwriting. Detective Betts handwrote on the paper given to her by Lieutenant Boehm "See Attached Statement." Lieutenant Boehm immediately placed Detective Betts on "Emergency Suspension" and ordered her to report to OPRI on Thursday February 20, 2014.

CONFIDENTIAL



Detective Betts reported to OPRI on February 20, 2014 as ordered and met with OPRI Commander K. Gaddis and Lieutenant G. Hanna. After her interview with the aforementioned OPRI representatives, Detective Betts was placed on an indefinite suspension pending the outcome of the internal administrative investigation.

On Thursday March 6, 2014 Detective Betts was terminated. The MTPLC contends that MTPD management wrongfully terminated Detective Amanda Betts while a current grievance is active and at the pending "step 3" status. The MTPLC contends that Detective Betts, whose emergency suspension without pay was in the grievance process prior to her termination, did not afford her the ability to resolve the matter through the grievance process and was just about to enter step 2 in the process after receiving notification of the denial of the step 1 on Monday March 3, 2014. The MTPLC further contends information that would have been discussed had this been afforded is pertinent and directly related to Detective Betts termination allegations, and by terminating Detective Betts prior to the step 2 process and the step 3 hearing, the MTPLC was not afforded this contractual right.

REMEDY SOUGHT: The Metro Transit Police Labor Committee respectfully requests that Detective Betts be Detective Betts be immediately reinstated and returned to full duty and current discipline imposed be rescinded.

Nathaniel D. Herbert
Shop Steward/MTPLC

CONFIDENTIAL



# Metro Transit Police Labor Committee, Inc.

711 4th Street, N.W
Washington, D.C.20001

| | |
|---|---|
| DATE: | 03-04-2014 |
| MEMBER'S NAME: | Amanda Betts |
| PHONE: | On File |
| ADDRESS: | On File |
| EMPLOYEE #: | On File |
| WORK LOCATION: | Criminal Investigation Division |
| SHOP STEWARD'S NAME: | Nathaniel Herbert |
| POLICE OFFICIAL NOTIFIED: | ~~Sgt. C.L Page~~ S. Flinn Sgt 3-6-14 1707 HRS. |
| TYPE OF GRIEVANCE: | Step 2 |
| UNION CONTRACT VIOLATION: | Article 11(Excessive Discipline) |

FACTS OF THE CASE: On Monday February 24, 2014, the undersigned submitted a "Step 1" grievance in this matter to Detective Sergeant S. Flinn. The "Step 1" was denied.

On Thursday February 6, 2014 Detective Betts was ordered to give a written statement regarding the storage of CID case files by Detective Sergeant C.L. Page. Detective Betts complied with that order and gave her written statement in memo format to Detective Sergeant Page. After giving her initial statement, Detective Betts left the office to continue following up on some active cases and was called back to the office at the request of Detective Sergeant Page. Once Detective Betts arrived back at the office she was ordered to answer four additional questions regarding the same internal administrative investigation. Detective Betts complied with the order and typed her response to the questions presented to her. Detective Betts was ordered to remain in the office until relieved, which resulted in her being unable to eat lunch, and stay in the office thirty minutes past her regularly scheduled work time. Detective Sergeant Page reviewed all written statements provided by Detective Betts, and Detective Betts was allowed to leave for the day.

Detective Betts was on leave from Friday February 7, 2014 until Tuesday February 18, 2014. On Wednesday February 19, 2014 Detective Betts arrived at to begin her evening tour, which started at 1430. Lieutenant Boehm met with Detective Betts and ordered her to answer the same four questions that she previously answered on February 6, 2014, but in her handwriting. Detective Betts handwrote on the paper given to her by Lieutenant Boehm "See Attached Statement." Lieutenant Boehm immediately placed Detective Betts on "Emergency Suspension" and ordered her to report to OPRI on Thursday February 20, 2014.

CONFIDENTIAL



Detective Betts reported to OPRI on February 20, 2014 as ordered and met with OPRI Commander K. Gaddis and Lieutenant G. Hanna. After her interview with the aforementioned OPRI representatives, Detective Betts was placed on an indefinite suspension pending the outcome of the internal administrative investigation.

The MTPLC contends MTPD management wrongfully terminated Detective Amanda Betts while a current grievance is active and at the pending step 2 status. The MTPLC contends Detective Betts, whose emergency suspension without pay status is currently in the grievance procedure, was terminated prior to the MTPLC being able to present information at the step 2 & 3 level. The MTPLC contends information that would have been discussed had this been afforded is pertinent and directly related to Detective Betts termination allegations, and by terminating Detective Betts prior to the step 2 process and step 3 hearing, the MTPLC was not afforded this contractual right.

REMEDY SOUGHT: The Metro Transit Police Labor Committee respectfully requests that Detective Betts be immediately reinstated and returned to full duty and current discipline imposed be rescinded.

Nathaniel D. Herbert
Shop Steward/MTPLC

CONFIDENTIAL

PAGE 1 OF 1

# Metro Transit Police Labor Committee, Inc.

711 4th Street, N.W
Washington, D.C.20001

| | |
|---|---|
| DATE: | 02-21-2014 |
| MEMBER'S NAME: | Amanda Betts |
| PHONE: | On File |
| ADDRESS: | On File |
| EMPLOYEE #: | On File |
| WORK LOCATION: | Criminal Investigation Division |
| SHOP STEWARD'S NAME: | Nathaniel Herbert |
| POLICE OFFICIAL NOTIFIED: | Sgt. ~~C.L Page~~ S. Flinn S-5 2/24/14 0955 HRS. |
| TYPE OF GRIEVANCE: | Step 1 |
| UNION CONTRACT VIOLATION: | Article 11(Excessive Discipline) |

FACTS OF THE CASE: On Thursday February 6, 2014 Detective Betts was ordered to write a statement regarding an ongoing investigation in the Criminal Investigation Division by her immediate supervisor. Detective Betts complied with that order by giving the required statement. Detective Betts was on leave from Friday February 7, 2014 until Tuesday February 18, 2014. On Wednesday February 19, 2014 Detective Betts returned to work and was ordered to write another statement to answer the questions previously answered in her original statement. Detective Betts referred to her previous statement and was subsequently placed on Emergency suspension. On Thursday February 20, 2014 Detective Betts responded to the Office of Profession Responsibility and Investigations where her suspension was continued without pay pending the completion of the investigation.

REMEDY SOUGHT: The Metro Transit Police Labor Committee respectfully requests that Detective Betts be placed on a paid administrative status until the conclusion of the investigation.

Nathaniel D. Herbert
Shop Steward/MTPLC

CONFIDENTIAL

# M E M O R A N D U M

Metro Transit Police Department

SUBJECT: Step 3 Grievance Response
Former Detective Amanda Betts

DATE: April 1, 2014

FROM: MTPD – Lieutenant Gregory Hanna

TO: MTPD – Detective Colin Dorrity

This memorandum responds to the Step 3 grievance the union filed dated and received on March 11, 2014, alleging violation of Article 11 of the Collective Bargaining Agreement (CBA) between the Fraternal Order of Police and the Washington Metropolitan Area Transit Authority, as it relates to discipline issued to former Detective Amanda Betts. The discipline issued stemmed from former Detective Betts gross insubordination by refusing to answer questions and failure to cooperate with an administrative investigation on February 6, 2014, February 19, 2014, and February 20, 2014. The union contends that former Detective Betts was wrongfully terminated while a current grievance was active and pending at the Step 3 level for her suspension without pay status. The union contends that while former Detective Betts was on suspension without pay during the investigation, the termination did not afford her the ability to resolve the matter through the grievance process. Lastly, the union contends that information discussed during the grievance process would have been pertinent and directly related to her termination allegations.

On Thursday, March 27, 2014, the Step 3 was heard by Assistant Police Chief, Rodney Parks. Assistant Chief Parks conducted a careful review of the prima facia facts, the preponderance of evidence from the subsequent investigation, and noting that former Detective Betts lacked any new evidence to refute. The investigation was comprehensive and the report was found to sufficiently document both its findings and recommendations.

Based on the above, the Step 3 has been denied.

**LAW ENFORCEMENT SENSITIVE**
**NOT FOR GENERAL RELEASE**

WMATA000358

CONFIDENTIAL

# M E M O R A N D U M

SUBJECT: Step Two (2) Declination DATE: March 7, 2014

FROM: Lieutenant Stephen Boehm

TO: Shop Steward Nathaniel Herbert

The Step Two (2) regarding Detective Betts' grievance of Article 11 (Discipline) of the Agreement between the Washington Area Transit Authority (WMATA) and the Fraternal Order of Police (FOP) Labor Committee is being denied. Article 11, specifically Section 1(d) was followed. Detective Betts was given numerous chances to answer the questions provided and refused, even after being informed of the penalties for doing so.

Additionally, the Metro Transit Labor Committee (MTPLC) contends that they were not afforded the opportunity to present "information" at the Step 2 level. I am posing the follow questions; what is this "information" and why was it not included in the Step Two?

D-912
03/10/2014
@ 0915

Metro
Transit
Police
Department

LAW ENFORCEMENT SENSITIVE
NOT FOR GENERAL RELEASE

CONFIDENTIAL

# M E M O R A N D U M

SUBJECT: Step 1 Grievance Response
Detective Amanda Betts

DATE: March 3, 2014

FROM: MTPD – Sergeant Sean Flinn S. Flinn 5-5 3/3/2014 1043 hrs

TO: MTPD – Shop Steward Nathaniel Herbert

This memorandum responds to the Step 1 grievance the union filed dated February 21, 2014, and received on February 21, 2014, alleging violation of Article 11 of the Collective Bargaining Agreement (CBR) between the Fraternal Order of Police and the Washington Metropolitan Area Transit Authority, as it relates to Excessive Discipline. The union contends that Detective Betts answered the questions presented to her and that she should be put on a paid administrative status.

After a careful review, it is management's position that Detective Betts refused to cooperate with an official conducting an administrative investigation and that her current duty status is reasonable.

Based on the above, this Step 1 is denied.

03/03/2014 e
1045

Metro
Transit
Police
Department

**LAW ENFORCEMENT SENSITIVE**
**NOT FOR GENERAL RELEASE**

IN ARBITRATION

In the Matter of the Arbitration Between:
**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**

and

**FRATERNAL ORDER OF POLICE/METRO TRANSIT POLICE LABOR COMMITTEE, INC.**

Grievance of:
**Amanda M. Betts**
Termination

Before an Arbitration Panel:
M. David Vaughn,
Neutral Member
Justin P. Keating, Esq.,
Union-Appointed Member
Dan T. Pribich, Esq.,
Authority-Appointed Member

**OPINION AND AWARD**

This proceeding takes place pursuant to Article 10 of the 2008-2010 collective bargaining agreement (the "Agreement") between the Washington Metropolitan Area Transit Authority ("WMATA," the "Employer" or the "Authority") and the Fraternal Order of Police/Metro Transit Police Labor Committee, Inc.("FOP/MTPLC" or the "Union") (together, the Authority and the Union are the "Parties" to the proceeding) to resolve a grievance filed on behalf of Detective Amanda M. Betts ("Grievant") protesting her termination. The Parties were unable to resolve the dispute through the steps of their negotiated grievance procedure, and the Union invoked arbitration.

As provided in the Agreement, the dispute was presented to a Tri-Partite Arbitration Panel (the "Panel") for which M. David Vaughn was selected as the Neutral Member from the list of arbitrators then maintained by them, and Dan T. Pribich, Esq., and Justin P. Keating, Esq., were appointed as partisan Panel Members by WMATA and FOP/MTPLC, respectively.

A hearing was convened in Washington, D.C., on September 23, 2014, and reconvened on October 14, 2014. The Authority was represented in the hearing by Senior Labor Relations Officer Dan T. Pribich, Esq. and the Union by Justin P. Keating, Esq., of the law firm of Beins, Axelrod, P.C. At the outset of the hearing, the Parties stipulated that the matter is properly in arbitration and

before the Panel. The Parties were then afforded full opportunity to present witnesses and documents and to cross-examine witnesses and challenge documents offered by the other. Sergeant Charles L. Page, Lieutenant Stephen Boehm, Sergeant Sean Flinn, Deputy Chief Kevin P. Gaddis, and Chief Ronald A. Pavlik, Jr., testified at the call of the Authority. For the Union testified Detective (and FOP/MTPLC Vice Chairman) Christopher Archer and Grievant, who was present throughout the hearing and testified on her own behalf. All witnesses, were sworn but not sequestered. Joint Exhibits ("J. Ex. __") 1-7, Authority Exhibits ("A. Ex. __") 1-3 and Union Exhibits ("U. Ex. __") 1-3 were offered and received into the record. Court reporters were present at both days of hearing; by agreement of the Parties, the verbatim transcript (page references to which are designated as "Tr. __") which they caused to be prepared constitutes the official record of the proceeding.

At the conclusion of the hearing, the evidentiary record was complete. The Parties elected to close by written post-hearing briefs. The record of proceeding closed on December 10, 2014, upon receipt of both briefs. A draft Opinion and Award was circulated for the Panel's review. The Parties authorized additional time for the Panel to complete its work.

The Parties stipulated to the arbitrability of the grievance; the Panel finds the dispute to be properly before it, ready for decision. This Opinion and Award is based on consideration of the record and the arguments of the Parties.

**ISSUES FOR DETERMINATION**

The Parties agreed that the issues for determination are:

Did the Authority have just cause to terminate Grievant?
If not, what shall be the remedy?

CONFIDENTIAL

## RELEVANT CONTRACTUAL PROVISIONS

Article 9 (Grievance Procedure) of the Agreement (J. Ex. 1), in relevant part, provides:

> <u>Section 6.</u> In processing grievances against the Authority, the following steps shall be followed . . .
>
> * * *
>
> <u>Step 2:</u> If the grievance is not settled at Step 1, the Union shall file a written grievance with the supervisor designated by MTPD within seven (7) days of the Step 1 response. The written grievance shall contain a brief statement of facts describing the complaint, a statement of the provisions of this Agreement alleged to be violated, and a statement of the relief requested. The supervisor shall give a written response to the Union and to employees named in the grievance within seven (7) days after receipt of the written grievance.
>
> <u>Step 3:</u> If the grievance is not settled in Step 2, the Union shall file a written grievance with the Chief or his designee within seven (7) days after receipt of the Step 2 response. The parties shall meet within fourteen (14) days to try to resolve the grievance. The Chief or his designee shall give a written response to the Union and to employees named in the grievance within seven (7) days after the discussion.
>
> <u>Step 4:</u> If the grievance is not settled at Step 3, . . . the Union may invoke arbitration . . . In order to invoke arbitration, the Union will serve notice of intent to appeal to the Authority together with a written statement of the specific provisions of this Agreement at issue. . . .

Article 11 (Discipline) of the Agreement, in relevant parts, provides:

> Section 1. Disciplinary action is a means of correcting employee behavior in instances where there is a violation as outlined in Section 2 of this Article. MTPD may impose the following discipline:
>
> * * *
>
> (d) Emergency Suspension: . . . In any "emergency suspension" case, the relieved employee shall be given the opportunity to meet within twenty-four (24) hours or no later than the start of the next business day, with the supervisor who issued the suspension and the Chief or designee.
>
> * * *
>
> Section 2. The grounds for discipline include:
>
> * * *
>
> (b) Violation of any rules and regulations established by the MTP in the form of General Orders, Special Orders, Memoranda and Training Procedures.

Article 14 (Management Functions) of the Agreement, in relevant part, provides:

> Section 1. All management functions and rights which have not been expressly modified or restricted by a specific provision of this Agreement are retained and vested exclusively in the Authority, including but not limited to; the exclusive right, in accordance with its judgment, to reprimand, suspend, dismiss or otherwise discipline employees for just cause; . . .

CONFIDENTIAL

## FACTUAL BACKGROUND AND FINDINGS

### The Parties

The Authority operates the Washington, D.C., metropolitan area mass transportation system, including the bus and subway systems. The Union represents a bargaining unit of the Authority's public safety employees, including detectives, assigned to the Metro Transit Police Department ("MTPD"). At all times relevant to this proceeding, Grievant was employed by the Authority as a Detective, was a member of the bargaining unit and was covered by the Agreement. At the time of Grievant's termination, Sergeant Charles L. Page was her immediate supervisor and Lieutenant Stephen Boehm was her second-level supervisor.

### Authority Regulations

All MTPD officers are required to take an Oath of Office (J. Ex. 7) before assuming their positions. The Oath of Office includes vows to cooperate and to not tarnish the badge or uniform:

> I will abide by the rules and regulations of the Transit Authority and I will obey my superiors in all lawful matters of duty performance. I accept the police credential and shield as being representative of the special trust placed in me as a Metro Transit Police Officer.

The Authority has also developed and promulgated a General Order containing "procedures for accepting, processing, and investigating complaints of alleged employee misconduct." Section III (Procedures), Sub-section A (Basis for Discipline), of General Order #231 ("Investigation of Employee Misconduct Allegations") (J. Ex. 6), provides, among other things:

> Employees who withhold information from, are untruthful, or fail to cooperate with an internal investigation are subject to disciplinary action up to and including

termination, in addition to any other disciplinary action that may result from the investigation.

Section III, Sub-section F.4, provides that, during an investigative interview, an employee "will be given the following admonition":

a. *This is an internal, administrative investigation only.*
b. *You will be asked, and are required to answer all questions specifically related to the performance of your duties and your fitness for duty.*
c. *If you refuse to answer these questions, you are subject to discipline up to and including termination. You are also subject to discipline for knowingly giving false statements.*
d. *Your answers are to be used only for internal administrative purposes and may not be used in any subsequent criminal prosecution, should such occur.* [Emphases in original.]

It is undisputed that Grievant was familiar with and bound by these requirements.

**Grievant's Work History**

Grievant began her employment with the Authority on November 28, 2005. She completed her 10-month training and took her Oath of Office on September 26, 2006, as a Police Officer on midnight mobile patrol. (J. Ex. 2) She became a Detective assigned to the Criminal Investigation Division ("CID"), on June 13, 2010. (A. Ex. 2; Tr. 188). As a Detective, Grievant investigated criminal cases, creating and using case files for that purpose.[1]

---

[1]Case files contain confidential information, including photographs of and identifying information about suspects, witnesses and victims, as well as information from various law enforcement data bases. Detective Archer testified that he sometimes takes case files home, either to work on them or to have them in preparation for court the next day. He testified that he sometimes takes home "three to five [case files], give or take." (Tr. 183)

Grievant, with the exception of an excessive use of sick leave mostly related to her pregnancies and maternity, consistently received high evaluations across all categories throughout her employment. During Grievant's employment she used Family and Medical Leave ("FML") in 2008 (two months), 2011 (six months) and 2012-2013 (five months). (A. Ex. 2; Tr. 189)

**Grievant's Prior Criticisms of Management**

By a Form 5 dated April 29, 2013 (U. Ex. 2), Grievant filed a Charge of Discrimination ("Charge 1") against WMATA with the Equal Employment Opportunity Commission ("EEOC") based on race, sex, retaliation, disability, and hostile work environment. EEOC Charge 1 stated that, after she notified her supervisors, in May 2012, that she was pregnant, she was "harassed and treated differently than males and non-pregnant [female] employees with respect to requests for transfers to administrative and limited duty assignments, surrender of service weapon, and unfair performance evaluations." Grievant also stated that the discrimination was "[c]ontinuing."

At hearing, Grievant testified that, shortly after she returned from maternity leave in early 2013, she was given a poor performance evaluation. She testified that she appealed the evaluation – sending it to everyone in her chain of command as well as everyone in the administrative services chain of command – and was then disciplined for allegedly operating outside of her "chain of command" in pursuing the appeal. She further testified that she was given a "dereliction," a low level form of discipline, but that it was rescinded after a grievance was filed. (Tr. 195-96)

In EEOC Charge 1, Grievant also charged that she had "been harassed in retaliation for my participation as a witness in a prior charge . . . filed with EEOC by another party." She

CONFIDENTIAL

testified that EEOC charge was filed by Detective Alanna[2] Watkins and pertained to "an incident with her and a supervisor." (Tr. 197)

Grievant testified that, during her tenure with the Authority, she gave a number of statements - to EEOC, to the Office of Professional Responsibility Inspections ("OPRI") and to the Office of Inspector General ("OIG") - critical of MTPD Management and supervisors. She testified that, in 2012, she gave statements in connection with a joint investigation by OPRI and OIG into alleged misconduct in CID. She further testified that then Captain (now Deputy Chief) Gaddis, who was in charge of OPRI and interviewed her, was "more concerned with who the author of [a] complaint was" than with the hostile environment that she described and that she made statements to him that were "critical of [her] supervisors." (Tr. 198-200) Grievant also testified that she gave official statements to the EEOC that were critical of several of her supervisors, specifically including, Sergeant Page, Sergeant Vernon Clayton, Lieutenant Boehm and Lieutenant Gregory Hanna and was critical of Chief Pavlik with respect to her performance evaluation. (Tr. 200-201)

In its PHB, the Union states (p. 2), "The most recent correspondence related to that charge is the first page of Union Exhibit 2. It is dated January 3, 2014, just a few weeks before MTPD began the wheels rolling in the events that led to her termination. Given the evidence, the timing is not likely a coincidence." However, the January 3, 2014, letter from EEOC pertains to a subsequent charge filed by Grievant; it clearly states at the top that it relates to a different charge number (see the description of "Charge 2" contained in the section entitled "Subsequent Events." Nonetheless, the January 3 letter states that, "Because the document that you submitted to us constitutes a charge of employment discrimination, we have complied with the law

---

[2]There is some confusion in the record with respect to Detective Watkins' first name, which is variously described as "Linda" (Tr. 197), "Elena" (Tr. 218) and "Alanna" (Union PHB, pp. 3 and 7, and Captain Gaddis's Report of Investigation, J. Ex. 2). The Board has used "Alanna".

CONFIDENTIAL

and notified the employer that you filed a charge." Thus, the Union's suggestion that the Employer knew of this second Charge is likely true.

**Events Leading to the Grievant's Termination**

In December 2013, while Grievant was off work for an extended time period on medical leave, questions arose with respect to some open cases that she had been investigating. Sergeant Page testified that, when he contacted Grievant at home to ask about the status and whereabouts of the case files, she informed him that she had them, along with some other case files, and that he told her that was a problem because he and others in the office needed to review them. (Tr. 25-26) He further testified that he told Grievant that he wanted to arrange a meeting so that someone could "come out and pick her cases up, because she is not supposed to take the cases home and that's a hindrance for us moving forward investigating open cases." (Tr. 26) No meeting took place but Grievant returned to work a week or two later. Grievant testified that, when Sergeant Page contacted her, "he requested one specific case file" and that, "afterwards – I'm not sure if it was days or weeks, but afterwards, he did request all of my cases, and then I returned shortly after that." (Tr. 219) There is no assertion that Grievant failed to return all her files.

Sergeant Page testified that, in early February 2014, "numerous inquiries had come up and when we would go to look for cases, we couldn't find them." There was no written policy prohibiting or limiting detectives from taking case files home. However, Sergeant Page further testified that, on February 4, he made a roll-call announcement

> again letting everybody know that you are not supposed to take your cases out of the office, they are supposed to be made accessible, unless it's a case that you need for court. But they should be accessible at all times. [Tr. 27]

It is undisputed that Grievant was at that roll-call. However, Grievant testified that she recalled Sergeant Page advising "to leave cases that were in the adjudication process in the office. So I understood it to not mean all cases, just the ones that an attorney would call about." (Tr. 241-42)

On February 5, 2014, Sergeant Page began an unrelated administrative inquiry into the possible improper storage of case files by then-Detective Watkins, with whom Grievant was partnered that day. After Sergeant Page met with Detective Watkins, the latter asked Grievant to take Watkins to WMATA's Employee Assistance Program ("EAP"). (Tr. 202) Grievant testified that, when she returned to the office after taking Detective Watkins to EAP, Sergeant Page asked her why Detective Watkins had gone to EAP. She testified that, after she told Sergeant Page that she did not know why, he requested that she "write a statement as to why she [Detective Watkins] went to EAP, and then he gave me questions." (Tr. 203-204) She further testified that, after she turned in the statement, she and Sergeant Page had a conversation during which Grievant "said something to the effect that, I take my case files home." Grievant testified that, after her comment, Sergeant Page "request[ed] all of my files that I had in my possession." (Tr. 204) She further testified that she turned in all of her case files and left for the day. (*Id.*) Sergeant Page testified that she brought back a "stack of cases, 30, 35 cases or so," including "open cases, closed cases [and] suspended cases." (Tr. 23) The record is not clear how many of these case files involved open cases.

On February 6, 2014, Sergeant Page asked Grievant to provide a statement as to why she had so many case files in her personal possession. By an e-mail that day (12:07 p.m.) (J. Ex. 2), Grievant responded as follows:

> At the request of Sergeant Charles Page, I am to provide a statement as to why I, "take cases home or leave them

> in the car."[3] I, typically, take cases home that I am actively working on. My cases are usually loaded into the MTPD cruiser at the commencement of my tour of duty or when I leave the office, so as to work on them throughout the day, as well as assisting with calls for service. Furthermore, per Sergeant Charles Page, there is no established rule or regulation, stipulating that we are not allowed to take cases from the office.

At approximately 12:30 p.m., Sergeant Page contacted Grievant by telephone and instructed her to return to the office - she had left to get lunch - in order to sign her statement. (J. Ex. 2; Tr. 28-29 and 206) Sergeant Page testified that he told Grievant that she had to "come back immediately" to sign the statement and not to "have lunch first." (Tr. 43) The reason for the urgency of Sgt. Page's request is not apparent from the record. Sergeant Page further testified that, while he was waiting for Grievant to return to the office,

> I took a further look at the statement and realized that it didn't answer the initial question. I had my supervisor take a look at the statement and we composed four questions that we wanted her to answer due to the initial statement not answering the initial question. [Tr. 29][4]

Sergeant Page testified that he and Lieutenant Boehm then drafted four additional questions for Grievant to answer. (Tr. 29) He typed the four questions onto a single sheet of paper, with approximately one inch between each question, presumably space for her to answer them by hand directly on the page. (J. Ex. 2) Upon Grievant's return to the office, Sergeant Page gave her a hard copy of the questions. (Tr. 31) The questions were as follows:

---

[3]Sergeant Page testified that he instructed Grievant to "provide a statement on why she was storing case files in her vehicle." (Tr. 28)

[4]Actually, the import of Grievant's answer is in clear response to the question: Grievant said she takes cases home or leaves them in the car because she is "actively working on them."

1. What is the purpose of taking home or leaving in the cruiser trunk over thirty active case files on a daily base [sic]?

2. Are you aware that most of your case files pertain [sic] sensitive information i.e. NCIC printouts and Juvenile information?

3. Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and your case file is needed? You were out sick and we needed to access to [sic] your files, you advised, you had them at home with you.

4. Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and accessible if needed by a supervisor and or [sic] other Detectives?

The evidence does not establish that, at the time Grievant was given a copy of the questions on a single sheet of paper, she was told to answer the questions on the very sheet of paper as opposed to simply answering them with spaces between. She had this document in her possession for approximately four or five hours. During that period of time, she asked for time to eat lunch on at least three occasions, but was "directed to complete the statement" first. (J. Ex. 2; Tr. 212) The reasons for denying Grievant lunch are not apparent from the record. She was also instructed that she could not leave until she had completed and submitted her answers. Grievant testified that the instructions caused her to feel stressed and under duress.

Sergeant Page testified that, since there "were only four questions" and "the average person could have probably answered in 15, 20 minutes maybe," he "would periodically walk out of the office and just say, 'hey, are you about finished?' And the response she [Grievant] would give each time is 'almost.'" (Tr. 47)

Some time between 4:30 and 5:15 p.m. (Tr. 32 and 211), Grievant gave Sergeant Page her response, a typed document but not

the document Sergeant Page had handed her with the four questions and space for handwritten answers. Instead, it was a "Memorandum," signed and dated by Grievant, containing her recopied e-mail statement; an explanation of what she had done since 12:30 p.m., when Sergeant Page told her to return to the office; the four questions typed verbatim; a paragraph-long statement which she said was her answer to all four questions; and a statement that the "second statement is being given under duress." Her statement was as follows:

> Some case files are comprehensive, albeit [sic] in the CID office at the Metro Supply Facility or with a detective. As I recall, while out on a medical leave of absence, I was, initially, contacted by Sgt. Page regarding the upcoming case review with Assistant Chief Parks, and the "UNST" case. In response to Question #4, yes, I was present. From my recollection, Sgt. Page specified cases that were in the adjudication process.

When Grievant provided the Memorandum to Sergeant Page, she did not attach the original typed document with the four questions that he had given her. Sergeant Page testified that, since he "wanted that to accompany the paperwork so no one could say this isn't what I asked her," he instructed Grievant to give him the original document.[5] When Grievant retrieved the original document from her car and gave to Sergeant Page, he saw that she had thoroughly crossed out all of her handwritten answers. He testified that Grievant told him that they "were her personal notes and I didn't need to see them." (J. Ex. 2; Tr. 32-34). At hearing, Grievant testified that she blacked out her handwritten responses because she "used it as a draft to formulate the other typed document." (Tr. 209) She denied having been instructed to hand-write her answers or to use the sheet of aper provided. (Tr. 210) Sergeant Page then turned the documents over to Lieutenant Boehm "and he picked up the investigation at that point." (Tr. 34) The Panel

---

[5]The evidence is that Grievant retyped the questions verbatim in her Memo. There is no assertion that she mistyped the questions or omitted anything. Sergeant Page's concern is without basis.

notes that Lieutenant Boehm did instruct Grievant to hand-write her answers. (Tr. 234)

Grievant called in sick on February 7, 2014, and, after requesting assistance from EAP, was then absent from the office until 2:30 p.m. on February 19, 2014. (Tr. 213-14) Upon her return on February 19, 2014, Lieutenant Boehm and Sergeant Flinn met with Grievant; she declined to have a Union steward present. In the meeting, Lieutenant Boehm instructed Grievant to answer the same four questions, now contained on two sheets of paper with two questions each and space for handwritten responses, that Sergeant Page had given her on February 6. He also provided her with copies of her February 6 responses. (Tr. 91-92 and 215) Lieutenant Boehm testified that he gave Grievant her previous responses to "show[] her that she did not answer those questions by what she had previously written and now I needed her to answer them to me on the piece of paper written." (Tr. 66) Grievant, after reviewing the two new pages, said that "she had already answered them" and Lieutenant Boehm "explained to her again I did not feel that she answered those questions and now I would need her to answer them." (Tr. 67, 93 and 215)

There is no evidence that Lieutenant Boehm told Grievant why he believed she had not answered the questions and did not ask clarifying or follow up questions. He testified that he simply asked Grievant a number of times to answer the questions and that, eventually, he advised her that, "if she refused to answer these questions, it would lead to discipline, up to and including termination." It is undisputed that she then wrote "see attached statement" under each question and included a copy of her February 6 submission. (Tr. 67-68, 92-93 and 215) Grievant testified that it was her "understanding" that Lieutenant Boehm "just wanted them [the answers] handwritten." (Tr. 215) There had been no indication from Lieutenant Boehm that was the case and no indication that a hand-written response would have been more informative than the medium through which she answered.

Lieutenant Boehm, after becoming convinced that Grievant would not write anything more, received permission from Captain Earl Brown, the designated "Watch Commander," to place Grievant on emergency suspension without pay, which he did, and directed her to report to OPRI the next day. The "emergency" giving rise to the emergency suspension are not apparent from the record.

On February 20, 2014, at 9:00 a.m., Grievant arrived at the stated location for an interview with Captain Gaddis, head of OPRI, along with Lieutenant Hanna and a Union representative. Captain Gaddis testified that, prior to meeting with Grievant, he had been told that Grievant "was the subject of the investigation and that she was stonewalling the investigation by not cooperating." (Tr. 101) During the course of his interview, according to the Memorandum of Administrative Inquiry (J. Ex. 2), Captain Gaddis advised Grievant that he was conducting an internal administrative investigation, that he was a superior officer, that he was giving her a direct order, and that therefore "she was compelled," to provide verbal responses to the same four questions, and that her failure to respond could result in discipline up to and including termination.

Captain Gaddis then read to Grievant the "admonition" contained in General Order #231. Captain Gaddis, in the Memorandum of Administrative Inquiry, stated that, after he read the "admonition," he "asked her [Grievant] seven different times to answer my questions. Each of the seven times she refused to answer my questions by sticking to her script of, '*I need to refer to my statement*' or some similar phrase." (Emphasis in original.) (J. Ex. 2; Tr. 103-106) Captain Gaddis testified that, during the interview, Grievant was "[c]onfrontational, not cooperating, kept trying to write, trying to be distractive. I had to tell her a couple times quit writing, put that away, focus on me, answer the question." In addition to interviewing Grievant, Captain Gaddis received written statements from Lieutenant Boehm (dated February 27, 2014) and Sergeant Flinn (dated February 19, 2014) describing,

CONFIDENTIAL

in essence, what had happened in the interviews they had conducted. Captain Gaddis stated the following conclusions:

> [Grievant] intentionally did not cooperate with an internal administrative investigation. She was uncooperative by not answering questions specifically related to her position as a detective by two ranking officials: Captain Keven P. Gaddis and Lieutenant Stephen Boehm. Both officials gave [Grievant] direct orders to answer the questions and cooperate. She refused. Moreover, besides compelling [Grievant] to answer the questions and cooperate with the investigation, both officials told her that she would be subject to discipline up to and including termination if she refused. She was admonished that the questions were specifically related to her duties as a detective with the {MTPD]. She still disobeyed.
>
> [Grievant] was given numerous opportunities to cooperate with the internal investigation and to answer the questions asked. She steadfastly refused by sticking to a rehearsed script that she would have to refer to her statement, or that she already answered the questions in her statement. The questions were simple questions that she should have been able to answer, but she continued to use stall tactics to obstruct the investigation. She intentionally tried to keep the question and answer session going in a circuitous back and forth exchange to avoid direct questioning. As she stated, she has over eight years on the department with almost four of those years as a detective. She has received training in interviewing and interrogation and she knows what a proper answer to a question should be.
>
> [Grievant], as an employee under investigation, does not dictate or decide what an appropriate answer to a question is, nor does she get to decide that something she wrote in a previous statement is acceptable enough to preclude her from verbally answering a question. When conducting investigations, the investigating official has broad knowledge of the case and has reasons to ask employees certain questions to fill in the missing gaps of information. As [Grievant] is well aware, proper questions and answers are crucial parts of every investigation. If every employee under investigation used the same uncooperative tactics that [Grievant] used in this investigation, the integrity of the department

> would suffer along with the public the department serves. [J. Ex. 2]

Captain Gaddis recommended that Grievant be terminated for violating General Order #231 and the Oath of Office (*Id.*), based on the following three specifications:

> Charge #1 Specification
>
> Lieutenant Stephen Boehm gave [Grievant] notice that she had to answer his questions. Lieutenant Boehm told [Grievant] the consequences if she did not properly answer his questions. Lieutenant Boehm ordered [Grievant] to hand write the answers to four prepared questions. [Grievant] refused numerous times to comply.
>
> Charge #2 Specification
>
> Captain Kevin P. Gaddis gave [Grievant] notice that she had to answer his questions. Captain Gaddis told [Grievant] the consequences if she did not properly answer his questions. Captain Gaddis ordered [Grievant] to verbally answer four prepared questions. [Grievant] refused numerous times to comply.
>
> Charge #3 Specification
>
> Two ranking officials, Captain Kevin P. Gaddis and Lieutenant Stephen Boehm, ordered [Grievant] to cooperate in an internal investigation. This cooperation included answering questions related to her duties as a detective. [Grievant] refused to cooperate numerous times.

**Termination and Grievance**

Chief of Police Pavlik reviewed Captain Gaddis's report and concurred with his evaluation that Grievant had been uncooperative and should be terminated. By a memorandum dated March 6, 2014, the Authority terminated Grievant's employment based on the two violations of General Order #231 and the one violation of her Oath of Office. (*Id.*) A meeting was held thereafter, at which Deputy Chief Mark Olsen informed Grievant and her Union representative,

Detective Archer, that she was terminated. (Tr. 173-74) The record does not indicate exactly when this meeting took place – whether it was on March 6, 7 or even the 10th.

The Union filed a timely grievance at Step 2 with Sergeant Flinn, on March 6, 2014, to protest Grievant's emergency suspension as excessive.[6] (J. Ex. 3; Tr. 162) As a remedy, the Union requested that Grievant "be immediately reinstated and returned to full duty and current discipline imposed be rescinded."

By a memorandum dated March 7, 2014, but not received by the Union until March 10, 2014, Lieutenant Boehm denied the Union's Step 2 grievance with respect to Grievant's emergency suspension. (U. Ex. 1) By a Step 3 grievance on the suspension dated March 11, 2014 (J. Ex. 3), the Union noted Grievant's subsequent termination:

> On Thursday March 6, 2014 [Grievant] was terminated. The MTPLC contends that MTPD management wrongfully terminated [Grievant] while a current grievance is active and at the pending "step 3" status. The MTPLC contends that [Grievant], whose emergency suspension without pay was in the grievance process prior to her termination, did not afford her the ability to resolve the matter through the grievance process and was just about to enter step 2 in the process after receiving notification of the denial of the step 1 on Monday March 3, 2014. The MTPLC further contends information that would have been discussed had this been afforded is pertinent and directly related to [Grievant's] termination allegations, and by terminating [Grievant] prior to the step 2 process and the step 3 hearing, the MTPLC was not afforded this contractual right.

The Union also filed a timely grievance against Grievant's termination. Chief Pavlik testified that, at the time Grievant was terminated, he was aware of the pending grievance concerning her emergency suspension. He testified that, since Grievant's emergency suspension and termination were closely related, the

---

[6] The Union filed its Step 2 grievance with respect to Grievant's emergency suspension prior to, but on the same day as, Grievant's termination.

Parties agreed that the two should be "merged together." (Tr. 162-63) A Step 3 hearing on the termination was conducted by Assistant Police Chief Rodney Parks on March 27, 2014. According to a memorandum written by Lieutenant Hanna on April 1, 2014 (J. Ex. 4), Assistant Police Chief Parks denied the grievance at Step 3:

> Assistant Chief Parks conducted a careful review of the prima facie facts, the preponderance of evidence from the subsequent investigation, and noting that [Grievant] lacked any new evidence to refute. The investigation was comprehensive and the report was found to sufficiently document both its findings and recommendations.

The Parties were unable to resolve the dispute through the steps of the negotiated grievance procedure; and the Union invoked arbitration. This proceeding followed.

**Subsequent Events**

By a letter dated January 3, 2014 (U. Ex. 2), EEOC Investigator Maria J. Tolentino provided Grievant with an EEOC Form 5 containing

> a summary of your claims based on the information you provided. Because the document that you submitted to us constitutes a charge of employment discrimination, we have complied with the law and notified the employer that you filed a charge. Before we investigate your charge, however, you must sign and return the enclosed Form.

The Form 5 contains Grievant's signature with the date of March 18, 2014. (U. Ex. 3) This second Charge of Discrimination ("Charge 2") against the Authority is based on alleged retaliation and hostile work environment. Charge 2 stated that she believed that she was

> retaliated against based on being a witness [to a second EEOC case filed by Detective Watkins[7]]. On March 14,

[7]Grievant testified that, in this situation, Ms. Watkins "complained against a detective who was, at that time, her partner, and I had also, I guess, been the brunt of his jokes, and so I attested to that." (Tr. 197)

> 2013, in response to a previous performance evaluation appeal, I was given another evaluation with a lower score. Furthermore, on April 12, 2013, I was disciplined for going out of my chain of command when I complained.

Grievant's Charge 2 noted that,

> On February 20, 2014, I was placed on an [sic] suspension without pay and on March 6, 2014 I was discharged. The reason given for my discharge was failure to cooperate with an internal investigation.

The EEOC letter is dated January 3, 2014 (prior to Grievant's termination); however, the actual Charge of Discrimination is dated March 18, 2014 (subsequent to her termination).

## POSITIONS OF THE PARTIES

The positions of the Parties were set forth at the hearing and in their post-hearing briefs. They are summarized as follows:

**The Authority** argues that it had just cause to terminate Grievant. It contends that Grievant's several and repeated failures to cooperate with its investigation directly violated her duties as required by General Order #231 and her Oath of Office in ways that threatened the operations of the Department and the security of the information in the case files. WMATA asserts, in addition, that Article 14, Section 1, allows management to discipline "in accordance with its judgment" for just cause, and points out that Grievant was never asked to waive any immunity in the interviews with her superiors. Finally, it points to clearly established precedent that police officers must be held to a higher standard and that they may be dismissed for failing to cooperate in administrative investigations.

WMATA further argues that it is undisputed that Lieutenant Boehm ordered Grievant to answer the four questions in writing on February 19 and that Captain Gaddis ordered Grievant to answer the same four questions orally on February 20. It maintains that, on

both occasions, she was advised that, if she did not answer, she would be subject to discipline up to and including termination but that, despite the warning, she refused to answer the questions. The Authority contends that the record is devoid of any other instances in which its officers deliberately failed to answer questions in an internal administrative investigation after being ordered to do so by a superior officer.

The Authority further argues that Grievant tried to prevent, and was successful in preventing, a complete investigation of her treatment of CID files. It points out that Captain Gaddis testified that, had Grievant answered the questions fully and completely during his interview, he would have referred the matter back to Lieutenant Boehm to complete his investigation. (Tr. 137-38) WMATA asserts that Grievant never said that she did not understand the questions and that a cursory review of her written statements shows that she did not answer the four questions. It points out that Grievant was a trained police officer, with advanced training on interviewing and interrogation who has interviewed people as part of her everyday activity, who clearly knew and understood what constitutes a responsive reply but took every opportunity to be non-responsive and/or refuse to answer. The Authority maintains that Grievant's excuses – that she was being "harassed" (Tr. 218 an 235) or that she was "stressed" (Tr. 213, 226 and 231-32) – are not credible, pointing out that there was no such allegation in the written grievance or invocation of arbitration.

WMATA further argues that, on two separate occasions, Chief Pavlik ruled in favor of Grievant in appeals related to an evaluation and a disciplinary matter and that she provided no medical evidence to support her claim that she was "stressed." It maintains, in addition, that Grievant ignored the time-honored principle to "work now, grieve later."

Finally, as to the emergency suspension, the Authority argues that neither the grievance nor the invocation of arbitration

CONFIDENTIAL

alleges a violation of this contractual provision, *i.e.*, Article 11. It contends that Captain Gaddis met with Grievant within 24 hours of the imposition of the suspension, she was afforded an opportunity to present her side but continued to stonewall. It points out that Captain Gaddis testified that, if Grievant had fully answered the questions, he would have returned the matter to Lieutenant Boehm to complete the investigation and she would not have been recommended for dismissal.

WMATA urges that, in the absence of convincing evidence that Grievant did not know better or was somehow excused in her actions, it must be concluded that Grievant knowingly and willfully violated her duties as stated in the Agreement and that the grievance must, accordingly, be denied.

**The Union** argues that the Authority failed to meet its burden to prove just cause for its actions. It contends that MTPD failed to follow the contractual requirements for handling an Emergency Suspension and prematurely cut off the grievance process related to that suspension. It asserts, in addition, that the Authority infected the investigation by leaving it in the hands of the same people who had been the subjects of Grievant's previous complaints and that, in any case, the "investigation" was simply a pretext.

FOP/MTPLC further argues that, despite the Authority dismissing the issue, WMATA failed to comply with the contractual requirement, pursuant to Article 11, Section 1(d), that the suspending supervisor be present at the meeting with the Chief's designee immediately following an emergency suspension. Although the Union concedes that Grievant met with Captain Gaddis and Lieutenant Hanna within 24 hours of her emergency suspension, it maintains that Lieutenant Boehm and Captain Brown were conspicuously and inappropriately absent from the meeting. It contends that, with the presence of a supervisor with first-hand involvement in the situation, *e.g.*, Lieutenant Boehm, Captain Gaddis and Lieutenant Hanna could have played more of a mediative role in trying to resolve the conflict between Boehm and Grievant.

CONFIDENTIAL

It asserts that, instead, Grievant faced two officials who were multiple ranks above her and the meeting had the feel of an inquisition intended to rubber-stamp a decision already made to terminate her rather than a discussion aimed toward resolving the conflict.

The Union further argues that the Authority short-circuited the grievance process as well as Grievant's due process rights by terminating her before the grievance process with respect to the suspension could play itself out. It maintains, contrary to WMATA's contention, that it is not trying to arbitrate the separate grievance on the suspension, but that Grievant's termination was improperly used to cut off her due process rights in the suspension grievance. FOP/MTPLC points out that, during the meeting when Grievant was terminated, Detective Archer expressed to Deputy Chief Olsen the Union's frustration that, by preemptively terminating her, the Authority had not allowed Grievant to complete the grievance process on the suspension. It points out, in addition, that, hours earlier, Detective Archer told OPRI Sergeant Clayton, in an informal discussion, that Grievant would answer the four questions if Management would give her the Step 3 on her suspension but that Clayton replied that, at that point, it did not matter because Grievant was still going to be terminated. (Tr. 173-76) The Union notes that Grievant testified similarly - that, had she been given the opportunity at Step 3 of the suspension grievance, she would have answered the questions (Tr. 217) - contending that it is understandable how, between the meeting with OPRI after the emergency suspension and the day of the termination, Grievant could have come around to a different mind set, *i.e.*, that Management was doing all it could to get rid of her.

FOP/MTPLC further argues that, at Step 3 of the termination grievance, Detective Archer requested that Grievant be allowed to remain on unpaid suspension - in other words, at no cost to WMATA - while the grievance on her suspension and her EEO issues were resolved. The Union asserts that the Authority rejected his

request because it was more interested in terminating her than in resolving the issues at hand.

The Union further argues that WMATA's investigation of Grievant was conducted by the very people against whom she had previously made accusations of improper conduct. It maintains that MTPD should have assigned the investigation to an official who had not had previous negative dealings with her. FOP/MTPLC contends that any contention by the Authority that this complaint was made too late in the process is without merit because it is under no obligation to give notice of every contention it might put forth at arbitration or to interfere in the early stages of an administrative investigation where investigators have conflicts of interest.

FOP/MTPLC further argues that MTPD had decided by early 2014 to rid itself of Grievant, due to her numerous, previously registered, complaints against nearly all of her superiors and her association with another employee (Detective Watkins) who alleged harassment, and that its investigation was merely a pretext. It asserts that, if the Authority's investigation had been intended to get to the bottom of the issue rather than just to set up Grievant for termination, it would have proceeded to ask her questions in different ways or arrange for her to be interviewed by someone else with whom she might have had a more productive interaction.

The Union maintains, moreover, that there is no rule prohibiting detectives from taking home case files and there is nothing inherently wrong with doing so. It points out that, apparently, the only two detectives whose "take home" practices concerned Management were the two detectives - Watkins and Grievant - who had filed EEO charges against MTPD.

Finally, the Union argues that Grievant's easy volunteering of the fact that she was storing case files at home as proof that she felt this action was not in violation of her duties demonstrates that she and Sergeant Page had an honest misunderstanding, with the

latter believing he had cautioned Grievant against continuing to take them out of the office. It contends that the lack of any order in writing led Grievant to understand Sergeant Page's directive to her as only pertaining to times when she was on leave. FOP/MTPLC points out that Deputy Chief Gaddis testified that there are legitimate reasons for a detective to have some case files out of the office and asserts that the fact that Sergeant Page told detectives at roll call on February 4 that they should not be taking case files out of the office unless they were needed for court is an admission that his contention - that detectives should not take files out of the office - had not been made very clear prior to that date.

FOP asserts that Management had no clear idea of what steps other detectives took to secure case files or even how many case files other detectives were taking out of the office (Tr. 88 and 115) - Sergeant Page merely testified that taking out ten or more case files just did not "sound normal" (Tr. 40) - but that, since Management knew that Grievant's practice of taking files home or the manner in which she secured them outside the office would not justify discipline, supervisors found a different way to terminate her employment.

For all of these reasons, the Union urges that the grievance be sustained, that Grievant's termination be rescinded and that she be reinstated and made whole for all losses incurred.

**DISCUSSION AND ANALYSIS**

The burden of demonstrating just cause for Grievant's discipline rested with the Authority. For the reasons which follow, the Panel is persuaded that, while Grievant acted inappropriately in some aspects of the investigation, she did so only in response to blatant failures on the part of her superiors conduct a fair investigation, use proper procedures and deal properly with issues that easily could have been avoided or resolved informally, had such resolution been Management's purpose.

Accordingly, the Panel finds not only that just cause for Grievant's termination was established, but that no discipline should be imposed. The grievance must be sustained. The Award so reflects.

**Rules of Conduct**

In the Authority's exercise of its rights to establish and enforce rules of conduct, the Authority developed the Oath of Office and General Order #231 which apply to all sworn officers. The Oath of Office includes vows to cooperate and to not tarnish the badge or uniform. General Order #231 includes Section III, Sub-section A, stating that employees "who withhold information from . . . or fail to cooperate with an internal investigation" are subject to disciplinary action up to and including termination. It also includes Sub-section F.4, a four-sentence admonition given to employees during an investigative interview, informing the employee that he or she "will be asked, and [is] required to answer all questions specifically related to the performance of [his or her] duties" and that, if the employee "refuse[s] to answer these questions" or "knowingly giv[es] false statements," he or she will be "subject to discipline up to and including termination."

It is not contested that the Oath of Office and General Order are reasonable and reasonably related to the Employer's legitimate business objectives. The rules are not in contradiction of the collective bargaining agreement. In a command environment such as a police department, full cooperation by employees in internal investigations is crucial to the effective operation of the organization. The evidence establishes that Grievant was well acquainted with these rules. Therefore, the Panel holds her to have been on notice of the rules and procedures and responsible for complying with them.

## Procedural Issues

It is undisputed that Lieutenant Boehm, in the presence of Sergeant Flinn, informed Grievant on February 19, 2014, that she was being "emergency suspended" and that, as a result, she was to report to OPRI at 9:00 a.m. on February 20. On that date, Grievant met with Captain Gaddis and Lieutenant Hanna. Article 11, Section 1(d), of the Parties' Agreement provides that, in such cases, the relieved employee "shall be given the opportunity to meet within twenty-four (24) hours . . . with the supervisor who issued the suspension and the Chief or designee." Lieutenant Boehm was undoubtedly the "supervisor who issued the suspension." It could even be argued that Sergeant Page, who handed off the situation to Lieutenant Boehm, Sergeant Flinn, who was present during Grievant's discussions with Lieutenant Boehm on February 19, or Captain Brown, the designated Watch Commander who authorized the emergency suspension, was "the supervisor who issued the suspension." However, none of them was present on February 20. This was a clear violation of Article 11.

Inexplicably, the Authority contends that neither the grievance nor the invocation of arbitration alleges a violation of Article 11. In fact, both documents specifically identify the contractual violation as "Article 11 (Excessive Discipline." WMATA's contention is in error. The issue is properly raised and considered.

The failure to afford employees required due process is often sufficient to invalidate the discipline imposed on them. However, as noted by Professor James Oldham in *The Common Law of the Workplace*, National Academy of Arbitrators, Theodore J. St. Antoine, Ed., 2nd Ed. (BNA, Washington, D.C., 2005) at § 6.19: ". . . arbitrators hesitate to negate a penalty entirely because of procedural irregularities if they are satisfied the result was not a substantial injustice to the employee. In most cases arbitrators take the rule violations into account in assessing the appropriateness of the penalty but do not declare the entire action

a nullity." In the instant situation, the Union failed to demonstrate that this minor deviation from the contractual requirement had any actual negative impact on Grievant. Thus, the Panel concludes that overturning the discipline because the shortcoming at the emergency suspension phase is not an appropriate response to the Authority's violations Because they are not shown to have prejudiced Grievant or the Union.

The Union also contends that the Authority violated the Agreement and Grievant's due process rights by terminating her before the grievance process on her emergency suspension could be completed. There is nothing in the record to indicate that, in essence, the Authority is prohibited from completing a disciplinary process against an employee while he or she has an earlier disciplinary grievance pending. The Panel rejects the Union's assertion that the Authority improperly terminated Grievant prior to the Step 3 grievance on her emergency suspension. In any case, the Panel notes Chief Pavlik's testimony that, since Grievant's emergency suspension and termination were closely related, they should be "merged together," *i.e.*, consolidated. Although the Union argues that Management's collective memory on this issue was "fuzzy," it did not actually offer any evidence that contradicted Chief Pavlik's testimony.

The Panel is also not persuaded by the Union's contention that, by preemptively terminating Grievant, it denied Grievant opportunity to answer the four questions *if* Management had afforded her the Step 3 hearing on her suspension, as Detective Archer contended he told OPRI Sergeant Clayton that Grievant would. Grievant had been disciplined for her alleged failures to answer questions put to her. Again, the Panel is not convinced. Grievant's conduct which led to her suspension and termination was complete before the grievances were filed. Neither the Agreement, practice or common sense give her a "do-over" in the grievance process. While the grievance process can be used to compromise and resolve the dispute leading to a grievance, it is not a violation

of the contract if either Party fails or refuses to use the grievance process to "mediate" the dispute.

In any event, the Union never explained how Grievant's answers would have differed from those she gave earlier. Additionally, its contention is simply self-serving (on Grievant's behalf) and, in any case, would have been clearly "too little, too late." By the time Detective Archer allegedly made his offer, Grievant had already been given numerous opportunities to do exactly that - further answer the questions - by Page, Boehm and Gaddis. The Panel is not convinced that Grievant's answers were unresponsive and holds the failure of the investigators to identify the nature of Grievant's unresponsiveness by telling her how and why her responses were insufficient and/or by asking clarifying and follow-up questions. In this regard, see the discussion on the Merits, below. However, her answers were what they were and could not be undone by having her give different answers during the grievance process.

The Union's contention also contradicts the Union's most basic argument, *i.e.*, that Grievant had already answered the questions and, if Management needed something different, managers were obligated to clarify to her what they were looking for. The mere fact that Management not only emergency suspended Grievant but pursued her termination does not explain how Grievant "all of a sudden" realized that she had not fully and completely answered the four questions but was prepared, a month later, to answer them. Finally, neither the Union nor Grievant ever explained what was, or would have been materially different in her responses.

The Panel is also not persuaded by the Union's contention that the Authority should have assigned the investigation to an official who had not had previous negative dealings with her. The Panel notes, as an initial matter, that would have been difficult since the Union and Grievant acknowledged that, at one time or another, she had complained about every or almost every supervisor in her chain of command. (Tr. 200) The Panel finds of no consequence the

Union's contention that Chief Pavlik admitted that he knew that Sergeant Page had been the subject of one of Grievant's prior complaints. Chief Pavlik's knowledge of that fact simply demonstrates, not that the investigation was unfair, but that, within MTPD, Grievant's complaints were well known. In any case, the Panel notes that Sergeant Page did not conduct the investigation, so the fact that Grievant had complained about him did not affect the outcome. Finally, the Panel notes that the OPRI investigation was assigned to Captain Gaddis, who was *not* in Grievant's usual chain of command and was not among the many supervisors about whom she complained. To the extent that Grievant was not forthcoming with Captain Gaddis, the Union failed to explain why.

Finally, the Panel rejects the Authority's contentions that Grievant's excuses that she was being "harassed" or that she was "stressed" are not credible because neither was alleged in the written grievance or invocation of arbitration. Although it is apparent that neither was alleged in either document, the Parties' Agreement, contrary to WMATA's contention otherwise, does not require that either document contain them. Article 9, Section 6, requires a filing at Step 2 to "contain a brief statement of facts describing the complaint, a statement of the provisions of this Agreement alleged to be violated, and a statement of the relief requested." Similarly, at Step 4, the Union must "serve notice of intent to appeal to the Authority together with a written statement of the specific provisions of this Agreement at issue." Neither provision requires that the Union explain in advance the defenses it intends to utilize, nor does the Agreement set out the consequences for failure to meet any such requirement.

Having rejected the Union's procedural arguments, the Panel now turns to consider the merits of the dispute.

CONFIDENTIAL

**Merits**

The Parties' Agreement requires that the Employer prove just cause to support its discipline. For reasons set forth, the Panel finds that Grievant was not justly disciplined and that, in any event, invocation of the penalty of termination was arbitrary and excessive, connotative of improper motivation by Management.

The record establishes that the sequence of events leading to this proceeding began when MTPD began an unrelated administrative inquiry into another Detective's practice of taking case files home. The absence of case files from the CID office not only risks compromise the security of information contained therein, but also means that the files are not available to other detectives and supervisors and might, thereby, interfere with Department operations. However, MTPD has no written rule or regulation that prohibits Detectives from taking cases out of the office. Indeed, there is evidence that other detectives took case files home and that Management was aware of the practice. The fact that Sergeant Page made a roll-call announcement on February 4, 2014, which he described as telling Detectives that they were not supposed to take cases out of the office only implies that it was not an unusual practice for them to do so and that there was nothing in writing that prohibited it. Indeed, as indicated, the evidence is that detectives did regularly take files in order to work on the files out of the office, that Management was aware of such a practice and that, up until the February 4th announcement, it had never clarified any such policy.

Grievant, who was interviewed as part of that initial investigation, volunteered that she, too, took case files home or kept them in her police and/or personal vehicle. It was not clearly established what files Grievant had in her possession at the time she acknowledged having taken cases home or that she had more than she was working on. Thus, it is not clear that she actually violated an order not to take home and keep case files far more than what could actively be worked on at once. The Panel is

not convinced that there was any such general order. In any event, there is neither evidence or allegation that Grievant failed to perform her duties with respect to the processing of the files or that the files were compromised by her actions.

Management argues, however, that there was no need for Grievant to have so many case files - as many as 30 or 35, including open, closed and suspended cases - out of the office at the same time. That situation was not resolved; and, although the investigation against Grievant was also initiated as a result of her taking case files out of the office, ultimately, she was not disciplined for taking case files - no matter the number - out of the office. As described below, she was disciplined for not cooperating with the investigation which Management initiated following her admission.

As part of the investigation as to why Grievant had so many case files in her personal possession, Sergeant Page, after consulting with Lieutenant Boehm, drafted four questions which he asked Grievant to answer. The Panel is persuaded that these poorly worded questions - typed on one sheet of paper with an inch or so of space between them - were not phrased to elicit necessary information as to what she had done - she had volunteered that she had taken cases home - but to force Grievant to issue brief and incriminating responses.

The Panel notes that Grievant answered the questions. The reaction of Sergeant Page, when Grievant provided a separately typed sheet with a combined paragraph-long response to all four questions, implies that he and Lieutenant Boehm had designed the sheet with the questions in order to elicit answers on the sheet itself, although it appears that Sergeant Page never gave her a direct order to answer the questions in handwriting or to use the sheet he provided.

The record is clear that over the next two weeks the positions of both sides hardened: Sergeant Page, Lieutenant Boehm and,

ultimately, Captain Gaddis directed Grievant to provide answers to the four questions, threatening her with disciplinary action if she did not; Grievant repeatedly stated that she had answered the questions and refused to provide more than what she had done on February 6. The Panel notes that the admonition given to Grievant during the different stages of interrogation warn of discipline including termination for refusal to answer questions or for giving false statements. The record does not establish either that she refused or that she gave false statements.

Management may have believed that Grievant's written statements were non-responsive and inadequate. However, although supervisors repeatedly made clear to Grievant that they did not like her responses or considered them inadequate, no supervisor explained to her what their expectations for answers were or what in her response was inadequate and required supplementation or clarification. For example, Lieutenant Boehm testified that, on February 19, when he gave Grievant the four questions, now contained on two sheets of paper with two questions on each, he also gave Grievant her previous responses to "show[] her that she did not answer those questions by what she had previously written and now I needed her to answer them" and that, after Grievant said that "she had already answered them," Lieutenant Boehm "explained to her again I did not feel that she answered those questions and now I would need her to answer them."

As indicated, the evidence establishes that Grievant responded to the questions. Moreover, the Panel concludes that, contrary to Lieutenant Boehm's testimony, Grievant did not state that she understood that her previous answers were not responsive. More importantly, although Lieutenant Boehm states that he asked Grievant to clarify her responses to the questions three or four times, there is nothing in the record to indicate that he ever made his specific concerns – that he was "trying to figure out why she was taking these cases out of the office," that there was "sensitive information that should not be taken out of the office

. . . where . . . persons outside of law enforcement could have access to them" – explicit to Grievant.

Even the simplest interview techniques, such as stating what was unclear or insufficient in the responses, rephrasing the questions, asking more specific clarifying or follow up questions to follow up on her allegedly incomplete or unresponsive answers, were not utilized. These failures are particularly striking because the supervisors were experienced investigators. They knew how to elicit information not forthcoming through questions. At least three of the supervisors (four if Sergeant Flinn is counted) had opportunities to offer additional explanations to Grievant or to ask her different questions. None did so; instead, they simply repeated their directives, and continually threatening disciplinary action, purportedly seeking to obtain a different result. Such an environment could not have fostered true cooperation, as intended by the Parties' Agreement. Indeed, the Panel is not convinced that Management's handling of the situation reasonably advised Grievant what was expected of her in giving responses which would have satisfied Management.

Similarly, Captain Gaddis testified that, after he read the General Order #231 "admonition" to Grievant, he asked her seven different times to answer his questions but that, each time, "she refused to answer my questions by sticking to her script." True, perhaps, but it is clear that it was Management which was working from a script, as well. Although Captain Gaddis testified that Grievant was confrontational, uncooperative and distractive, the evidentiary record makes clear that she did provide answers to the questions and he never made clear to her what specifically in her response she needed to revise or further explain, and never used investigatory techniques to elicit the facts. Put bluntly, this was not a fair investigation to determine what happened and why, but to place Grievant in a catch 22: provide answers that could be used against her in some way not necessary clear, or not do so and be disciplined for failure to cooperate.

The Panel notes that Grievant, by refusing to revise her answers to the four questions, might have been found to have disobeyed her superiors in direct violation of the Agreement, her Oath of Office and General Order #231. Grievant, like all sworn officers, had an obligation to cooperate in the investigation and not to refuse to answer questions, withhold information or give false statements. Her failure and refusal to change or supplement her responses suggests that she knew she was being set up for discipline, regardless of the course she took. However, the total failure of Management to rephrase or ask Grievant follow-on questions or to explain what was insufficient by way of her responses reveals its intentions and mitigates her own shortcomings in the investigation. Management was obligated to advise her why it believed she was not cooperating in other than conclusory terms. It did not. The Panel is not convinced that her handling of the questions warrants discipline.

The Panel's determination that just cause was not established for Grievant's discipline includes consideration of whether the investigation leading to the discipline was fair and impartial - the Panel has concluded it was not - and whether the Grievant's responses were appropriate. The Panel concludes that they were not unreasonable and that any gaps Management believed to exist, could readily have been explained by Management. In assessing the penalty, the Panel has also considered Grievant's length of service, past disciplinary record and overall work record. It is undisputed that, with the exception of excessive use of sick leave, mostly related to her pregnancies and maternity, Grievant was a good employee. She consistently received high performance evaluations across all categories throughout her employment. Grievant lacked a history of performance, integrity or conduct problems which warranted Management's draconian handling of the investigation.

However, Grievant's prior criticisms of Management were extensive and well known. These included two charges filed with the EEOC, Charge 1 based on race, sex, retaliation, disability and

CONFIDENTIAL

hostile work environment and Charge 2 based on retaliation and hostile work environment; multiple formal statements and support for Detective Watkins in cases that she had filed; an appeal of a performance evaluation; and multiple statements to OPRI and OIG involving cases other than the instant matter. Grievant had made previous negative statements about virtually everyone in her chain of command. While these various complaints apparently did not result in findings against Management, they were undoubtedly unwelcomed by Grievant's chain of command. There is no evidence that they were unprotected or procedurally improper. These are relevant circumstances that the Authority failed to consider in assessing both the supervisors' conduct and motives and in responding to the grievances protesting the discipline. Indeed, the penalty invoked by Management is, itself, telling. The penalty of termination is saved for the most serious violations. The totality of the circumstances in this matter persuades the Panel that Grievant's conduct never was such a violation.

Grievant testified that she felt "harassed" and "stressed" by Management conduct toward her. The Panel is persuaded that her sensitivity was reasonable: For one reason or another, MTPD managers appear to have been determined to rid themselves of Grievant. The questions and investigation and the catch 22 they created was the chosen mechanism. Her supervisors' actions reflect animosity toward her. To be sure, regardless of their intentions, Grievant played into their efforts by her delays in responding and refusals to elaborate or clarify her responses. However, the Panel has concluded that, Managers' handling of the questions and investigation so overshadows any violation on Grievant's part as to render any discipline not for just cause.

**Conclusion**

The burden of proof of just cause has not been met. The grievance must be sustained. Grievant was terminated with undue haste, for contrived and insufficient reason and without just cause. The Award so reflects.

**Remedy**

Grievant was suspended without pay and then terminated. Her grievances, filed at the outset of the disciplinary process asserted lack of just cause for Management's actions, but did not specifically seek an economic remedy to accompany her reinstatement. The Agreement provides, at Article 9, Section 6, that grievances include a statement of relief requested; however, the Agreement does not, by its terms, attach any consequences to a failure to include a full range of remedy, nor does the Agreement divest the Panel of jurisdiction to award a remedy not included in the grievance. The presumed purpose of requiring a remedy is to ensure that the Employer understands what is at issue in the dispute. The Panel is not convinced that the Authority was unaware of the economic losses at issue or was prejudiced by the omission from the grievances of an issue of back pay. The Award reflects the Panel's assessment of the remedial consequences of its termination of Grievant.

- o -

CONFIDENTIAL

AWARD

The grievance is sustained. The Authority failed to prove that it had just cause to discipline Grievant, let alone terminate her.

The Employer shall rescind Grievant's termination. She shall be reinstated to her former position with seniority unimpaired, and shall be made whole for all wages and benefits lost, beginning from the time she was placed on emergency suspension. Her personnel record shall be amended so to reflect.

The Authority shall implement the Award within 30 calendar days from the date of its issuance.

Issued at Clarksville, Maryland, this 28th day of January, 2015.

M. David Vaughn,
Neutral Member

Justin P. Keating 3/3/15
Justin P. Keating, Esq.
Union-Appointed Member

Dan T. Pribich, Esq.,
Authority-Appointed Member
DISSENTS / SEE ATTACHED

CONFIDENTIAL

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**

**AND**

**FRATERNAL ORDER OF POLICE / METRO TRANSIT POLICE LABOR COMMITTEE, INC.**

**IN THE MATTER OF A BOARD OF ARBITRATION**

**CHAIR: M. DAVID VAUGHN, ESQ.**

**RE: GRIEVANCE OF AMANDA BETTS**

**DISSENTING OPINION**

The majority of the Board of Arbitration herein has determined that the Metro Transit Police Department (hereinafter referred to as the "MTPD") did not have just cause to discharge the Grievant from her employment as a sworn officer and Detective within the Criminal Investigation Division (hereinafter referred to as "CID") of the MTPD. The Grievant was discharged from employment for violating General Order #231, Section III, A., 3 on two separate occasions and for violating her Metro Transit Police Oath of Office. I offer my Dissent as the Authority appointed Arbitrator to the decision of the majority of the Board as I find that it was not supported by the factual record, arbitral treatise or appropriate case law.

The crux of this matter involves two interactions between the Grievant and ranking members of the MTPD command staff. On the first occasion the Grievant was presented four written questions concerning CID files assigned to her by the head of CID, Lt. Boehm. The record reflects that the Grievant admitted that the four questions pertained to her performance as a member of CID. (Transcript p. 240). The record also reflects that the Grievant admitted that she received an order from Lt. Boehm to answer those four questions during their interaction. (Transcript at p. 233). The Grievant further acknowledged that she understood that Lt. Boehm wanted to her to hand write her answers right then and there on the piece of paper containing the four written questions. (Transcript at p. 233-234).

During her testimony the Grievant stated that Lt. Boehm advised her that if she failed to cooperate that she would be subject to discipline up to and including termination. (Transcript at p. 234). At Hearing the Grievant admitted that she did not write her answers on the paper as ordered but instead wrote "See attached statement" after each question. (Transcript at p. 233). The "attached statement" refers a paragraph written by the Grievant almost two weeks prior to this meeting with Lt. Boehm. Lt. Boehm informed her that the paragraph submitted previously was not responsive and ordered her to now write answers to these questions on the paper provided. (Transcript at p. 66-68). The Grievant refused to write anything else.

The Grievant's conduct precipitated a meeting with the Office of Professional Responsibility and Investigations (hereinafter referred to as "OPRI"). The next day the Grievant along with her Union representative met with then Captain, now Deputy Chief Gaddis. (Transcript at p. 235). At that meeting, which was recorded and entered into evidence, Captain Gaddis asked, then ordered the Grievant to

verbally answer the same four questions. (Transcript at p. 235). Captain Gaddis advised her that this was an administrative investigation, that he was her superior officer and that if she refused that she would be subject to discipline up to and including termination. (Transcript at p. 236). The Grievant admitted at Hearing that she refused to answer the questions. (Transcript at p. 235).

The Grievant was charged with violating the following provision of General Order #231:

**"Employees who withhold information from, are untruthful, or fail to cooperate with an internal investigation are subject to disciplinary action up to and including termination, in addition to any other disciplinary action that may result from the investigation."**

The record cited, which consists of the Grievant's admissions under oath at Hearing, confirms her violations of the General Order. Her failure to abide by the cited rule and her failure to obey her superiors when ordered to answer also violates her Oath of Office. It must be noted that at Hearing, under cross examination, the Grievant simply answered three of the four same questions by saying "yes". (Transcript at p. 230-235). She answered the fourth question by admitting that she had the thirty plus files in her car because she was behind on her work. (Transcript at p. 230). She did not answer those same questions either in writing or verbally when ordered to by Lt. Boehm or Captain Gaddis. This is clear evidence on the record that the Grievant violated G.O. #231. She simply refused to answer Lt. Boehm or Captain Gaddis after receiving the orders to answer the same four questions.

The majority of the Board chose to disregard this factual record of violations in favor of an unsubstantiated story of animus on the part of the MTPD towards the Grievant. Despite never alleging this animus in any of the Grievance documents or the invocation of Arbitration, the Grievant maintains that the reason she did not answer was that she felt she was being "targeted" or "harassed". (Transcript at p. 234-235). Yes, she was a target of an administrative investigation based on her conduct but the MTPD told her that she was the subject of an administrative investigation. Her evidence of this "animus" was that she filed EEOC complaints in the past. Curiously neither the investigating officer (Captain Gaddis) nor the discharging official (Chief Pavlik) were named in any of her previous EEOC complaints. Additionally there have been absolutely no findings against WMATA, the MTPD or its officials as a result of her complaints. The Grievant and the Union could not provide any evidence of misconduct by Captain Gaddis or Chief Pavlik and had to admit that Chief Pavlik had ruled in her (the Grievant's) favor on several issues in the past. (Transcript at p. 196, 224 ).

The majority of the Board, in relying on the animus theory, also ignored the status of the law as determined by the U.S Supreme Court. In the **University of Texas Southwestern Medical Center v. Nassar,** 133 S. Ct. 2517 (2013), the Court held that the allegation of retaliation in Title 7 (the EEOC claims of the Grievant):

**"require proof that the desire to retaliate was the but-for cause of the challenged employment action. See Gross, supra, at 176. "**

The U.S Supreme Court **rejected "the motivating factor" causation standard for retaliation claims** and concluded that a heightened causation standard is the correct standard to (among other reasons)

CONFIDENTIAL

**reduce the number of frivolous claims.** In the present matter the Grievant admitted that it was her unsolicited admission concerning her conduct regarding the CID files that started the administrative inquiry. (Transcript at p. 204, 224). There was absolutely no proof offered by the Union or Grievant that the desire to retaliate for filing EEOC claims was the cause of the discipline of the Grievant.

Finally the majority of the Board also chose to ignore one time honored and true premise of labor relations, "work now, grieve later". If the Grievant felt that the questions were a violation of the CBA then it was incumbent upon her to answer and comply with the orders, then file a grievance challenging the action. Obviously she did not answer and her conduct prevented the administrative investigation from continuing. The majority of the Board has determined to endorse her conduct, disregard the facts and law and rely on unproven allegations of animus to reinstate the Grievant. Additionally the majority chose to award back wages despite the failure to name and seek that remedy in the grievance process as is required by the terms of the collective bargaining agreement. Based on the foregoing record and law I must dissent.

Dan T. Pribich
Authority Appointed Arbitrator

CONFIDENTIAL

# Allegations and Investigations Disposition

Tracking Number: ACC #14-028

Employee name: Amanda Betts

Assignment: Criminal Investigation Division

Synopsis of allegation: Detective Betts failed to update her Report of Investigation's within on weeks' time of assignment.

This investigation is complete; the final report includes the following conclusion:

- ❑ *Unfounded* - the allegation was determined to be false or not factual or that you were not involved.
- ❑ *Not Sustained* - insufficient evidence is available to prove or disprove the allegation.
- ❑ *Exonerated* - the event occurred but was lawful.
- X *Sustained* - the evidence is sufficient to support the allegation.

Employee's Signature and Date: ______________________________

Supervisor: Sergeant Charles Page

CONFIDENTIAL

# Allegations and Investigations Disposition

Tracking Number: ACC #14-028

Employee name: Amanda Betts

Assignment: Criminal Investigation Division

Synopsis of allegation: Detective Betts failed to safeguard NCIC and Juvenile printouts ensuring confidentiality of information.

This investigation is complete; the final report includes the following conclusion:

- ❑ *Unfounded* - the allegation was determined to be false or not factual or that you were not involved.
- ❑ *Not Sustained* - insufficient evidence is available to prove or disprove the allegation.
- ❑ *Exonerated* - the event occurred but was lawful.
- X *Sustained* - the evidence is sufficient to support the allegation.

Employee's Signature and Date: ______________________________

Supervisor: Sergeant Charles Page

CONFIDENTIAL

# Allegations and Investigations Disposition

Tracking Number: ACC #14-028

Employee name: Amanda Betts

Assignment: Criminal Investigation Division

Synopsis of allegation: Detective Betts failed to respond to the lawful order of any supervisor.

This investigation is complete; the final report includes the following conclusion:

- ☐ *Unfounded* - the allegation was determined to be false or not factual or that you were not involved.
- ☐ *Not Sustained* - insufficient evidence is available to prove or disprove the allegation.
- ☐ *Exonerated* - the event occurred but was lawful.
- X *Sustained* - the evidence is sufficient to support the allegation.

Employee's Signature and Date: ______________________________

Supervisor: Sergeant Charles Page

CONFIDENTIAL

# M E M O R A N D U M

SUBJECT: Letter of Reprimand

DATE: March 04, 2014

FROM: MTPD – Chief Ronald A. Pavlik Jr.

TO: MTPD – Detective Amanda Betts

A review of the attached investigative report indicated that on February 5, 2014 you had in your vehicle over thirty five case files. You failed to follow a direct order given on two different occasions to ensure your case files are accessible in the office.

You are advised that the disciplinary action imposed in this instance may impact unfavorably on possible future opportunities as well as your selection for special assignments. Future incidents could result in progressive discipline to include termination from the force.

In the future, you will be expected to upgrade your performance and sense of responsibility to levels required of a sworn member of the Metro Transit Police Department.

Metro Transit Police Department

LAW ENFORCEMENT SENSITIVE
NOT FOR GENERAL RELEASE

CONFIDENTIAL

# M E M O R A N D U M

SUBJECT: Letter of Suspension DATE: March 04, 2014

FROM: MTPD – Chief Ronald A. Pavlik Jr.

TO: MTPD – Detective Amanda Betts

Metro Transit Police Department

A review of the attached investigative report indicated that on February 5, 2014, you had in your vehicle over thirty five open case files, some dating back to 2011 with no Report of Investigation completed. The Criminal Investigation Division Case Management SOP states ROI's will be updated within one week's time.

The investigative report was both comprehensive and is sufficiently documented to support both its findings and recommendation. I have therefore approved the recommendation that you receive a one (1) day suspension without the benefit of pay or compensation. You will serve your one (1) day suspension on Tuesday, March 25, 2014.

You are advised that the disciplinary action imposed in this instance will impact unfavorably on possible future opportunities as well as your selection for special assignments. Continued instances of malfeasance will result in progressively more severe discipline to include termination. In the future, you will be expected to upgrade your performance and sense of responsibility to levels required as a Metro Transit Police Detective.

I have read the above report
and am aware that a copy will
be placed in my personnel folder.

____________________ __________________________________________

Date Signature

LAW ENFORCEMENT SENSITIVE
NOT FOR GENERAL RELEASE

CONFIDENTIAL

# M E M O R A N D U M

SUBJECT: Letter of Suspension DATE: March 04, 2014

FROM: MTPD – Chief Ronald A. Pavlik Jr.

TO: MTPD – Detective Amanda Betts

A review of the attached investigative report indicated that on February 5, 2014, you had in your vehicle over thirty five open case files, some dating back to 2011. Multiple NCIC and Juvenile printouts were with some case files. GO 405 states printouts will be safeguarded to ensure confidentiality of information.

The investigative report was both comprehensive and is sufficiently documented to support both its findings and recommendation. I have therefore approved the recommendation that you receive a one (1) day suspension without the benefit of pay or compensation. You will serve your one (1) day suspension on Wednesday, March 26, 2014.

You are advised that the disciplinary action imposed in this instance will impact unfavorably on possible future opportunities as well as your selection for special assignments. Continued instances of malfeasance will result in progressively more severe discipline to include termination. In the future, you will be expected to upgrade your performance and sense of responsibility to levels required as a Metro Transit Police Detective.

Metro Transit Police Department

I have read the above report
and am aware that a copy will
be placed in my personnel folder.

_______________ Date

_______________ Signature

CONFIDENTIAL

# MEMORANDUM

Metro Transit Police Department

SUBJECT: Administrative Inquiry
Detective Amanda Betts
ADM#14-028

DATE: March 04, 2014

FROM: MTPD – Sergeant Charles Page

TO: MTPD – Deputy Chief Erhart Olson
MTPD – Captain Julious Byrd
MTPD – Lieutenant Stephen Boehm

Acting Bureau Commander Lt. S. Boehm

**PROLOGUE:**

This inquiry was initiated on February 6th, 2014 when an investigation was being conducted as to where Detective ALANNA WATKINS was keeping her case files. The Writer (DETECTIVE SERGEANT CHARLES PAGE) asked DETECTIVE AMANDA BETTS whether she had observed Detective Watkins placing case files into her assigned MTPD cruiser and personal vehicle. Detective Betts volunteered that she also takes case files home on a daily basis and further advised me that she would sometimes store them in the trunk of her vehicle. Detective Betts further advised that she currently had some case files in her car. The purpose of this investigation is to determine whether Detective Betts violated NCIC protocol and also disobeyed a direct order by:

- Transferring multiple case files home and storing them in the trunk of her personal vehicle or cruiser.

**OBSERVATION:**

On December 16, 2013 Detective Betts advised me that she would possibly be out for extended leave; (Leave Without Pay (LWOP.) On December 20, 2013 This Writer spoke with Detective Betts via phone and advised her that case files should be maintained in the office to allow access to them in the event she is out for an extended period of time. I instructed Detective Betts to call me back to make arrangements to have her case files returned to the Criminal Investigation Division (CID). Detective Betts did not make arrangements to return the case files, however she eventually dropped a couple of case files off at the office.

On February 4, 2014, during roll call all Detectives were directed to make sure their case files are accessible in the office in the event case files were needed by a supervisor, or a fellow Detective for information purposes. Detective Betts was in attendance and acknowledged hearing this order.

On February 05, 2014, while conducting a separate investigation, Detective Betts volunteered information to me, stating she normally takes case files home to type them up and also stores case files in the trunk of MTPD issued Police vehicles. I reminded Detective Betts that I had a phone conversation with her back in December reference taking case files home and also addressed her the day prior in roll call. Detective Betts acknowledged that she had attended that particular roll call and she stated "Oh, I remember Cooper brought it up in roll call."

Detective Betts advised she had a stack of case files presently in, "the car." I advised her to go and retrieve them. Approximately five minutes later, Detective Betts returned to the Sergeants' office with a large stack of case files. I further instructed her to leave them on SERGEANT SEAN FLINN's desk and I would advise her when she could pick them back up.

A review of the case files revealed Detective Betts had in her possession thirty five (35) case files. A large majority of these case files did not have Reports of Investigations (ROIs) attached, some case files were dated back as far as June 2011. I advised LIEUTENANT STEPHEN BOEHM of these findings and provided him the case files for review as well. Lt. Boehm conducted an internal audit of all case files and the results are attached, video documentation also included (Attachment #1).

On February 6th, 2014, I directed Detective Betts to provide a written statement explaining why on a daily basis, she took over thirty case files home and stored them in the trunk of her vehicle or Detective Watkins' assigned vehicle. Detective Betts emailed me her statement and left the office (Attachment #2). I noticed upon review of her statement Detective Betts left the office without signing her statement. I called Detective Betts on her cell phone and advised her to return to the office to sign her statement. Detective Betts stated she was going to get something to eat and then return. I ordered her to return, finish her statement, and then go get something to eat. Detective Betts advised that she would be back shortly. After reviewing her statement, I composed four questions for Detective Betts to answer, in order to gain more specific answers. Upon her arrival at approximately 1200 hours, the writer advised her to sign her statement and also advised her to answer the four questions.

- What is the purpose of taking home or leaving in the cruiser trunk over thirty active case files on a daily base.
- Are you aware that most of your case files contain sensitive information ie, NCIC printouts and juvenile information?
- Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and your case file is needed? You were out sick and we needed to access your case files, you advised you had them at home with you.
- Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and

accessible if needed by a supervisor and or other detectives?

Detective Betts took approximately five hours to reply to the four questions. At the conclusion of her tour of duty at 1630 hours, Detective Betts emailed her statement and handed me a typed response which did not answer the provided questions. I asked Detective Betts where the sheet of paper that contained the Question and Answer (Q&A) questions. Detective Betts told me she wrote the questions over and took the sheet of paper I gave her to her car. I reminded her that she was supposed to write the answers on the sheet of paper and not rewrite them. Detective Betts then left the office and returned with the original Q & A sheet that I gave her to answer, however she scratched out all of her responses and stated that she wrote personal notes on the Q & A sheet and did not want me to see what she wrote. I advised Detective Betts to attach the sheet to her statement, sign it and then check off (attachment #3). I provided her response to Lieutenant Boehm.

Upon review, Lieutenant Boehm advised that Detective Betts had not answered any of the questions asked. Lieutenant Boehm advised that he would question Detective Betts during her next available tour. I provided Lieutenant Boehm with the questions and her written response.

On Wednesday February 19th, 2014, Lieutenant Boehm provided Detective Betts with the same four written questions and asked her to provide him with a written response. Detective Betts refused, advising, "See attached statement." This was referring to the statement Detective Betts provided on February 6th, 2014. Finally, Detective Betts again refused to answer those same questions asked of her by the Captain of the Office of Professional Responsibilities and Inspections (OPRI), KEVIN GADDIS.

**<u>CONCLUSION:</u>**

CID case files are confidential. Some of Detective Betts case files included sensitive information. Instead of keeping these files at CID, where they would be secure, she chose to store them either at her residence or the trunk of a vehicle, which violates policy. Additionally, I advised Detective Betts to ensure that her case files were accessible to her supervisors, who may need the information contained within, when she was not working. An audit of her cases indicated Detective Betts also had multiple assigned cases without completed ROI's, this violates the CID SOP. Finally, Detective Betts disobeyed a direct order from the writer as well as a direct order from Lieutenant Boehm in violation of G.O. 217.

**FINDINGS:**

**Charge:** **Violation of General Order 405,III,J,II, E;**
Printouts (hard copies) will be safeguarded to ensure confidentiality of information.

**Specification:** Detective Betts took case files home and or stored them in the trunk of a vehicle.

**Classification:** Sustained

**RECOMMENDATION:** One (1) day suspension.

**Charge:** **Violation of CID Case Management SOP**
Within one week's time, all case notes (until that point) will be recorded directly into The case detective's official Report of Investigation.

**Specification:** Detective Betts failed to complete a ROI within One (1) week of being assigned.

**Classification:** Sustained

**RECOMMENDATION:** One (1) day suspension

**Charge:** **Charge;Violation of General Order 215, II;**
Members will respond to the lawful order of any supervisor.

**Specification:** Detective Betts failed to follow a direct order given on two different occasions to ensure her case files are accessible in the office.

**Classification:** Sustained.

**RECOMMENDATION:** Letter of Reprimand.

CONFIDENTIAL

| | |
|---|---|
| **Charge:** | **Charge;Violation of General Order 217, III, A;** Members will respond promptly and truthfully to all inquiries initiated by an official. |
| **Specification:** | Detective Betts failed to provide a written statement to Lieutenant Boehm as ordered. Additionally, she never answered the questions asked of her by Sgt. Page. |
| **Classification:** | Sustained. |
| **RECOMMENDATION:** | Termination. |

| MTP # | Type | Case # |
|---|---|---|
| 201123208 | Robbery | CA 695 |
| 201200599 | Indecent Exposure | CD 15 |
| 201316787 | Petit Larceny | CA 639 |
| 201325082 | Assault | CA 1014 |
| 201339307 | Attempt Robbery | CA1752 |
| 201339784 | Simple Assault | CD 1779 |
| 201343341 | Dest./Prop. | CA 1959 |
| 201344554 | Assault | CA 2028 |
| 201344948 | Robbery | CA 2047 |
| 201347053 | Robbery | CA 2174 |
| 201347300 | Credit Card Misuse | CA 2192 |
| 201347727 | Dest./Prop. | CA 2214 |
| 201348747 | Robbery | CA 2263 |
| 201349868 | Robbery | CA 231 |
| 201350328 | Simple Assault | CA 2344 |
| 201350652 | Simple Assault | CA 2358 |
| 201351145 | Robbery | CA 2381 |
| 201351888 | Dest./Prop. | CA2415 |
| 201352120 | Robbery Snatch | CA 2424 |
| 201352351 | Robbery Snatch | CA 2440 |
| 201352427 | Simple Assault | CA 2448 |
| 201353707 | 2nd Degree Assault | CA 2496 |
| 201354510 | RSP | CDI 2520 |
| 201354633 | Robbery | CA 2524 |
| 201355602 | Dest./Prop. | CA 2563 |
| 201356885 | Robbery | CA 2637 |
| 201357365 | Theft under $1000 | CA 2650 |
| 201357620 | Robbery | CA 2606 |
| 201358102 | Robbery Snatch | CA 2695 |
| 201358675 | Dest./Prop. | CA 2719 |
| 201359437 | Simple Assault | CA 2743 |
| 201403587 | Theft 2 | CA 100 |
| 201404905 | Robbery Snatch | CA 143 |
| 201405317 | Assault | CA 161 |
| 201405521 | 2nd Degree Assault | CDI 165 |

Additionally, there was a MVA prir
DVR from 201351916
Email from Poulos referencing case

Condition
ROI indicating case was closed by exception. Linx printouts with juvenile information. Copies of emails.
Case Jacket--Closed out
Case jacket w. student photos and id from Springbrook High. Possible suspect. DVR.
Case jackey with suspect identifiers and photo.
Case jacket w. photo spread. Release from Investigation. Linx printouts of suspects.
Report w. notes on back and email to V001. SUSPECT identified.
Report w. notes written on back/DVR missing/MVA printout of suspect
Report w. notes on back
Report w. notes and a photo spread (no suspect indicated)
Case jacket with V01 photos (CSS & Linx) as well as photos of S-1 and confirmatory viewing sheet. Suspect ID'd.
Report w. notes on back
Report w. notes on back
Appears as though patrol stopped the suspect and V001 was unable to be contacted/uncooperative (closed by exc
Case with email indicating possible suspect and Linx printout of that suspect.
Report w. notes on back
No ROI/DVR attached.
Report w. notes on back
Report w. juvenile photo from school as well as an adult suspect photo.
Report w. DVR request
Report w. notes written on back and DVR
Report w. notes and DVR and Smart Card info.
Report w. notes on back
No ROI/juvenile information and photos. Attached DVD.
Case jacket w. report (notes on back). No ROI. Email from V001 advising where stolen credit cards were used.
Report w. notes on back and email and DVR
Report w. notes and DVR and BOLO. Emails from MPDC advising the suspect's identity
Report w. notes on back
Report w. video/Linx reports (juvenile)/Smart card information/possible suspect id'd from csosa
No ROI. DVRs and juvenile information.
Report w. notes on back
Appears to be completed without ROI. Includes a 379 and juvenile photos along with statements.
Case jacket completed with ROI (Suspension).
Report w. notes written on back and DVR
Report with date received written on back
Report with date received written on back

ıtout and Memo to Capt. Byrd referencing a traffic accident that Detective Betts was involved in.

϶ #201353102 and 201359423 w. suspect info.

CONFIDENTIAL

# M E M O R A N D U M

DATE: 2/6/2014

SUBJECT: Statement regarding Cases

FROM: Detective Amanda M. Betts

TO: Sergeant Charles Page

At the request of Sergeant Charles Page, I am to provide a statement as to why I, "take cases home or leave them in the car". I, typically, take cases home that I am actively working on. My cases are usually loaded into the MTPD cruiser at the commencement of my tour of duty or when I leave the office, so as to work on them throughout the day, as well as assisting with calls for service. Furthermore, per Sergeant Charles Page, there is no established rule or regulation, stipulating that we are not allowed to take cases from the office.

Metro
Transit
Police
Department

LAW ENFORCEMENT SENSITIVE
NOT FOR GENERAL RELEASE

# M E M O R A N D U M

DATE: 2/6/2014

SUBJECT: Statement regarding Cases

FROM: Detective Amanda M. Betts

TO: Sergeant Charles Page

Metro Transit Police Department

At the request of Sergeant Charles Page, I am to provide a statement as to why I, "take cases home or leave them in the car". I, typically, take cases home that I am actively working on. My cases are usually loaded into the MTPD cruiser at the commencement of my tour of duty or when I leave the office, so as to work on them throughout the day, as well as assisting with calls for service. Furthermore, per Sergeant Charles Page, there is no established rule or regulation, stipulating that we are not allowed to take cases from the office.

**The above statement was submitted via email at approximately 12:07 pm. My second statement is below.*

At approximately 12:30 pm I was contacted by Sgt. Page and told to return to the CID office. I then advised Sgt. Page that I was headed to grab my lunch. He responded by saying that he needed me to return immediately to complete my statement. Once I responded to CID, I was given 4 (four) {enumerated below}, additional questions composed by Sgt. Page, in response to the above referenced statement. Furthermore, I advised Sergeant Page that I had not eaten and would like to grab something to eat; I was then directed to complete the statement. At 2:56 pm, for the third time, I advised Sgt. Page that I had not eaten, and his response was "I gotta have that before you go", referring to this statement. At approximately 3:30 pm, I advised Sgt. Page that I would like to eat- Sergeant Page responded that "you can go when you finish. The second statement is being given under duress.

1) What is the purpose of taking home or leaving in the cruiser over thirty active case files on a daily base?

2) Are you aware that most of your case files pertain sensitive information ie. NCIC printouts and juvenile information?

3) Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and

your case file is needed? You were out sick and we needed to access to your files, you advised, that you had them at home with you.

4) Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and accessible if needed by supervisor and or other Detectives?

Some case files are comprehensive, albeit in the CID office at the Metro Supply Facility or with a detective. As I recall, while out on a medical leave of absence, I was, initially, contacted by Sgt. Page regarding the upcoming case review with Assistant Chief Parks, and the "UNST" case. In response to Question #4, yes, I was present. From my recollection, Sgt. Page specified cases that were in the adjudication process.

RECEIVED ADDITIONAL QUESTIONS = 12:50P 2/6/14

1. What is the purpose of taking home or leaving in the cruiser trunk over thirty active case files on a daily base?

[redacted]

2. Are you aware that most of your case files pertain sensitive information ie. NCIC printouts and Juvenile information?

[redacted]

3. Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and your case file is needed? You were out sick and we needed to access to your files, you advised, you had them at home with you. [redacted]

4. Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and accessible if needed by a supervisor and or other Detectives?

[redacted]

SEE ATTACHED STATEMENT

* ALTHOUGH ADDRESSED IN STATEMENT I WAS DIRECTED TO PROVIDE THIS COPY OF QUESTIONS, WHICH SERVED AS A DRAFT.

CONFIDENTIAL

R/1

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

MEDICAL OFFICE

RETURN TO DUTY NOTICE

| | | |
|---|---|---|
| ...YEE NAME ...nda Betts | EMPLOYEE NUMBER 001345 | WORK LOCATION |

| | |
|---|---|
| ...EEN IN MEDICAL OFFICE 7-23-12 | LAST DATE COVERED IN CERTIFICATE OF ATTENDING PHYSICIAN |
| ...EPORTED 8:12 ☑ a.m. ☐ p.m.<br>...XCUSED 9:21 ☐ a.m. ☐ p.m. | PURPOSE RTD |
| ...MPLOYEE APPROVED FOR ...N TO DUTY 7-23-12 | RESTRICTIONS Limited Duty |

SIGNATURE Gina C Pervall, MD DATE 7/23/12

...OTICE MUST BE PRESENTED TO YOUR WORK LOCATION OFFICE

...08) Original - Employee Yellow - Medical/Sick Leave Pink - Medical/Chart

CONFIDENTIAL

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

# MEDICAL OFFICE

# RETURN TO DUTY NOTICE

| OYEE NAME | EMPLOYEE NUMBER | WORK LOCATION |
|---|---|---|
| ...A Betts | 00734 5 | JGB |

| SEEN IN MEDICAL OFFICE | LAST DATE COVERED IN CERTIFICATE OF ATTENDING PHYSICIAN |
|---|---|
| 2/4/13 | 2/1/13 |

| | PURPOSE |
|---|---|
| REPORTED 8:32 ☑ a.m. ☐ p.m.<br>EXCUSED 9:10 ☑ a.m. ☐ p.m. | RTD |

| EMPLOYEE APPROVED FOR RN TO DUTY | RESTRICTIONS |
|---|---|
| 2/4/13 | RETURN TO DUTY PENDING NEGATIVE DRUG SCREEN |

SIGNATURE ____________ DATE 2/4/13

NOTICE MUST BE PRESENTED TO YOUR WORK LOCATION OFFICE.

/08) Original - Employee Yellow - Medical/Sick Leave Pink - Medical/Chart

WMATA000420

CONFIDENTIAL

metro

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

# MEDICAL OFFICE
# RETURN TO DUTY NOTICE

| EMPLOYEE NAME | EMPLOYEE NUMBER | WORK LOCA[TION] |
|---|---|---|
| Amanda Betts | 007345 | MSF |

| DATE SEEN IN MEDICAL OFFICE | LAST DATE COVERED IN CERTI[FICATE] OF ATTENDING PHYSICIAN |
|---|---|
| 5/6/11 | |

| | |
|---|---|
| TIME REPORTED 1215 ☐ a.m. ☒ p.m.<br>TIME EXCUSED 13:36 ☐ a.m. ☒ p.m. | PURPOSE RTD |
| DATE EMPLOYEE APPROVED FOR RETURN TO DUTY 5/9/11 | RESTRICTIONS Pending r[...] drug & alcohol scre[en] |

SIGNATURE [signature] DATE 5/6/[...]

THIS NOTICE MUST BE PRESENTED TO YOUR WORK LOCATION [...]

50.659 (9/08) Original - Employee Yellow - Medical/Sick Leave Pink - Medical/Char[t]

WMATA000421

CONFIDENTIAL

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

# MEDICAL OFFICE
# RETURN TO DUTY NOTICE

| EMPLOYEE NAME | EMPLOYEE NUMBER | WORK LOCATION |
|---|---|---|
| Amanda Betts | 007345 | MSF |

| DATE SEEN IN MEDICAL OFFICE | LAST DATE COVERED IN CERTIFICATE OF ATTENDING PHYSICIAN |
|---|---|
| 5/6/11 | |

| | |
|---|---|
| TIME REPORTED 1215 ☐ a.m. ☒ p.m.<br>TIME EXCUSED 13:36 ☐ a.m. ☒ p.m. | PURPOSE<br>RTD |

| DATE EMPLOYEE APPROVED FOR RETURN TO DUTY | RESTRICTIONS |
|---|---|
| 5/9/11 | Pending negative drug & alcohol screen |

[signature] ns — SIGNATURE

5/6/11 — DATE

THIS NOTICE MUST BE PRESENTED TO YOUR WORK LOCATION OFFICE.

50.659 (9/08) Original - Employee Yellow - Medical/Sick Leave Pink - Medical/Chart

Attn: Sgt. Cowans-Muniz
Ref: Return to Duty



05/18/2011 13:21 FAX 2029626043 MTPD ☑001/001

The Physician & Midwife Collaborative Practice, P.C.

*Exceptional care...for your life.*

November 1, 2010

**Physicians**
David Giammittorio, MD, FACOG
Mary Cutting, MD, FACOG
Habib Ahdoot, MD, FACOG
Lalitha Rambhala, MD, FACOG
Kenneth Ahdoot, MD, FACOG
Denise Cunningham, MD, FACOG
Kim Kongkasuwan, MD, FACOG
Shahrzad Tabibi, MD, FACOG
LaReine Sabella, MD, FACOG

**Midwives**
Karen Gonzalez, CNM
Patrice Valle, CNM
Catherine Armstrong, CNM
Sue Magenheimer, CNM
Margie Wentzel, CNM
Gina Haldeman, CNM
Elizabeth Itote, CNM
Angel Miller, CNM
Lisa Barnes, CNM
Pamela Becker, CNM
Patricia Gould, CNM
Rebecca Tuteral, CNM
Maria Shauer, CNM

To Whom It May Concern:

This letter is to verify that Amanda Betts (D.O.B. 10/13/82) is under my care for pregnancy with an EDC of 03/14/11.

She needs to be placed on limited duty as of 10/25/10.

Should you have any further questions regarding this matter, please do not hesitate to contact the office.

Sincerely,

Ahdoot, MD

Habib Ahdoot, MD

**Kenmore** 4660 Kenmore Avenue,Suite 902, Alexandria, VA 22304 • 703.370.4300
**Kingstowne** 5901 Kingstowne Village Parkway, Suite 200, Alexandria, VA 22315 • 703.922.3434
**Lake Ridge** 12508 Lake Ridge Drive,Lake Ridge, VA 22192 • 703.491.1122
**Sherwood Hall** 2616 Sherwood Hall Lane, Suite 208, Alexandria, VA 22306 • 703.780.6900

*www.physiciansandmidwives.com*

# The Physician and Midwife Collaborative Practice, P.C.

4660 Kenmore Avenue
Suite 902
Alexandria, Virginia 22304
Telephone: (703) 370-4300
Fax: (703) 370-0044

2616 Sherwood Hall Lane
Suite 208
Alexandria, Virginia 22306
Telephone: (703) 780-6900
Fax: (703) 780-3418

12508 Lake Ridge Drive
Lake Ridge, Virginia 22192
Telephone: (703) 491-1122
Fax: (703) 690-6533

5901 Kingstowne Village Parkway
Suite 200
Alexandria, VA 22315
Telephone: 703-922-3434
Fax: 703-922-6588

September 20, 2010

To Whom It May Concern:

This is to certify that Amanda Betts is a patient of this practice and is being followed here for her pregnancy. Amanda was able to return to work full duty on September 13,2010 .

Thank you for your attention to this matter.

Sincerely,

Denise Cunningham, MD

The Physician & Midwife Collaborative Practice, P.C.

CONFIDENTIAL

# The Physician and Midwife Collaborative Practice, P.C.

4660 Kenmore Avenue
Suite 902
Alexandria, Virginia 22304
Telephone: (703) 370-4300
Fax: (703) 370-0044

2616 Sherwood Hall Lane
Suite 208
Alexandria, Virginia 22306
Telephone: (703) 780-6900
Fax: (703) 780-3418

12508 Lake Ridge Drive
Lake Ridge, Virginia 22192
Telephone: (703) 491-1122
Fax: (703) 690-6533

5901 Kingstowne Village Parkway
Suite 200
Alexandria, VA 22315
Telephone: 703-922-3434
Fax: 703-922-6588

September 20, 2010

To Whom It May Concern:

This letter is to certify that Amanda Betts is a patient of this practice and is currently being seen for pregnancy. Her estimated date of delivery is March 14, 2011. Pregnant patients are routinely seen monthly until 29 weeks gestation, bi-monthly until 36 weeks gestation, then weekly until time of delivery. Evaluation is done at 6 weeks postpartum for a normal vaginal delivery, and at 8 weeks postpartum for a cesarean section without complication.

If there are any questions regarding this matter, please do not hesitate to contact our office. Please be certain to have the patient give us a signed authorization to communicate her private healthcare information with you.

Sincerely,

Denise Cunningham, MD

The Physician & Midwife Collaborative Practice, PC

CONFIDENTIAL

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
600 Fifth Street, N.W., WASHINGTON, DC 20001
**"EMPLOYEE ON THE JOB INJURY AND OCCUPATIONAL ILLNESS REPORT"**
**IMPORTANT- All employees reporting job related injury or occupational illness must complete this form at the time of injury.**

**EMPLOYEE INFORMATION:**
Last Name: BETTS First Name: AMANDA Middle Initial: M
Street Address: 12524 KEMPSTON LANE
City: WOODBRIDGE State: VA Zip: 22192
Home Phone: (703) 878-8258 Cell Phone: (301) 758-3813 Pager: ____
Date of Birth: 10/31/1982 Employee# 007345 SS# 223-39-2.57 Sex: M ( ) F (X)
Job Title: DETECTIVE Division: CID Union 689 ( ) Local 2 ( ) TA/TS ( ) (FOP)
Supervisor Name: SGT. C. PAGE Supervisor Phone Number: (202) 345
2nd Employer Y ( ) N ( ) Name of Employer: ____
Full Time Y ( ) N ( ) Address: ____
Part Time Y ( ) N ( ) City: ____ State: ____ Zip: ____
Date of Hire: ____ Name of Supervisor: ____
Work Hours: ____ Phone Number: ____

**INJURY INFORMATION:**
Date of Injury: 08/20/2010 Day: FRIDAY Time: ≈ 2:15 AM ____ PM X
Exact Location (Street Address) of Where Injury Occurred: R/O 5026 BENNING RD SE

State: MD ( ) DC (X) VA ( ) Date Shift Started: 08/20/2010
Body Part Injured: SCRATCHES & ABRASIONS TO HAND + ANKLES
Safety Equipment Required: Y ( ) N (X) What Type: ____ Used: Y ( ) N ( )
Eyewitness: Y (X) N ( ) Name: JAVIER HOKE Phone Number: (202) 642-1792
Did Another Person Cause This Injury? Y ( ) N (X) Motor Vehicle Accident Y ( ) N (X)
Name of Responsible Party: ____
Insurance Carrier or Agent Name: BLUE CROSS BLUE SHIELD Phone Number: ____
Additional Information: CAREFIRST

Please provide your statement of how the injury occurred:
- INTERNAL INJURY DUE TO FALL (PLACENTAL DETACHMENT) & CUTS & ABRASIONS TO HAND + ANKLE

Are you able to continue to work? Y (X) N ( )
If you need medical attention, name and address of the doctor you are going to see:
PHYSICIANS & MIDWIVES COLLABORATIVE PRACTICE
Doctors Phone Number: (703) 491-1122 Date you will see your doctor: 09/07/2010 & 09/08/2010

Please indicate the area of the injury by placing an X on the corresponding body parts below. To specify which side of the body is involved, please use "L" for left and "R" for right.



Employee please read before signing:

(1) This form is only to be used for Employees who are injured on the job.
(2) All persons having a workers' compensation claim that was caused by the act of another is required to have the written approval of the Authority before agreeing to or signing any settlement for the injuries or lost wages that were paid as part of the whole by the Authority or its insurer to the employee as workers' compensation benefits.
(3) Any Employee who willfully makes any materially false or misleading statements or representations for the purpose of obtaining any benefits under workers' compensation or leave provisions of the Authority may be subject to prosecution, disciplinary action up to and including dismissal and may adversely affect the employee's rights to workers' compensation benefits.

THIS IS TO CERTIFY THAT I HAVE READ THE ABOVE GUIDELINES AND UNDERSTANDS THEM FULLY AND THE INFORMATION I HAVE PROVIDED IS TRUE AND CORRECT.

Employee Signature: [signature] Date: 09/13/2010

CONFIDENTIAL

**Sentara Potomac Hospital -- Emergency Department**
**2300 Opitz Blvd. Woodbridge, VA 22191-3398**
**(703) 670-1363**

## Work/School Excuse

Patient: Betts, Amanda 9/7/2010 1751

May return to work/school: 3 Days

Restrictions: No strenuous activity, No heavy lifting, No physical exertion

Potomac On Call MD ______ F/U MD Ph: ______

F/U MD Fax: ______

Follow-up Date: ______

*Note to Employer / School Official:*

The patient named above was seen in our Emergency Department today. Recommended restrictions on activity and recommended follow-up are listed above. At the time of the follow-up visit, the physician may decide that further restrictions are necessary.

Signature: [signature]

CONFIDENTIAL

metro

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

### FAMILY AND MEDICAL LEAVE APPLICATION

Name: AMANDA M. BETTS Employee #: 007341
Home Address: 12524 KENDSTON LANE WOODBRIDGE VA 22192
Home Phone: (703) 878-8258
Job Title: DETECTIVE (MTPD) Hire Date: 11/28/2005
Department: MTPD Work Location: JETB Work Phone: (202) 450-0987
Supervisor: SGT. DAGE Return to Duty: ______
___L689___L922___L639___L2___Non-Represented FOP
Assigned Days Off: X Sun X Mon ___Tues ___Wed ___Thurs ___Fri X Sat
If Applicable, Alternative Work Schedule (AWS) Day Off:
Pay Week Hours: 40 Non-Pay Week Hours: 40

TYPE OF LEAVE REQUESTED:

X Birth, Adoption, Foster Child Placement
X Serious Health Condition: (X) self ( ) spouse ( ) child ( ) parent ( ) domestic partner

PERIOD OF LEAVE REQUESTED: From ≈ JANUARY 2011 To ≈ MAY 2011

NOTE:

1. If leave is to care for a newborn, adopted or newly-placed foster child, please provide the following information:
   Date of birth of newborn child: ≈ 03/07/2011 - 03/14/2011
   Date of in-home placement of adopted or foster child (or legal ward): ______.
   All legal documents supporting the above must be provided with this application.
2. Is your spouse a WMATA employee? ___yes ___no. If yes, give name: ______
3. If leave is for a serious health condition of your own or to care for an eligible family member with a serious health condition, a "Certification of Health Care Provider" form must be completed by the physician and submitted with this application. The form is attached to this package.

   In addition to the health care provider certification, if the requested leave is to care for an eligible family member, *legal proof of relationship* must be submitted with the application (i.e., birth certificate showing you as the parent, marriage certificate, etc.).

I understand that the Authority will maintain my health insurance and other benefit costs as if I were continuously in service for the duration of the leave being requested. If I am required to contribute to my health insurance or other insurance benefit payments, I must continue to make such payments while on leave. I also understand that failure to make such payments within a 30-day grace period from the date such payments are normally due may result in the cancellation of said insurance.

*I understand that all of my paid or accrued applicable leave will be used concurrently with my FMLA absence. If all leave balances are used, any remaining FMLA available leave will be unpaid.*

I hereby authorize the health care provider to release medical information for the purpose of determining compliance with the *Family and Medical Leave Act.*

Employee's Signature [signature] Date 01/31/2011

*An employee who fraudulently obtains FMLA leave will be subject to disciplinary action, up to and including termination.*

---DO NOT WRITE BELOW. FOR ADMINISTRATIVE USE ONLY---

HRMP Director/Designee Approval ___yes ___no Initial and date ______

metro

# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

## CERTIFICATION OF HEALTH CARE PROVIDER (FMLA)

**(Complete for Employee's Illness)**

**To be completed by a Health Care Provider only**

1. **Employee's Name** Amanda Betts **Employee #** 207345

2. The attached entitled *"Definitions"* describes what is meant by a *"serious health condition"* under the Family and Medical Leave Act. Does the patient's condition qualify under any of the categories described? If so, please check the applicable category.
(1)____ (2)____ (3)____ (4)____ (5)____ (6)____ or None of the above____

3. ***Employee's Illness***

A. First date the employee needs to be absent from work: 3/14/2011 duedate
Anticipated return to full duty: 4/25/11
Date(s) employee was seen by physician for this absence 1/24/11
Medicine prescribed (excluding over the counter)? —

B. Describe the medical facts which support your certification. Please include a brief statement as to how these facts meet the criteria of one of the six (6) categories referred to in Question #2.
High risk pregnancy
pt was hospitalized @ 12/7/10 - 12/8/10, and 1/10/11.
pt is experiencing pelvic pain + pressure.

C. Does this chronic condition or pregnancy warrant intermittent leave (including planned medical treatment, but excluding routine doctor visits? If so, give probable duration and frequency of episodes of incapacity to work.
yes, until delivery up to 2 times weekly

D. Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition? If yes, give the probable duration.
yes, up until delivery

E. Will any treatments be provided by other health care providers to whom you referred the employee? If so, please state the nature of the treatments.
yes, The Brock family Perinatal Diagnostic Center for Sonograms & AST.

4. ***Signature Section***

Habib Ahdoot
Printed Name of Health Care Provider

Habib ahdoot, MD
Health Care Provider Signature and Date

OB/Gyn
Type of Practice

License No. & State

Address: Physician & Midwifes
12508 Lake Ridge Drive
Lake Ridge, VA 22192

703-491-1122 / 703 491-1386
Telephone No. & Fax No.

Revised 11-15-2004

CONFIDENTIAL

**Cowans-Minor, Charida**

---

**From:** Page, Charles L.
**Sent:** Thursday, January 16, 2014 2:35 PM
**To:** Cowans-Minor, Charida
**Subject:** FW: A. Betts

**Importance:** High

---

**From:** Rikard, Roslyn
**Sent:** Thursday, January 16, 2014 1:22 PM
**To:** Page, Charles L.
**Subject:** A. Betts
**Importance:** High

FYI – I received completed FMLA forms for Amanda Betts today.

**Regards,**

*Roslyn Rikard*
**Employment Program Specialist**
**Department of Human Resources**
**Suite 7A-07B**
**202-962-1396 - phone**
**202-962-1283 - FMLA hotline**
**202-962-2479 - fax**
**rrikard@wmata.com**

CONFIDENTIAL

metro

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
MEDICAL OFFICE
RETURN TO DUTY NOTICE

| EMPLOYEE NAME | EMPLOYEE NUMBER | WORK LOCATION |
|---|---|---|
| Amanda Betts | 067345 | Landover |

| DATE SEEN IN MEDICAL OFFICE | LAST DATE COVERED IN CERTIFICATE OF ATTENDING PHYSICIAN |
|---|---|
| 1-16-14 | 1-15-14 |

| | |
|---|---|
| TIME REPORTED 1140 ☒ a.m. ☐ p.m.<br>TIME EXCUSED 1235 ☐ a.m. ☒ p.m. | PURPOSE<br>RTD |
| DATE EMPLOYEE APPROVED FOR RETURN TO DUTY<br>1-16-14 | RESTRICTIONS<br>None |

Burwell — SIGNATURE

1-16-14 — DATE

THIS NOTICE MUST BE PRESENTED TO YOUR WORK LOCATION OFFICE.

50.659 (9/08) Original - Employee Yellow - Medical/Sick Leave Pink - Medical/Chart

METRO TRANSIT POLICE DEPARTMENT
600 5th Street, N. W., Washington DC, 20001
(202) 962-2195
(202) 962-2491 (Fax)

# TREATING PHYSICIAN EMPLOYMENT STATUS REPORT

*(To be faxed the same day as the initial examination to (202) 962-2491)*

Member name: Amanda Betts Injury date: ____________

Date of examination: last seen 7/13/12 Current job title: Detective

Diagnosis: pregnancy – gestational diabetes.

Please check all boxes that apply:

[ ] The member is temporarily disabled from all work:
FROM: ____________ THRU: ____________

[ ] The member may return to regular duty effective: ____________

[✓] The member may return to limited duty effective: 7/8/12

With the following limitations: no lifting > 25lbs; no prolonged standing/walking; no strenuous activity; no firearm range duties
see attached

[✓] Based upon this examination, the member should sufficiently recover and be able to perform all duties of a law enforcement officer within six (6) months. (6-8 wks after delivery)

Medications prescribed: Insulin

Next appointment: 7/30/12

[signature], MD Date: 7/25/12

(Treating physician)

Physicians & Midwives
5901 Kingstowne Village
Parkway, Suite 200
Alexandria, VA 22315
703-922-3434

MTPD FORM #126 (Revised 02/14/2012)

METRO TRANSIT POLICE DEPARTMENT
LIMITED DUTY REQUEST

7/27/12

To: Chief of Police [signature] X Approved ___Disapproved

Recommend

Thru: Deputy Chief, Administrative Services Bureau ✓ Approval ___Disapproval [initials]

Deputy Chief, Patrol Operations Bureau ___Approval ___Disapproval

From: Amanda Betts Date: 7·26·12
(Member)

[ ] This was an On-Duty Injury/Illness. Please see attached treating Physician employment status report.

## PART I - On-Duty Injury/Illness only
## (This section to be completed by the treating physician)

On, ____________________, the above named member was examined concerning ____________ ____________________________________________, which occurred on-duty. Based on this examination, the member should sufficiently recover and be able to perform all duties of a law enforcement officer within six months. The member may perform limited duty with restrictions as listed:

____________________________________________

____________________________________________

____________________
(Signature of Physician)

## PART II - Off-Duty Injury/Illness Only
## (This section to be completed by the WMATA physician)

On, ____________________, the above member was examined concerning ____________ ____________________________________________, which occurred off-duty. Based on this examination, the prognosis of the private physician is supported and the member is medically recommended for limited duty consideration.

____________________
(Signature of Physician)

MTPD FORM #125 (Revised 11/07/2011)

CONFIDENTIAL

The Physician & Midwife Collaborative Practice, P.C.

*Exceptional care...for your life.*

**Physicians**
David Giammittorio, MD, FACOG
Mary Cutting, MD, FACOG
Habib Ahdoot, MD, FACOG
Kenneth Ahdoot, MD, FACOG
Denise Cunningham, MD, FACOG
Kim Kongkasuwan, MD, FACOG
Shahzrad Tab'bi, MD, FACOG
Tabitha Andre, MD
Melanie Modjoros, MD
Hillary Elns-Robinowitz, MD, FACOG

**Midwives**
Patricia Valle, CNM
Gina Haldeman, CNM
Elizabeth Itote, CNM
Pamela Becker, CNM
Patricia Gould, CNM
Rebecca Tuteral, CNM
Danielle Newkirk, CNM
Donna Greenfield, CNM
Jenna Benyounes Ulrich, CNM

DATE: June 28, 2012
RE: Amanda Betts
DOB: 10/13/1982

To Whom It May Concern:

Due to the patients description of her position at her place employment, I as her health care provider am requesting that Amanda is to be on a Limited Duty Status, starting July 8, 2012. This is to accommodate the patient's current pregnancy.

If you have any questions or concerns, please feel free to contact my office. Thank you for your understanding in this matter.

Sincerely,

Habib Ahdoot MD

Habib Ahdoot, M.D.

**Kenmore** 4660 Kenmore Avenue, Suite 902, Alexandria, VA 22304 • 703.370.4300
**Kingstowne** 5901 Kingstowne Village Parkway, Suite 200, Alexandria, VA 22315 • 703.922.3434
**Lake Ridge** 12508 Lake Ridge Drive, Lake Ridge, VA 22192 • 703.491.1122
**Sherwood Hall** 2616 Sherwood Hall Lane, Suite 208, Alexandria, VA 22306 • 703.780.6900

The Physician & Midwife Collaborative Practice, P.C.

*Exceptional care...for your life.*

**Physicians**
David Giammittorio, MD, FACOG
Mary Cutting, MD, FACOG
Habib Ahdoot, MD, FACOG
Kenneth Ahdoot, MD, FACOG
Denise Cunningham, MD, FACOG
Kim Kongkasuwan, MD, FACOG
Shahzad Tabibi, MD, FACOG
Tabitha Andre, MD
Melanie Modjeroa, MD
Hillary Elins-Robinowitz, MD, FACOG

**Midwives**
Patricia Valle, CNM
Gina Haldeman, CNM
Elizabeth Itoro, CNM
Pamela Becker, CNM
Patricia Gould, CNM
Rebecca Tuteral, CNM
Danielle Newkirk, CNM
Donna Greenfield, CNM
Jenna Benyounes-Ulrich, CNM

DATE: July 13, 2012
RE: Amanda Betts
DOB: 10/13/1982

To Whom It May Concern:

Amanda M. Betts is currently being treated for a high-risk pregnancy. Due to her diagnosis Diabetes and pregnancy, it is recommended that she refrain from long commutes, duties, location, tour of duty and/or overall work environment that would place undue stress and hardship upon her. Her blood sugar is high and fluctuating, she will be using frequent insulin injections.

Please accommodate Amanda, under the Americans with Disabilities Act (ADA), due to her diagnosis of Diabetes.

Furthermore, it is requested, by her treating physician that she retains her current limited duty status.

If you have any questions or concerns, please feel free to call our office. Thank you for your time and understanding in this matter.

Sincerely,

H. Ahdoot

Habib Ahdoot, M.D.
The Physician and Midwife Collaborative Practice, P.C.

**Kenmore** 4660 Kenmore Avenue, Suite 902, Alexandria, VA 22304 • 703.370.4300
**Kingstowne** 5901 Kingstowne Village Parkway, Suite 200, Alexandria, VA 22315 • 703.922.3434
**Lake Ridge** 12508 Lake Ridge Drive, Lake Ridge, VA 22192 • 703.491.1122
**Sherwood Hall** 2616 Sherwood Hall Lane, Suite 208, Alexandria, VA 22306 • 703.780.6900

# M E M O R A N D U M

metro

Washington Metropolitan Area Transit Authority

**SUBJECT:** Reasonable Accommodations under the Americans with Disabilities Act (ADA)

**DATE:** July 11, 2012

**FROM:** Detective Amanda Betts

**TO:** Sgt. C. Page
Sgt. V. Clayton
Lieutenant S. Boehm
Captain D. Proctor
Deputy Chief E. Olson

The purpose of this memorandum is in response to the e-mail sent from Sgt. V. Clayton, dated Tuesday, July 10, 2012, informing me of my mandatory reassignment from Criminal Investigations Division to Background Investigations effective Monday, July 16, 2012.

I respectfully request the following:

- Reconsideration of my reassignment based on:

  a. current limited duty status held within CID

  b. previous limited duty status held within CID for myself and other employees with similar medical condition/disability

  c. my current high risk medical condition that could be negativly compromised by undue burden, stress and hardship caused by a change to my job description, duties, location, tour of duty, and overall work environment

  d. continuity of operations to ensure effective case management to the benefit of the victims and the department

- Clarification on the justification for my reassignment.

- An extension on my reporting date due to the insufficient notice and to the impact of this major work/life adjustment.

Your consideration of my reasonable accommodations request to retain my current status is appreciated.

The Physician & Midwife Collaborative Practice, P.C.
*Exceptional care...for your life.*

**Physicians**
[illegible], MD, FACOG
Mary Cutting, MD, FACOG
[illegible] Ahdoot, MD, FACOG
[illegible], MD, FACOG
[illegible] Cunningham, MD, FACOG
[illegible], MD, FACOG
[illegible], MD, FACOG
[illegible], MD
[illegible], MD
[illegible], MD, FACOG

**Midwives**
Patricia Valle, CNM
[illegible], CNM
[illegible], CNM
[illegible], CNM
[illegible], CNM
[illegible], CNM
[illegible], CNM
[illegible], CNM
[illegible], CNM

July 17, 2012

To Whom It May Concern,

Amanda Betts (DOB 10/13/82) is under my care for pregnancy. She has complications in this pregnancy that place her in a high risk status. I am recommending that she remain in her current position on limited duty status. A transfer to another job/different location would place her under increased stress due to lack of proximity to her family in case of emergencies.

She should not be commuting more than 30 minutes, nor should she be lifting greater than 25 lbs or standing longer than 30 minutes at a time. She needs to refrain from firearm range duties. She also needs the ability to check her blood sugars throughout the day and take insulin if needed. Her blood sugars have been fluctuating and need close monitoring.

Please consider this recommendation as her job status can affect her stress level, which in turn can affect her health and that of her fetus.

Feel free to contact the office with any questions.

Sincerely,

H. Ahdoot

Habib Ahdoot, M.D.

**Kenmore** 4660 Kenmore Avenue, Suite 902, Alexandria, VA 22304 • 703.370.4300
**Kingstowne** 5901 Kingstowne Village Parkway, Suite 200, Alexandria, VA 22315 • 703.922.3434
**Lake Ridge** 12508 Lake Ridge Drive, Lake Ridge, VA 22192 • 703.491.1122
**Sherwood Hall** 2616 Sherwood Hall Lane, Suite 208, Alexandria, VA 22306 • 703.780.6900

CONFIDENTIAL

**Cowans-Minor, Charida**

**From:** Cooper-Lucas, Lisa
**Sent:** Wednesday, July 18, 2012 3:21 PM
**To:** Byrd, Julious A.; Cowans-Minor, Charida
**Subject:** UPDATE REGARDING DETECTIVE BETTS

Capitan Byrd- The physician has thoroughly reviewed Det. Betts medical documentation. The documentation provided does not support limiting Det. Betts work location to be within any specific geographical area.

***Lisa Cooper-Lucas abd CEAP SAP LPC***
***Manager Medical Services and Compliance Branch***

*E-mail is not a secure form of communication and confidentiality of e-mail messages cannot be guaranteed. Your use of e-mail indicates your acknowledgement of such limitations. If you are not the intended recipient of this message, please be advised that you are not authorized to read, print, retain, copy, or disseminate any part of or any attachment to this message. If the message has been sent to you in error, please notify the sender by replying to this transmission*

CONFIDENTIAL

# Fax & Mail

# COVER SHEET

12471 Dillingham Square • Woodbridge, VA 22192

[redacted]/Phone (703) 878-0550

FAX: 703-878-2592

**BUSINESS SERVICES OFFERED**

- UPS • FEDEX
- US MAIL
- WESTERN UNION
- FAX
- Boxes • Packaging Supplies • Mailing Envelopes • Business Cards • Labels
- Brochures • Desktop Publishing • Databases
- Scanning

DATE July 13, 2012

TO Capt. J. Byrd & Sgt. Cowans-Minor

FAX NO (202) 962-6116

FROM Det. Amanda Betts

PHONE (202) 450-0987

**URGENT**

Yes ☑

No ☐

COMMENTS: Medical Documentation & Reasonable Accomodations Request

WMATA000440

| Agency | ID # | Name (Last) | First | Middle | Suffix |
|---|---|---|---|---|---|
| 01 | 007345 | Betts | Amanda | Maxine | |

1 Main | 2 Assignmnt | 3 Equipment | 4 Licenses | 5 Training | 6 Medical | 7 Personal | 8 Confident. | 9.Custom

| Sex | Height | Weight | Eye | Hair | Ethnicity | Race | DOB | POB | State |
|---|---|---|---|---|---|---|---|---|---|
| F | 5'08" | 170 | | | | B | 10/13/1982 | RICHMOND | VA |

Home Address

Location
12524 KEMPSTON LN

| Bldg | Apt # | City | State | Cnty | Zip |
|---|---|---|---|---|---|
| | | WOODBRIDGE | VA | | - |

New Addr?

Primary Phone: (703) 878-8258
Secondary Phone: (301) 758-3813
Driver's License: A61-35-9005
State: VA

| Marital Status | Blood | Donor | Military | Rank | Yrs Ed. | Highest Degree | Days Off |
|---|---|---|---|---|---|---|---|
| S | B+ | | | | | | Sat-Sun |

| Rank | Jacket | Badge | Div | Bureau | Section | Assignment | Languages Spoken |
|---|---|---|---|---|---|---|---|
| PO | 000429 | 949 | MM | FO | C | | |

**Cowans-Minor, Charida**

**From:** Amanda Betts [mandy7038@gmail.com]
**Sent:** Monday, February 04, 2013 10:42 AM
**To:** Cowans-Minor, Charida
**Subject:** RE: Return to duty/Detective Betts

I left my return to duty slip on your computer screen. I am in the back cleaning out my email inbox, should you need me.

On Jan 17, 2013 11:05 AM, "Amanda Betts" <mandy7038@gmail.com> wrote:

Copy

On Jan 17, 2013 11:01 AM, "Cowans-Minor, Charida" <CCowans-Minor@wmata.com> wrote:

Before you are able to return to full duty you must go to the range to qualify. I will contact Officer McClung to set up a date after the 4th. You must go to metro medical with your original doctors paperwork putting you out and the final paperwork returning you to duty before you come back to duty. Thanx

---

**From:** Amanda Betts [mailto:mandy7038@gmail.com]
**Sent:** Thursday, January 17, 2013 10:58 AM
**To:** Cowans-Minor, Charida; Page, Charles L.
**Subject:** Return to duty/Detective Betts

Hello,
I will be returning to work on 2/4/13.

PS- I am unable to send messages from my work phone.

Amanda Betts

CONFIDENTIAL



**METRO TRANSIT POLICE DEPARTMENT**
**OPRI - BACKGROUND INVESTIGATIONS**
**REPORT OF INVESTIGATION**

**DATE/TIME**
**Detective/Investigator** **SUMMARY OF ACTION**
**Applicant Case #:** BI 05-377(2) INVESTIGATION FOR REINSTATEMENT
FORTUNA

Date: 3/6/2015

The APPLICANT, BETTS, Amanda, was preliminarily interviewed and issued a PHQ packet for completion by 3/20/2015. BETTS is seeking reinstatement after a separation of one year from the Metro Transit Police Department. BETTS was ordered reinstatement through a collective bargaining arbitrator's award and opinion.

Date: 3/18/2015

BETTS contacted Sgt. Stokes to request an extension. New due date 3/27/2015.

Date: 4/2/2015

Chief Pavlik waived the FIT test requirement.

The submitted PHQ packet was reviewed and the following items were determined missing or incomplete.

- Missing Notorized releases
  - Authorization for release of personal information
  - Notification of intent to obtain investigative consumer reports and authorization/consent to release of consumer reports
  - Notification of intent to obtain investigative consumer reports and authorization/consent to release of investigative consumer reports
  - Notification of intent to obtain medical records and authorization/consent to release medical records

OFFICIAL USE ONLY
This report is the property of the Metro Transit Police Department.
Neither it nor its contents may be disseminated outside the agency to which loaned.

- Missing Official Transcript from Marymount University – A past due bill was submitted in lieu of this document. However, the transcript is still needed.
- Missing Copy of driver's license
- Incomplete PHQ
    - All questions must be answered – 57b, 57c, 57f, 57h, 64a, 64b, 64c
    - Complete address for Marymount University
    - List employment activity during separation from MTPD.
    - Dates and addresses for other Law Enforcement Position applications
    - 3 personal references
    - 5 neighborhood references
- The MPD Criminal History requests need to be signed

BETTS was contacted via email and asked to pick up the incomplete packet. BETTS replied she was would pick it up on 4/3/2015.

Date: 4/6/2015

Sgt. Stokes contacted BETTS via email to request that she pick up the incomplete packet. BETTS picked up the packet and a due date of 4/15/2015 was issued for resubmission of the packet.

Date: 4/16/2015

BETTS contacted Sgt. Stokes via email requesting a two week extension. The request was denied. Sgt. Stokes issued a direct order to submit the complete package with notarized releases by 4/20/2015.

Date: 4/20/2015

BETTS submitted the PHQ packet without the signed releases or other items. The following items were missing or incomplete.

- Missing Dates for other law enforcement applications
- Incomplete neighborhood references – missing 3
- MPD Criminal History Check was not dated – Betts corrected this at the time of the meeting

- Missing transcripts from Marymount
- Missing releases
    - o Authorization for release of personal information
    - o Notification of intent to obtain investigative consumer reports and authorization/consent to release of consumer reports
    - o Notification of intent to obtain investigative consumer reports and authorization/consent to release of investigative consumer reports
    - o Notification of intent to obtain medical records and authorization/consent to release medical records
- Missing copy of driver's license

During an interview, consultation, and advisement with Captain Hanna, BETTS was informed of the consequences of her failure to submit the completed packet and signed releases. BETTS was also informed that her failure to cooperate with the background process could result in a denial of police recertification. BETTS continued to refuse to submit the releases. Therefore, this investigation cannot move forward.

Date: 5/6/2015

BETTS resigned from the department.

It is recommended this case be CLOSED with no further processing.

*Investigator Christin Fortuna*

| RECCOMENDED FOR HIRE | NOT RECOMMENDED FOR HIRE | |
|---|---|---|
| ☐ | ☑ | [signature] 05-19-2015<br>Sergeant |
| ☐ | ☑ | [signature] G. Hanna 5/19/15<br>Captain |

OFFICIAL USE ONLY

This report is the property of the Metro Transit Police Department.
Neither it nor its contents may be disseminated outside the agency to which loaned.

CONFIDENTIAL

# MEMORANDUM

TO: Ronald Pavlik, MTPD-Chief

Greg Hanna, MTPD-Captain OPRI

MTPD District 1 (One) Sergeants {Administrative Duty Supervisors} CMcG 5/6/15

Tanya Moore-McGee, WMATA Director Human Resources

Brian Donahoe, WMATA Labor

Dan Pribich, WMATA Labor

Colin Dorrity, FOP Chairman MTPDLC

FROM: Amanda Betts

DATE: May 6, 2015

SUBJECT: Letter of Resignation

Sirs/Madam:

Please accept this as my formal resignation from the Metro Transit Police Department {MTPD}/Washington Metropolitan Area Transit Authority {WMATA}, effective immediately. To date I have been subject to, including but not limited to, discrimination, retaliation, disparate treatment, and a hostile work environment at the hands of the Metro Transit Police Department/Washington Metropolitan Area Transit Authority.

I pray that God richly blesses, covers and keeps you all.

Amanda M. Betts

**Fortuna, Christin M.**

**From:** Fortuna, Christin M.
**Sent:** Monday, April 20, 2015 11:27 AM
**To:** Stokes, Roberto
**Cc:** Hanna, Gregory S.
**Subject:** RE: Background Investigation

Sergeant,

This morning I met with Captain Hanna and Amanda Betts to obtain the background packet and review it for completeness. During that review it was determined the following items are incomplete or missing.

- Missing Dates for other law enforcement applications
- Incomplete neighborhood references – missing 3
- MPD Criminal History Check was not dated – Betts corrected this at the time of the meeting
- No transcripts from Marymount
- No releases
- No copy of driver's license

Christin Fortuna

---

**From:** Stokes, Roberto
**Sent:** Thursday, April 16, 2015 10:00 AM
**To:** Amanda Betts
**Cc:** Fortuna, Christin M.; Hanna, Gregory S.
**Subject:** RE: Background Investigation

Good morning Ms. Betts, Investigator Fortuna initiated your background process on March 6, 2015 and gave you your background packet the same day and advised you that the due date to turn the packet in was March 20, 2015. On March 18, 2015 I granted you an extension to turn your background packet in, with a due date of March 27, 2015, to which you turned in an incomplete PHQ packet without the waiver forms. On April 6, 2015 your PHQ packet was returned to you and you were given a due date of April 15, 2015 to turn your completed PHQ packet, to include all of the waiver forms, which you did not meet. With that being said, your request for a two week extension is denied and I am ordering you to have your PHQ packet and all of the waivers completed, signed, notarized and turned in by 1445 on Monday April 20, 2015. Thank you.

**From:** Amanda Betts [mailto:manda7038@gmail.com]
**Sent:** Thursday, April 16, 2015 7:27 AM
**To:** Stokes, Roberto
**Cc:** Fortuna, Christin M.
**Subject:** RE: Background Investigation

Good morning,
I am returning to work from leave, today. I was unable to complete the above mentioned background packet. I respectfully request an additional two week extension.

Thank you,
Amanda Betts

CONFIDENTIAL

On Apr 6, 2015 3:04 PM, "Stokes, Roberto" <RStokes@wmata.com> wrote:

Good afternoon Ms. Betts, Investigator Fortuna advised that you made it by and picked up you incomplete PHQ packet, your due date to resubmit a completed PHQ packet, along with all of the waiver forms will be Wednesday April 15, 2015, no later than 1445 hours. Thank you.

**From:** Amanda Betts [mailto:manda7038@gmail.com]
**Sent:** Monday, April 6, 2015 9:32 AM
**To:** Stokes, Roberto
**Subject:** RE: Background Investigation

My apologies, I was on sick leave Friday. I will stop by today to pick up the packet.

Thank you,

Amanda Betts

On Apr 6, 2015 9:23 AM, "Stokes, Roberto" <RStokes@wmata.com> wrote:

Good morning Ms. Betts, I was advised that you did not come by on Friday April 3rd, 2015 to pick up your incomplete PHQ packet as you stated you would below. If you are in today you need to come to the Background Investigations Office to pick up your incomplete PHQ packet so that you can complete it and resubmit it along with all of the waiver forms which you did not submit. As you know a proper background cannot be conducted without all of the needed information and the longer you take to submit all of the required information, the longer you background will take.

**From:** Amanda Betts [mailto:manda7038@gmail.com]
**Sent:** Thursday, April 2, 2015 10:35 AM
**To:** Stokes, Roberto
**Subject:** RE: Background Investigation

I'm on leave today, however I will come by tomorrow to pick it up.

Thank you,

Amanda Betts

On Apr 2, 2015 9:05 AM, "Stokes, Roberto" <RStokes@wmata.com> wrote:

Good morning Ms. Betts, please see the below for a list of items which still needed to completed in your background packet. The packet must be complete before we can begin the investigation.

- Notorized releases
- Official Transcript from Marymount University – A past due bill was submitted in lieu of this document. However, the transcript is still needed.
- Copy of driver's license
- Complete PHQ
    - All questions must be answered – 57b, 57c, 57f, 57h, 64a, 64b, 64c
    - Complete address for Marymount University
    - List employment activity during separation from MTPD.
    - Dates and addresses for other Law Enforcement Position applications
    - 3 personal references
    - 5 neighborhood references
- The MPD Criminal History requests need to be signed

Please come to Backgrounds today, or tomorrow at the latest by 1445, to pick up your PHQ packet so that you can complete it and resubmit it with all of the above listed documents, thank you.

**From:** Stokes, Roberto
**Sent:** Friday, March 27, 2015 11:03 AM
**To:** Amanda Betts
**Subject:** RE: Background Investigation

Copy, thanks.

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------

From: Amanda Betts <manda7038@gmail.com>

Date:03/27/2015 10:59 AM (GMT-05:00)

To: "Stokes, Roberto" <RStokes@wmata.com>

Cc:

Subject: RE: Background Investigation

Yes, hopefully I can have them to you within the next week. Sorry for the delay. Also, tentatively, you can schedule me for the April 18 FIT test.

Thank you

Amanda Betts

On Mar 27, 2015 10:32 AM, "Stokes, Roberto" <RStokes@wmata.com> wrote:

Good morning Ms. Betts, I have your PHQ booklet, minus the waivers and release forms and would like conformation on when you will be able to have them turned in, as well as a conformation on which date you would prefer to take your FIT?

**From:** Stokes, Roberto
**Sent:** Tuesday, March 24, 2015 6:44 PM
**To:** Amanda Betts
**Subject:** RE: Background Investigation

Yes there was one on the 21st.

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------

From: Amanda Betts <manda7038@gmail.com>

Date:03/24/2015 5:26 PM (GMT-05:00)

To: "Stokes, Roberto" <RStokes@wmata.com>

Cc:

Subject: RE: Background Investigation

Did a FIT test date just pass?

On Mar 24, 2015 5:06 PM, "Stokes, Roberto" <RStokes@wmata.com> wrote:

CONFIDENTIAL

Copy

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------

From: Amanda Betts <manda7038@gmail.com>

Date:03/24/2015 4:44 PM (GMT-05:00)

To: "Stokes, Roberto" <RStokes@wmata.com>

Cc:

Subject: RE: Background Investigation

I will have to get back to you on that.

Thank you,
Betts

On Mar 24, 2015 4:37 PM, "Stokes, Roberto" <RStokes@wmata.com> wrote:

Good afternoon Ms. Betts, FYI, as a reappointment you are required to take Fitness Indicator Test. The next test date will be on Saturday April 18, 2015, at NVCJA and the next one after that will be Saturday May 16, 2015. Please advise which FIT date you would like to attend, thank you.

**From:** Amanda Betts [mailto:manda7038@gmail.com]
**Sent:** Wednesday, March 18, 2015 9:50 PM
**To:** Stokes, Roberto
**Subject:** RE: Background Investigation

Copy that, thank you.

Good evening,

Amanda Betts

On Mar 18, 2015 9:03 PM, "Stokes, Roberto" <RStokes@wmata.com> wrote:

CONFIDENTIAL

You're welcome ma'am and just to confirm your new due date to turn your background packet in to the Background Investigations Unit is Friday March 27, 2015. Close of business is 1500 hours, so please have it there by 1430. FYI, I have added Investigator Fortuna in the email chain.

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------

From: Amanda Betts <manda7038@gmail.com>

Date:03/18/2015 8:50 PM (GMT-05:00)

To: "Stokes, Roberto" <RStokes@wmata.com>

Cc:

Subject: RE: Background Investigation

Yes that is good. Thank you

On Mar 18, 2015 8:41 PM, "Stokes, Roberto" <RStokes@wmata.com> wrote:

I'm sorry I ment March 27th.

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------

From: Amanda Betts <manda7038@gmail.com>

Date:03/18/2015 8:28 PM (GMT-05:00)

To: "Stokes, Roberto" <RStokes@wmata.com>

Cc:

Subject: Background Investigation

Good evening,
May I have an extension on the full background investigation information packet? I received it from Inv. Fortuna when I came in March 6, 2015, shortly after meeting with Capt. Hanna. Inv. Fortuna advised a due date of March 20, 2015.

- Amanda Betts

CONFIDENTIAL

# MTPD Applicant Pre-Investigation Worksheet

| | | |
|---|---|---|
| Last Name: BETTS | First Name: AMANDA | Middle Initial: M |

| | |
|---|---|
| Gender: ☐ Male ☒ Female | Race: ☐ American Indian/Alaska Native ☐ Asian or Pacific Islander ☒ Black (Not of Hispanic Origin) ☐ Hispanic ☐ White (Not of Hispanic Origin) ☐ Other or Undeclared |

| |
|---|
| Address: 12524 KEMPSTON LANE |

| | | |
|---|---|---|
| City: WOODBRIDGE | State: VA | Zip: 22192 |
| Home Phone: | Work Phone: 301-575-6073 | Cell Phone: |
| Email Address: manda7038@gmail.com | SSN #: 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 | Birth Date: 10/13/1982 |

Please identify where you learned about this employment opportunity with Metro Transit Police Department.

☐ Newspaper ☐ Walk-In ☐ Internet ☐ WMATA Website ☐ Job Fair

☐ WMATA Employee ______________ ☐ Other______________

**Please check the appropriate box in response to the questions below.**

Y N

☒ ☐ Are you a US Citizen?

☒ ☐ Have you previously applied/tested with the Metro Transit Police Department?

(If Yes, explain)______________

☒ ☐ Are you at least 20 years and 9 months of age? **Note: As per the established position qualifications for Metro Transit Police Officers, you are required to be at least 21 years of age at the time of employment.**

☒ ☐ Have you ever been employed by a Law Enforcement Agency? If yes, explain.

MTPD (11/28/05)

☒ ☐ Do you have a valid and current driver's license?

☐ ☒ Do you have more than six (6) negative points on your driving record? ~~UNKNOWN~~ AB NOT TO MY KNOWLEDGE

☐ ☒ Are there any negative or adverse actions on your driving record? If yes, explain. ~~UNKNOWN~~ AB NOT TO MY KNOWLEDGE

☒ ☐ Has your driver's license **ever** been suspended and/or revoked? If yes, list dates.

PRIOR TO EMPLOYMENT W/ MTPD

CONFIDENTIAL

Y N
☐ ☒ Have you **ever** been arrested for or charged with a DUI, DWI or been charged with reckless/negligent driving? If yes, list dates.

☐ ☒ Have you **ever** served in the military? If so, which branch?
☐ Army ☐ Navy ☐ Marines ☐ Air Force ☐ National Guard ☐ Coast Guard ☐ Reserves________

☐ Honorable Discharge ☐ General-Honorable Discharge ☐ General-Medical Conditions
☐ General-Less than Honorable ☐ Dishonorable ☐ Uncharacterized Discharge

☒ ☐ Have you **ever** been arrested, charged, and/or convicted with a criminal offense? If yes, please list the date of the offense and the nature of the arrest and/or charges against you.
YES, PRIOR TO EMPLOYMENT W/ MTPD (11/28/05 - EXPUNGED)

If you have been arrested, charged, and/or convicted of a criminal offense, has the criminal offense been expunged, pardoned, or sealed? EXPUNGED

☒ ☐ Have you **ever** used/experimented with or possessed illegal drugs? If yes, please indicate the type of drug; list the frequency and last date of usage.
YES, = 2001 ~~(DEC. 2001)~~
(DEC. 2001; = 2 TIMES; MARIJUANA)

☐ ☒ Do you owe anything to the IRS or have any student loans that are currently in default? If yes, are you on a payment plan? What is the remaining balance?
NO, NOT THAT I AM AWARE OF

☒ ☐ Do you have any bills/debts that are currently in collections? If yes, are you on a payment plan? What is the remaining balance?
POSSIBLY 2 UTILITIES IN COLLECTIONS

☐ ☒ Have you **ever** filed for Bankruptcy? If yes, please indicate the type of Bankruptcy, the filing date and discharge date.

☒ ☐ Have you **ever** been terminated or resigned in lieu of termination? If yes, please list the name of the employer and the termination date.
YES, METRO TRANSIT POLICE DEPT, MARCH 6, 2014

## CERTIFICATION AND AUTHORIZATION

**I, the undersigned, certify that I have read, personally completed, and understand the Metro Transit Police Applicant worksheet in its entirety and the information provided is true and complete to the best of my knowledge. There are no misrepresentations, misleading information, or omissions. If there are any misrepresentations, misleading, falsifications or omissions of information, I accept and understand that my application will be disqualified.**

**I further understand that with my submission of this signed form, I have authorized the Metro Transit Police Department to perform a criminal background screening.**

Signature: [signature] Date: 03/6/15

CONFIDENTIAL

DISTRICT OF COLUMBIA
metro TRANSIT POLICE
MARYLAND VIRGINIA
1976

# METRO TRANSIT POLICE

* I FEEL THAT THIS (REQUIREMENT TO COMPLETE A BACKGROUND INVESTIGATION) ALONG WITH OTHER ACTIONS, ARE IN RETALIATION FOR PROTECTED EEOC ACTIVITY AND ARE ~~ARE~~ VIOLATIONS OF MY CIVIL RIGHTS (VIOLATIONS CIVIL RIGHTS ACT OF 1964) *

Amala M. Bey

Personal History Questionnaire
for Police Officer ~~applicants~~ REINSTATEMENT

**CONFIDENTIAL**

FOR PERIOD OF TERMINATION (WRONGFUL TERMINATION) 8/1/14 TO 3/12/15

CONFIDENTIAL

1

CONFIDENTIAL

# M E M O R A N D U M

DATE: 2/6/2014

SUBJECT: Statement regarding Cases

FROM: Detective Amanda M. Betts

TO: Sergeant Charles Page

At the request of Sergeant Charles Page, I am to provide a statement as to why I, "take cases home or leave them in the car". I, typically, take cases home that I am actively working on. My cases are usually loaded into the MTPD cruiser at the commencement of my tour of duty or when I leave the office, so as to work on them throughout the day, as well as assisting with calls for service. Furthermore, per Sergeant Charles Page, there is no established rule or regulation, stipulating that we are not allowed to take cases from the office.

Metro
Transit
Police
Department

LAW ENFORCEMENT SENSITIVE
NOT FOR GENERAL RELEASE

CONFIDENTIAL

# M E M O R A N D U M

Metro Transit Police Department

DATE: 2/6/2014

SUBJECT: Statement regarding Cases

FROM: Detective Amanda M. Betts

TO: Sergeant Charles Page

At the request of Sergeant Charles Page, I am to provide a statement as to why I, "take cases home or leave them in the car". I, typically, take cases home that I am actively working on. My cases are usually loaded into the MTPD cruiser at the commencement of my tour of duty or when I leave the office, so as to work on them throughout the day, as well as assisting with calls for service. Furthermore, per Sergeant Charles Page, there is no established rule or regulation, stipulating that we are not allowed to take cases from the office.

***The above statement was submitted via email at approximately 12:07 pm. My second statement is below.***

At approximately 12:30 pm I was contacted by Sgt. Page and told to return to the CID office. I then advised Sgt. Page that I was headed to grab my lunch. He responded by saying that he needed me to return immediately to complete my statement. Once I responded to CID, I was given 4 (four) {enumerated below}, additional questions composed by Sgt. Page, in response to the above referenced statement. Furthermore, I advised Sergeant Page that I had not eaten and would like to grab something to eat; I was then directed to complete the statement. At 2:56 pm, for the third time, I advised Sgt. Page that I had not eaten, and his response was "I gotta have that before you go", referring to this statement. At approximately 3:30 pm, I advised Sgt. Page that I would like to eat- Sergeant Page responded that "you can go when you finish. The second statement is being given under duress.

1) What is the purpose of taking home or leaving in the cruiser over thirty active case files on a daily base?

2) Are you aware that most of your case files pertain sensitive information ie. NCIC printouts and juvenile information?

3) Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and

your case file is needed? You were out sick and we needed to access to your files, you advised, that you had them at home with you.

4) Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and accessible if needed by supervisor and or other Detectives?

Some case files are comprehensive, albeit in the CID office at the Metro Supply Facility or with a detective. As I recall, while out on a medical leave of absence, I was, initially, contacted by Sgt. Page regarding the upcoming case review with Assistant Chief Parks, and the "UNST" case. In response to Question #4, yes, I was present. From my recollection, Sgt. Page specified cases that were in the adjudication process.

CONFIDENTIAL

RECEIVED ADDITIONAL QUESTIONS = 12:50P— 2/6/14

1. What is the purpose of taking home or leaving in the cruiser trunk over thirty active case files on a daily base?

[redacted]

2. Are you aware that most of your case files pertain sensitive information ie. NCIC printouts and Juvenile information?

[redacted]

3. Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and your case file is needed? You were out sick and we needed to access to your files, you advised, you had them at home with you. [redacted]

4. Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and accessible if needed by a supervisor and or other Detectives? [redacted]

SEE ATTACHED STATEMENT

* ALTHOUGH ADDRESSED W/IN STATEMENT I WAS DIRECTED TO PROVIDE THIS COPY OF QUESTIONS, WHICH SERVED AS A DRAFT.

3 OF 3

CONFIDENTIAL

1. What is the purpose of taking home or leaving in the cruiser trunk over thirty active case files on a daily base?

*(SEE ATTACHED STATEMENT)

2. Are you aware that most of your case files pertain sensitive information ie.. NCIC printouts and Juvenile information?

SEE ATTACHED STATEMENT

2/20/14 10:54A

CONFIDENTIAL

3. Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and your case file is needed? You were out sick and we needed to access your case files, you advised you had them with you.

SEE ATTACHED STATEMENT

4. Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and accessible if needed by a supervisor and or other Detectives?

SEE ATTACHED STATEMENT

2

CONFIDENTIAL

# M E M O R A N D U M

SUBJECT: Emergency Suspension DATE: February 27, 2014

FROM: Lieutenant Stephen Boehm

TO: Captain Kevin Gaddis

Metro Transit Police Department

On February 19, 2014 at about 1430 hours, I advised Detective Betts that I needed a written statement from her regarding an administrative investigation which was started by Detective Sergeant Charles Page. This investigation is based on the fact that Detective Betts had acknowledged to taking CID cases home with her and had left them in her vehicle, making them unavailable for management when she was on leave. Detective Sergeant Page had already warned her previously about keeping her case jackets accessible for her officials in the event that she was unable to provide answers to any questions that may arise when she was not working.

Detective Sergeant Page had previously questioned Detective Betts on February 6, 2014 regarding her disobeying his order, and had asked her for a written statement. This statement included a series of four questions that he needed her to specifically answer. After about five hours, Detective Betts provided Sergeant Page with a statement and left, for it was the end of her tour. Upon review, Detective Betts had not answered those questions.

On February 19, Detective Betts's first available day to be questioned, I advised her that she needed to answer the questions directly. Again, as on February 6th, she was allowed to have a shop steward present. She declined and sat down in the sergeants' office with myself and Detective Sergeant Sean Flinn. I provided Detective Betts with the four questions again and showed her a copy of her original answers which I advised did not answer the questions. Additionally, I advised Detective Betts that she could view her previous statement because the intention of this second statement was not to catch her in a contradiction but rather to get her to actually answer the questions.

I directed Detective Betts to write her answers below the typed written questions. Detective Betts refused, advising she had already answered them. I again advised her that I was now asking her the four questions and wanted her to write her answers down. Detective Betts again refused and wrote down, "See Attached Statement" for question number one. I advised her that he wanted a new response because, again, it was a separate interview and I needed a response. Detective Betts refused, advising she had already answered them. I then advised Sergeant Flinn to contact the Watch Commander, Captain Earl Brown in order to begin the process for Emergency Suspension.

**LAW ENFORCEMENT SENSITIVE**
**NOT FOR GENERAL RELEASE**

CONFIDENTIAL

Finally, I advised Detective Betts one last time, that refusal to answer the questions being asked at this time by me, Lieutenant Boehm, would result in discipline, up to and including termination. Detective Betts, again, refused and wrote, “See Attached Statement” under questions two, three, and four. I advised her that she had not answered me directly, and that those answers would not be considered. Detective Betts refused to write anything additional. I advised her that she was being, “emergency suspended” and that she needed to report to OPRI at 0900 on February 20, 2014.

**LAW ENFORCEMENT SENSITIVE**
**NOT FOR GENERAL RELEASE**

CONFIDENTIAL

3

# M E M O R A N D U M

SUBJECT: Emergency Suspension of Detective Amanda Betts    DATE: February 19, 2014

FROM: MTPD – Sergeant Sean Flinn [signature] S. Flinn 3-5

TO: MTPD – Captain Kevin Gaddis

On Wednesday, February 19, 2014, at approximately 1429 hours, Detective Amanda Betts entered the sergeant's office at CID and asked if we could talk about getting her weapon and other items back. Present in the office was Lieutenant Stephen Boehm and I. Lt. Boehm informed her that we could talk about that later, but we needed to talk about a written statement that she previously provided to Sergeant Charles Page.

Detective Betts then inquired about what time it was. Lt. Boehm informed her that it was 1430 hours. Lt. Boehm went on to inform her that if she wanted a Union representative, Chris Archer was in the office and available. She declined. Lt. Boehm then produced four typed questions. There were two questions per page, leaving room for a written response. Additionally, Lt. Boehm provided Detective Betts with her previous statement that she gave to Sergeant Page. He informed her that she could use those as a reference and we were not trying to trick her into providing a false statement. She accepted the items then went over each page. She placed them all on the table in a neat pile and pushed them toward the Lieutenant and stated that she already answered these questions.

Lt. Boehm then informed her that this was an administrative investigation and that she needed to provide written answers to the four questions. He informed her that her previous answers did not fully answer the questions. She picked up the papers (her previous two statements and the questions and answer that she gave previously) and slowly looked at each page. She then stated that she had already answered them. Lt. Boehm informed her that she needed to provide a written response and it was an order. She looked at them again and wrote something down. I could not see it as I was on the other side of my desk. Lt. Boehm again informed her that she needed to answer the questions and she refused. Lt. Boehm then told me to notify the Watch Commander and he left the room. Det. Betts asked if she could leave and I informed her that she had to stay here. I called the Watch Commander, Captain Earl Brown, and informed him that Detective Betts was in the office and she was refusing to answer questions pertaining to an investigation. Captain Brown told me that he would call me back in five minutes that he needed to inform the Chief of Police.

While I was sitting in the sergeant's office with Detective Betts she informed me that she was not trying to be difficult. We talked about various topics not related to the

Metro Transit Police Department

**LAW ENFORCEMENT SENSITIVE**
**NOT FOR GENERAL RELEASE**

CONFIDENTIAL

incident at hand. Lt. Boehm called me and asked to speak with me. Detective Betts again asked if she could leave and I informed her that she had to stay in the office. I came back after a few moments and we continued to talk about various topics.

Lt. Boehm responded back to the room after several minutes and informed Detective Betts that refusing to provide answers to these questions, could result in discipline, up to and including termination. Detective Betts again picked up the papers and very slowly looked at each page. She then proceeded to write something. Again, I could not see what was written. Lt. Boehm informed her that her responses were not adequate. Detective Betts refused to provide any additional answers. Lt. Boehm then informed Detective Betts that she was being emergency suspended and that she would need to report to OPRI's office at 0900 hours tomorrow, Thursday, February 20, 2014.

After a few moments, Vice-Chairman for the Union, Chris Archer and Detective Betts entered the sergeant's office and asked if she was being Emergency Suspended. I informed them that she was. Vice-Chairman Archer then stated, "normally when you are placed on emergency suspension, you go to see the Chief the next day." I informed him that the General Order states that you will meet with the Chief or his/her designee. Vice-Chairman Archer inquired if OPRI was the Chief's designee. I again informed him that Detective Betts was instructed to report to OPRI's office at 0900 hours tomorrow.