UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMANDA BETTS,**<br><br>*Plaintiff,*<br><br>**v.**<br><br>**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**<br><br>*Defendant.* | No. 21-cv-1861-CKK-MAU |

REPORT AND RECOMMENDATION

Amanda Betts ("Betts") sued Washington Metropolitan Area Transit Authority ("WMATA") for employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Betts claims that WMATA discriminated and retaliated against her by issuing her subpar performance evaluations, suspending and terminating her, and not reinstating her to her prior position. Betts also claims that WMATA's purported actions caused a hostile work environment. Before the Court is WMATA's Motion for Summary Judgment (ECF No. 23) ("the Motion") concerning Betts's remaining Title VII claims for sex and race discrimination and retaliation. Because Betts has raised genuine issues of material fact warranting a trial, the Court recommends that WMATA's Motion be **DENIED**.

FACTUAL SUMMARY

Betts became an employee in WMATA's Metro Transit Police Department ("MTPD") in November 2005. ECF No. 24-1 at ¶ 1 ("Pl.'s Resp. to Def.'s Stmt. of Facts").[1] While employed

---

[1]    Citations are to the page numbers in the ECF headers.

with MTPD, Betts filed three Equal Employment Opportunity Commission ("EEOC") charges over a two-year period.  These charges form the basis for Betts's remaining Title VII claims for sex discrimination (Count Three), race discrimination (Count Four), and retaliation (Count Five). *Id.* at ¶¶ 3–5; ECF No. 10 at 36 ("Memorandum Opinion").  The Court will set forth only the allegations relevant to the disposition of WMATA's Motion.

**Betts's First Charge**

Betts alleges that, in the spring of 2012, she participated as a witness in an EEOC investigation that a female colleague initiated.  ECF No. 24 at 11 ("Pl.'s Opp. Br.") (citing ECF Nos. 7-3 at ¶ 5 ("Pl.'s Aff."); 7-16 ("Pl.'s First EEOC Letter")).  Around the same time, Betts notified WMATA she was pregnant.  ECF No. 24-1 at ¶ 11.  Betts claims that WMATA discriminated and retaliated against her for her participation in the investigation and her pregnancy. ECF No. 24-2 at ¶¶ 6, 8 ("Pl.'s Stmt. of Facts").

Betts contends that, after she returned from maternity leave, her direct supervisor issued an "unjustified" performance evaluation for the 2012 fiscal year ("February 2013 evaluation").  ECF No. 24 at 5; *see also* ECF No. 24-1 at ¶ 15.  Betts appealed that evaluation to Chief Taborn on February 20, 2013, and received a second performance evaluation from Sergeant Cowans-Minor on March 14, 2013 ("March 2013 evaluation"), which Betts appealed six days later.  ECF No. 24-1 at ¶¶ 25, 27–28.

Betts filed her first charge with the EEOC on April 29, 2013, alleging that (1) she was "treated differently than males and non-pregnant employees with respect to . . . unfair performance evaluations"; (2) that she was "discriminated against on the basis of [her] sex"; and (3) that she was "retaliated against because of [her] participation in prior EEO activity" in violation of Title

VII and "subjected to a hostile work environment."  ECF No. 23-4 ("First Charge"); *see* ECF No. 24-1 at ¶¶ 2–3.

### Betts's Second Charge

Because Betts did not appeal her evaluations to her direct supervisor, Betts "was investigated [and received a written dereliction] for violating General Order 240," which prohibits an employee from bypassing his or her chain of command.  ECF No. 24-1 at ¶¶ 26, 31, 35.  Betts contested the dereliction, and on May 16, 2013, Chief Pavlik, the new chief of MTPD, "ordered that her written dereliction be removed from her record."  *Id*. at ¶¶ 30–31.  In addition, Chief Pavlik ordered that MTPD issue a final performance evaluation to Betts within 90 days.  *Id*. at ¶¶ 32–34.  Betts contends that she did not receive that final evaluation until January 17, 2014.  ECF No. 24 at 13.

About two weeks after Betts received that final evaluation, she filed her Second Charge.  ECF No. 24-1 at ¶ 4; *see also* ECF No. 23-5 ("Second Charge").  She alleged that she faced continuing discrimination, retaliation, and a hostile work environment based on (1) her performance evaluations and (2) the dereliction issued to her on April 12, 2013.  ECF No. 23-5.  Betts then amended her Second Charge on March 18, 2014, after WMATA suspended and terminated her for allegedly failing to cooperate with an internal investigation.  ECF No. 24-1 at ¶¶ 39, 41.  The Court's reference to Betts's Second Charge will include both her original and amended submissions.

### Betts's Third Charge

Betts appealed her termination and, approximately one year later, received an arbitration award reinstating her to MTPD.  *Id*. at ¶ 46.  As part of that proceeding, three arbitrators considered whether WMATA had "just cause" to terminate Betts.  ECF No. 7-4 at 3 ("Arbitration Opinion

and Award"). The arbitrators heard arguments from WMATA claiming that it had cause to terminate Betts because of her "several and repeated failures to cooperate with its investigation" that violated "General Order #231 and her Oath of Office." *Id*. at 21. The arbitrators also heard Betts's arguments that WMATA failed to prove it had cause to terminate her and that the "investigation was simply a pretext" to fire her. *Id*. at 23. Ultimately, after considering witness testimony, documents, and briefing from the Parties, the arbitrators concluded that WMATA "failed to prove that it had just cause to discipline [Betts], let alone terminate her." *Id*. at 1–3, 39.

Betts contends that, upon her return, she was not adequately reinstated. ECF No. 24-1 at ¶¶ 46–68. On May 6, 2015, Betts resigned. *Id*. at ¶ 69. She filed her Third Charge on May 22, 2015, alleging that WMATA (1) intentionally delayed her reinstatement until March 12, 2015; (2) failed to provide proper employee identification, keys to access the bathroom, and a radio to report suspicious activity upon her return; (3) failed to notify a District One official of her new duty assignment; (4) required Betts to use personal funds to complete the recertification process; (5) required Betts to complete the police recertification process, including a full background investigation; and (6) caused Betts to resign on May 6, 2015. *Id*. at ¶ 5; ECF No. 23-6 ("Third Charge").

### PROCEDURAL POSTURE

Betts filed a five-count Complaint on July 12, 2021, which included claims of (1) hostile work environment based on sex, disability (based on her pregnancy), race, and retaliation in violation of Title VII and the Rehabilitation Act; (2) discrimination based on disability in violation of the Rehabilitation Act; (3) discrimination based on sex in violation of Title VII; (4) discrimination based on race in violation of Title VII; and (5) retaliation against protected activity in violation of Title VII. *See* ECF No. 1 ("Compl.").

WMATA filed a Motion to Dismiss or, in the alternative, for Summary Judgment, contending (1) that Betts failed to exhaust her administrative remedies as to her Title VII claims; (2) that all of her claims were time-barred by Title VII or the Rehabilitation Act, and (3) that Betts failed to state a plausible claim for relief as to each count. ECF No. 5. On August 22, 2022, the District Court granted in part and denied in part WMATA's Motion to Dismiss. *See* ECF No. 10 at 36.

After the Court's ruling, Betts had three remaining claims: (1) Title VII claims for sex discrimination (Count Three), (2) race discrimination (Count Four), and (3) retaliation (Count Five) *insofar* as these claims rely on (A) Betts's February 2013, March 2013, and January 2014 performance evaluations; (B) her February 2014 suspension and March 2014 termination; and (C) the allegations raised in her Third Charge. *Id*. WMATA seeks summary judgment on all three remaining counts.

**LEGAL STANDARD**

### I.    Standard of Review

The Court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The mere existence of some factual dispute is insufficient on its own to bar summary judgment. *Anderson*, 477 U.S. at 247–48. The dispute must pertain to a "material" fact. *Id*. Accordingly, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248

(citation modified).  The Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.

On summary judgment, a reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *See, e.g.*, *Stoe v. Barr*, 960 F.3d 627, 629 (D.C. Cir. 2020).  The non-movant must point to specific facts in the record that reflect a genuine issue warranting trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "Courts must avoid making credibility determinations or weighing the evidence, since credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Rothberg v. Xerox Corp.*, No. 12-cv-617, 2016 WL 10953882, at *10 (D.D.C. Feb. 3, 2016) (citation modified) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

## II.    Title VII of the Civil Rights Act of 1964

Title VII prohibits an employer from discriminating against its employees and applicants based on race, sex, national origin, and protected activities.  42 U.S.C. § 2000e-2(a).  The two essential elements of a Title VII discrimination claim are that (1) the plaintiff suffered an adverse employment action (2) because of the plaintiff's race, color, religion, sex, national origin, age, or disability.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  Similarly, Title VII includes an anti-retaliation provision that also prohibits "discrimination against an employee or job applicant who . . . has made a charge, testified, assisted, or participated in a Title VII proceeding or investigation."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 53 (2006) (citation modified); 42 U.S.C. § 2000e-3(a).  The elements of a retaliation claim are that (1) the

plaintiff engaged in activity that Title VII protects; (2) their employer took a materially adverse action against them; and (3) the employer took the action because of the protected activity.  *Salak v. Pruitt*, 277 F. Supp. 3d 11, 21 (D.D.C. 2017).

When a plaintiff lacks direct evidence of discrimination or retaliation, the Court applies the *McDonnell Douglas* burden-shifting framework to both claims.  *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019); *see also Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019).  Under that framework, the employee must first make out a prima facie case of retaliation or discrimination.  *Iyoha,* 927 F.3d at 566.  The employer must then come forward with a legitimate non-discriminatory reason for the challenged action.  *Id.*  If that burden is met, the Court must conduct one "central inquiry" in deciding an employer's motion for summary judgment: "[W]hether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis."  *Id.* (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)).

## DISCUSSION

The District Court previously ruled that Betts's remaining discrimination and retaliation claims could only rest on her: (1) February 2013, March 2013, and January 2014 evaluations; (2) suspension and termination; and (3) the alleged conduct she raised in her Third Charge.  ECF No. 10 at 36.  Betts's First Charge contains allegations about her February 2013 and March 2013 evaluations; her Second Charge contains allegations about her January 2014 evaluation,[2] February

---

[2]    Although Betts only references her March 2013 evaluation in her Second Charge, it is actually Betts's January 2014 performance evaluation that is at issue because that is Betts's final 2012 fiscal year evaluation.  Inexplicably, the Parties contend that Betts made claims regarding her January 2014 performance evaluation in her First Charge.  *See* ECF No. 23-1 at 2 (WMATA claims the January 2014 evaluation was at issue in her First Charge); ECF No. 24 at 6 (Betts claims

2014 suspension, and March 2014 termination; and her Third Charge contains allegations about her March 2015 reinstatement. The District Court allowed Betts's discrimination and retaliations claims about these events to proceed because (1) Betts had exhausted her administrative remedies; and (2) Betts had alleged sufficient facts to plausibly state claims for relief. *Id.* at 16–19, 25–29. In coming to the latter conclusion, the District Court deferred reviewing materials WMATA cited outside of the pleadings in support of its arguments and WMATA's non-retaliatory justification for its actions. *Id.* Before the Court advances to the merits of WMATA's Motion, however, it must address the Parties' two threshold disagreements.

## I. Although All Three Charges Set Forth Retaliation Claims, Only Betts's First and Second Charges Set Forth Race and Sex Discrimination Claims.

First, the Parties disagree about whether Betts made claims of race and sex discrimination in her Second and Third Charges. The Court must address this disagreement first because WMATA later argues that Betts cannot rely on her Second Charge to support her discrimination claims. Betts alleges in her Complaint and subsequent filings that her suspension and termination, both captured in her Second Charge, constitute race and sex discrimination. *See* ECF No. 1 at ¶¶ 47, 54 (alleging her "unfair performance evaluations . . . and termination" constitute discrimination on the basis of race and sex). WMATA, however, asserts that Betts "has no claim for sex and race discrimination in her . . . Second Charge," because Betts only "checked the Charge's boxes for retaliation and 'other' for hostile work environment." ECF No. 26 at 14 ("Def.'s Reply Br."); *see also* ECF No. 23-1 at 3 (arguing that "[t]he Court limited Plaintiff's factual allegations in her Amended Second Charge to her February 2014 suspension and her March 2014 termination, as

---

her January 2014 performance evaluation was at issue in her First Charge only). This is impossible because the First Charge was filed on April 13, 2013, nearly a year before WMATA issued the January 2014 evaluation.

the basis for her remaining claim of retaliation.").

WMATA is wrong.  First, the Court never limited Betts's race and sex discrimination claims to only her suspension and termination.  ECF No. 10 at 36 ("[T]he remaining claims are Plaintiff's Title VII claims for sex discrimination (Count Three), race discrimination (Count Four), and retaliation (Count Five)—*only* insofar as these claims rely on: Plaintiff's February 2013, March 2013, and January 2014 performance evaluations; her February 2014 suspension and March 2014 termination; and the allegations raised in her Third EEOC Charge.").  Second, although Betts did not check the box for "race" or "sex" discrimination in her Second Charge, Betts does check the box for "continuing action" and identifies March 14, 2013, the day she received her purported subpar performance evaluation, as the earliest date prior discrimination took place.  ECF No. 23-5.  It is, therefore, reasonable to infer that Betts intended that her Second Charge would build upon her First Charge, in which Betts did allege race and sex discrimination.  This is especially so because Betts explicitly mentions her March 2013 performance evaluation in the narrative of her Second Charge.  *Id.*; *see Ravenell v. Mayorkas*, No. 22-cv-3548, 2024 WL 1344460, at \*7 (D.D.C. Mar. 29, 2024) ("[C]ourts have found claims exhausted based on narrative descriptions included in an EEOC complaint even when a plaintiff fails to check the corresponding box."); *McIver v. Mattis*, 318 F. Supp. 3d 245, 250 (D.D.C. 2018) (dismissing claims as non-exhausted because the plaintiffs did not check the proper boxes *and* that they did not raise the claim in a narrative description).

Moreover, in her Second EEOC Letter, Betts maintains that she had been subject to "constant discrimination."  ECF No. 7-19 at 2 ("Pl.'s Second EEOC Letter").  Betts restated this contention in her pleadings, filings, and record evidence.  *See* ECF No. 1 at ¶ 47, 54 (alleging her "unfair performance evaluations . . . and termination" constitute discrimination on the basis of race

9

and sex); ECF No. 7-1 at 10–11 ("Pl.'s Opp. Br. to Def.'s Motion to Dismiss") (arguing that a male counterpart was not investigated or disciplined for keeping files in his car); ECF No. 24 at 19 (arguing Betts's suspension and termination establish a prima facie case of race and sex discrimination). Finally, the District Court also recognized that Betts raised claims of "continuing discrimination" in her Second Charge. *See* ECF No. 10 at 8–9. In light of these facts, the Court construes Betts's Second Charge to include claims of race and sex discrimination as well as retaliation. *See Crawford v. Duke*, 867 F.3d 103, 108 (D.C. Cir. 2017) (EEOC complaints "are to be construed liberally since very commonly they are framed by persons unschooled in technical pleading.") (citation modified).

The Court does not, however, construe Betts's Third Charge to include claims of race and sex discrimination. Betts did not include any narrative about alleged discrimination in her Third Charge nor does she check the box for discrimination or a "continuing action." ECF No. 23-6. Moreover, Betts sets forth no allegations from her Third Charge in Counts III and IV in her Complaint. *See* ECF No. 1 at ¶¶ 45–51, 52–58 ("Plaintiff endured unnecessary supervisory scrutiny, undermining of her supervisory roles, verbal harassment, declination of requests for transfers to administrative and limited duty assignments, surrendering her service weapon, unfair performance evaluations, and termination."). Nor does her December 15, 2021, letter to the EEOC regarding her Third Charge clearly allege race and sex discrimination. ECF No. 7-22 ("Pl.'s Third EEOC Letter") (stating Betts was "subject to arbitrary and capricious 'requirements' and several acts of retaliation, disparate treatment and a hostile work environment."). It appears that the first instance in which Betts explicitly claimed that the allegations in her Third Charge constituted race and sex discrimination was in her Opposition to WMATA's Motion for Summary Judgment. *See* ECF No. 24 at 23–28. In that Opposition, Betts combines her retaliation arguments pertaining to

10

her Third Charge with her claims of race and sex discrimination, rather than arguing them separately. *Id.* Accordingly, she sets forth only retaliation claims in her Third Charge.

In sum, Betts raises claims of discrimination and retaliation in her First and Second Charges and includes allegations that her performance evaluations, suspension, and termination were adverse employment actions. In her Third Charge, Betts alleges retaliation claims only and includes allegations that WMATA (1) intentionally delayed her reinstatement; (2) failed to provide proper employee identification, keys to access the bathroom, and a radio to report suspicious activity upon her return; (3) failed to notify a District One official of her new duty assignment; (4) required Betts to use personal funds to complete the recertification process; (5) required Betts to re-do the recertification process, including a full background investigation; and (6) caused Betts to resign on May 6, 2015. *See* ECF No. 23-6.

## II.    Only Betts's 2014 Suspension and Termination Constitute Adverse Actions for her Discrimination and Retaliation Claims.

Second, the Parties disagree about whether Betts has alleged any cognizable adverse employment actions. Specifically, WMATA argues that the evaluations at issue in Betts's First and Second Charges and the alleged retaliatory actions in her Third Charge do not constitute adverse actions. ECF No. 23-1 at 9, 17–19. Regarding her first two charges, Betts argues that her subpar performance evaluations constituted adverse actions and, further, caused her not to receive her 2013 step increase or promotional opportunities. ECF No. 24 at 11–15. For her Third Charge, the Court understands Betts to argue that WMATA's alleged retaliatory actions are adverse because WMATA did not sufficiently restore her employment. *Id.* at 26–27.

### A.    Betts's First and Second Charges.

The Parties dispute whether the performance evaluations in Betts's First and Second Charges constitute adverse actions. Notwithstanding these arguments, Betts's Second Charge

11

clearly identifies two adverse actions: her suspension and termination. *See Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (noting significant changes in employment status, such as firing, constitute adverse employment actions).

Betts's claims of discrimination and retaliation based on her evaluations, however, are a different matter. WMATA argues that performance evaluations cannot constitute adverse actions because there was no corresponding financial harm. ECF No. 23-1 at 6–7. Betts argues that, under *Chambers v. District of Columbia*, she need not tie her evaluations to any financial harm and need only show that these evaluations affected the "terms, conditions, or privileges of [her] employment because of a protected characteristic." 35 F.4th 870, 874–75 (D.C. Cir. 2022). According to Betts, she has met that standard by demonstrating that her low scores "could lead to future issues," such as not receiving promotions or other opportunities, under WMATA's policies and the Corrective Action Plan WMATA issued to Betts. ECF No. 24 at 15–16.

To maintain Title VII claims for discrimination and retaliation, a plaintiff must show that he or she suffered an adverse employment action. *Walker v. McCarthy*, 582 F. App'x 6, 7 (D.C. Cir. 2014). For discrimination claims, courts in this District have found that employment "[a]ctions that do not meet this [*Chambers*] test include . . . giving an employee a poor performance review." *Stewart v. U.S. Dep't of Agric.*, No. 23-cv-1194, 2024 WL 4332618, at *5 (D.D.C. Sept. 27, 2024); *see also Heavans v. Dodaro*, 648 F. Supp. 3d 1, 14 (D.D.C. 2022). Similarly, for retaliation claims, performance evaluations are not materially adverse unless they affect an employee's "position, grade level, salary, or promotion opportunities." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting *Baloch*, 550 F.3d at 1199).

To meet these standards, Betts argues that her evaluations caused her to be denied her 2013 step increase and promotional opportunities. ECF No. 24 at 13. Specifically, Betts alleges that

her January 2014 performance evaluation caused her to not receive her step increase in November 2013.  ECF No. 24-2 at ¶ 7.  WMATA, however, cites evidence that Betts *did* receive an "hourly rate increase from $31.004808 an hour to $33.227885 during the payroll period of 11/17/2013–11/30/2013, *i.e.*, on the anniversary of her hiring date."  ECF No. 23-1 at 7 (citing ECF No. 23-22 at ¶¶ 8–9 ("Edmonds Decl.")).  Betts does not dispute the authenticity of this evidence or otherwise argue that the Court cannot rely on it.  Instead, Betts attempts to create a genuine issue by citing (1) her Second EEOC Letter, which simply repeats her allegations that she did not receive a pay increase until May 2014; and (2) WMATA's GO 240 policy that states "[t]wo or more scores of 2 or below, automatically denies a member a salary step increase for 30 days, pending a reevaluation that contains not more than one score of 2 or below."  ECF No. 24 at 13–14 (citing ECF No. 7-19 and ECF No. 23-7 at 2 ("GO 240 Policy")).  This evidence at best only supports a finding that Betts *could* have been subject to a delay in receiving a step increase, not that her pay was actually delayed.  The evidence does not create a genuine issue in the face of WMATA's direct evidence establishing that Betts *did* receive a pay increase in November 2013.

Similarly, although Betts claims that her evaluations were "used for promotions," she fails to raise a genuine issue that her evaluations caused her any financial or other concrete harm.  *See* ECF No. 24-1 at ¶ 32–34; ECF No. 24 at 14 (arguing WMATA's GO 240 Policy and her February 2013 Corrective Action Plan Document "could lead to future issues").  In making this argument, Betts relies solely on her own self-serving affidavit, in which she makes a number of conclusory statements that her evaluations "hurt her ability to receive promotions, pay increases, field training opportunities, and consideration for promotional lateral opportunities outside of WMATA."  ECF No. 24 at 13.  From Betts's perspective, her performance evaluations "obstructed [her] opportunity

13

to become a Field Training Detective" and "hindered [her] eligibility to be promoted to Sergeant." ECF No. 7-3 at ¶¶ 29–30.

In response, WMATA cites record evidence that Chief Pavlik converted Betts's February 2013 evaluation into an interim evaluation, which could *not* be used to determine eligibility for promotions or step increases. ECF Nos. 23-14 at ¶ 20 ("Pavlik Decl."); 23-26 at 34:1–19 ("Alvarez Dep."). WMATA also cites evidence that, since 2011, performance evaluations cannot be used in the promotion process from Officer to Sergeant or to become a Field Training Detective. ECF No. 23-23 at ¶ 10 ("Boehm Decl."); *but see* ECF No. 23-26 at 31:21–32:3 (stating that generally evaluations are used in the promotion process). Against WMATA's evidence, Betts's conclusory allegations fail to raise a genuine issue that her evaluations caused her to be denied specific promotions or other opportunities. *Blackmon-Malloy v. United States Capitol Police Bd.*, No. 01-cv-2221, 2024 WL 4298853, at *10, 37 (D.D.C. Sept. 26, 2024) (concluding that plaintiff's performance evaluation was not sufficient to sustain a claim of retaliation because he could not tie his evaluations to the loss of any bonus or career opportunity). Accordingly, she has failed to raise a genuine issue of material fact that her performance evaluations, purported delayed step increase, and alleged denial of promotional opportunities constitute actionable adverse actions.

### B.    Betts's Third Charge.

Similarly, Betts has failed to raise a genuine issue that any of the following alleged actions in her Third Charge constitute adverse employment actions: (1) that WMATA intentionally delayed her reinstatement; (2) that WMATA failed to provide proper employee identification, keys to access the bathroom, and a radio to report suspicious activity upon her return; (3) that WMATA failed to notify a District One official of her new duty assignment; (4) that WMATA required Betts to use personal funds to complete the recertification process; (5) that WMATA required Betts re-

14

do the police recertification process, including a full background investigation; and (6) that WMATA caused her resignation.  ECF No. 23-6.  Betts has failed to show that any of these alleged events affected the "terms, conditions, or privileges of [her] employment because of a protected characteristic," *Chambers*, 35 F.4th at 874–75, or "produce[d] such obvious negative consequences that [she could] establish the 'objectively tangible harm,' required to sustain a claim of retaliation," *Blackmon-Malloy*, 2024 WL 4298853, at \*14 (quoting *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013)).[3]  Indeed, these purported adverse actions are more akin to the "trivial harms" the Supreme Court considers "petty slights or minor annoyances" that all employees experience, regardless of whether that employee has reported prohibited behavior. *Burlington N.*, 548 U.S. at 68.  Nor has Betts pointed to any authority supporting the conclusion that such actions can constitute adverse employment actions.  Instead, Betts makes conclusory statements, citing Betts's own "recollection" and WMATA's witnesses' statements in which they could not recall whether certain reinstatement procedures were followed.  ECF No. 24 at 26–27. Because she fails to raise a genuine dispute that any of these disparate acts alleged in her Third Charge constitute adverse actions, only Betts's suspension and termination in her Second Charge

---

[3]     It appears that Betts intended to suggest her resignation was, in fact, not voluntary and amounted to a constructive discharge.  ECF No. 24 at 26–28; *see also Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) (voluntary resignations are presumed to be voluntary and not adverse employment actions).  Notwithstanding that inference, Betts did not plead a constructive discharge claim; and even assuming that she did, she failed to introduce any evidence to overcome this presumption.  *Id*. ("In certain cases, the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary.").  At most, the evidence demonstrates MTPD's actions amounted to petty behavior or inconveniences for Betts. For example, Betts argues that because MTPD failed to send information to the Maryland Police Training Commission ("MPTC"), she could not be recertified as a law enforcement officer, a requirement of her position.  ECF No. 24 at 25 (citing Pl.'s Third EEOC Letter).  But WMATA cited evidence that Betts *herself* failed to provide the required documentation to MTPD for recertification.  *See* ECF No. 26 at 18–19.

can sustain her remaining claims.

**III.    Betts Has Offered Sufficient Evidence for a Reasonable Juror to Conclude that the Proffered Reason for Her Suspension and Termination was Pretextual, Discriminatory, and Retaliatory.**

The Court now turns to the central question: with respect to her suspension and termination, has Betts produced sufficient evidence for a reasonable jury to conclude that WMATA's asserted non-discriminatory reason was pretext for intentional discrimination or retaliation based on Betts's membership in a protected class? *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) (quoting *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)). In considering the question, the Court looks at whether the jury can make such a finding "from the combination of (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions, and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer." *Id.* (citation modified). Although it is a close call, the answer is yes.[4]

**A.    Betts Has Raised a Genuine Issue of Material Fact on her Discrimination and Retaliation Claims.**

To show pretext for discrimination or retaliation, a plaintiff can present evidence demonstrating "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, the employer's pattern of poor treatment of other employees in the same

---

[4]    WMATA arguably fails to offer any legitimate, non-discriminatory reason for suspending and terminating Betts in response to Betts's *discrimination* claims because WMATA instead took the position that Betts had failed to assert a claim for sex and race discrimination in her Second Charge. *See* ECF No. 26 at 14. That said, WMATA did offer a legitimate, nondiscriminatory reason for suspending and terminating Betts in defense of Betts's *retaliation* claims. ECF Nos. 23-1 at 13; 26 at 14–15. Even assuming WMATA intended to rely on this defense for Betts's discrimination claims, Betts has nonetheless raised a genuine issue of material fact to warrant a trial on her discrimination and retaliation claims. *See infra*, § III. A.

16

protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Wheeler*, 812 F.3d at 1115 (quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015)) (citation modified). "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.

WMATA argues that it had legitimate, non-retaliatory reasons to suspend and terminate Betts because she "is the only officer ever known to have refused to submit to and cooperate with an investigation by MTPD's Office of Professional Responsibility and Inspections ('OPRI')." ECF No. 23-1 at 13 (citing ECF No. 23-14 at ¶ 25). Specifically, WMATA explained that Betts "refused to answer the questions" about "keeping approximately 30 sensitive police investigation files in the trunk of her car." ECF No. 23-1 at 13 (citing ECF No. 23-28 at 58:13-72:12 ("OPRI Investigation")). WMATA alleged that, in the course of its internal investigation, Betts repeatedly refused to participate and answer certain questions, which violated internal mandates and warranted termination. *Id*. 13–14 (citing ECF No. 23-27 at 7–8). WMATA also contends that management was unaware of Betts's EEO activity at the time WMATA suspended and terminated Betts. ECF No. 23-1 at 14 (noting Chief Pavlik, who terminated Betts, did not know of Betts's charges until one month after her termination).

Betts asserts that her alleged "fail[ure] to cooperate" is pretext for discrimination and retaliation. ECF No. 24 at 19. Specifically, Betts argues that she and another female detective, who also had a history of EEO activity, were singled out for taking case files home, even though white, male detectives with no EEO activity routinely took files home. *Id.* For example, Betts asserts that Sergeant Boehm, who is a white man with no prior EEO activity, had a large stack of case files in his car. ECF No. 7-3 at ¶ 34. Moreover, Betts argues that WMATA attempted to

elicit incriminating, written responses from her after she disclosed that she took case files home. ECF No. 7-4 at 11–14. Finally, Betts asserts that her repeated complaints about her chain of command accumulated in continued retaliatory actions, such as the evaluations she appealed, the charges she filed, and, ultimately, her termination. *See* ECF Nos. 24 at 19; 7-4 at 36–37.

Betts supports these arguments by citing her own affidavit, letters, deposition testimony, and an Arbitration Opinion and Award. Betts relies heavily on the latter, in which an arbitration panel found that WMATA did not have just cause to terminate Betts. ECF No. 7-4 at 39. She points to four findings of facts in the Arbitration Opinion and Award to support her arguments. First, WMATA had no written policy prohibiting or limiting detectives from taking case files home. *Id.* at 10, 32 (noting that "there is evidence that other detectives took case files home and that Management was aware of the practice"). Second, WMATA attempted to elicit "brief and incriminating" responses from Betts to use against her. *Id*. at 33–34. Third, WMATA disciplined Betts with the most severe punishment available. *Id*. at 33–37 ("[T]he penalty invoked by Management is, itself, telling."). And fourth, WMATA engaged in this behavior all while "likely" knowing of Betts's Second Charge. *Id*. at 10 ("[T]he Union's suggestion that the Employer knew of this second Charge is likely true."). Indeed, the arbitrators found that the "totality of the circumstances" established that Betts's failure to cooperate was "never . . . a violation," and WMATA was simply "determined to rid themselves" of Betts. *Id*. at 37.

The arbitrators weighed a breadth of evidence, including Betts's own testimony against opposing witnesses, to conclude that WMATA did not have just cause to fire Betts. The Court at this stage must view the evidence in the light most favorable to Betts. In light of the record evidence upon which Betts relies, and drawing all justifiable inferences in her favor, Betts has demonstrated that "a reasonable jury not only could disbelieve the employer's reasons, but also

could conclude that the employer acted, at least in part, for a prohibited reason." *See Walker*, 798 F.3d at 1093; *see also Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012) (reversing the district court's grant of summary judgement on plaintiff's race and sex discrimination and retaliation claims, in part, because an arbitral decision's "factual predicates and analysis give some boost to [plaintiff's] claim that the [defendant's] asserted reasons for terminating her were pretextual.").

WMATA doubles down that Betts "cannot dispute" WMATA's legitimate, non-retaliatory reasons for suspending and terminating her because she testified that she violated WMATA's mandates by disobeying her superiors. ECF No. 26 at 14 (citing ECF No. 23-28 at 58:13–72:12 ("Arbitration Hearing Tr.")). Despite WMATA's assertions otherwise, Betts's contentions are not "blatantly contradicted by the record, [such] that no reasonable jury could believe [them]. . . ." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (citation modified). Indeed, in addition to citing the Arbitration Opinion and Award, Betts points to evidence that all of this alleged conduct occurred against the backdrop of Betts voicing numerous concerns about management, receiving alleged negative performance reviews, and ultimately WMATA investigating and terminating her. *See* ECF No. 24 at 19 (citing ECF No. 7-3 at ¶¶ 2–30, 60–64).

Finally, WMATA argues that Betts's claims would still fail because the Arbitration Opinion and Award is irrelevant and inadmissible. ECF No. 26 at 11. But that issue is not one this Court must resolve at this juncture. Indeed, if WMATA seeks to prevent Betts from relying on this evidence at trial, then WMATA may bring a motion in limine. *See Amobi v. Brown,* 317 F. Supp. 3d 29, 38 (D.D.C. 2018) (granting a motion in limine to exclude an arbitrator's opinion as evidence at trial because "there is a substantial risk that the jury's own determination of the credibility . . . will be influenced in a manner that is prejudicial to Defendants."). Nevertheless, at summary

judgment, Betts is not barred from relying on the arbitrators' findings. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974) (An "arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate."); *accord DeJesus v. WP Co.*, 841 F.3d 527, 534 (D.C. Cir. 2016) (finding that a "jury could properly conclude that the [defendant's] proffered reason is so unreasonable that it provokes suspicion of pretext" in part based on an "allegation . . . found in the arbitration.") (citing *Alexander*, 415 U.S. at 60).[5]

## CONCLUSION

For the foregoing reasons, the Court recommends that the District Court **DENY** WMATA's Motion for Summary Judgment (ECF No. 23) and allow Betts's case to proceed to trial on her claims, as narrowed in this Report and Recommendation.

**SO ORDERED**.

Date:   July 17, 2026

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

---

[5]    The Supreme Court in *Alexander* allowed for "arbitral decision[s] [to be] admitted as evidence and accorded such weight as the court deems appropriate." 415 U.S. at 60. To WMATA's point, neither the Supreme Court or the D.C. Circuit have addressed the admissibility of the arbitrator's findings on hearsay grounds pursuant to Federal Rules of Evidence 801 and 802. Other Circuits, however, have interpreted the Supreme Court's silence on the issue not as an oversight but, instead, as an endorsement of the admission of arbitral decisions. *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 549 n. 3 (6th Cir. 2008). Accordingly, at this stage, the Court will not preclude Betts from relying on the Arbitration Award and Opinion.

**Local Civil Rule 72.3(b) Notice**

The Parties are advised that under the provisions of Local Rule 72.3(b), any Party who objects to a Report and Recommendation must file a written objection with the Clerk of Court within fourteen days of the party's receipt of the Report and Recommendation.  The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections.  Failure to file timely objections to the findings and recommendations set forth in this Report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

* * *