**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMANDA BETTS,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,<br><br>Defendant. | Civil Action No. 21-1861 (CKK-MAU) |

**MEMORANDUM OPINION**
(September 14, 2026)

Amanda Betts ("Betts") brings this employment discrimination action against her former employer, Washington Metropolitan Area Transit Authority ("WMATA"). At this stage in the proceedings, Betts has three remaining claims left: a sex discrimination claim, a race discrimination claim, and a retaliation claim. WMATA moves for summary judgment on Betts's remaining claims. Upon consideration of the parties' submissions,[1] the relevant legal authority, and the entire record, the Court shall **GRANT** WMATA's [23] Motion for Summary Judgment.

## I. BACKGROUND

### A. Factual Background

Betts is a Black, biological female who became an employee in WMATA's Metro Transit Police Department ("MTPD") in November 2005. Pl.'s Stmt., Dkt. No. 24-1 ¶ 1. While employed with MTPD, Betts filed three Equal Employment Opportunity Commission ("EEOC") charges

---

[1] The Court's consideration has focused on Defendant's Motion for Summary Judgment, Dkt. No. 23 ("Def.'s Mot."), and the attachments thereto; Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Dkt. No. 24 ("Pl.'s Opp'n"), and the attachments thereto; Defendant's Reply in Support of its Motion for Summary Judgment, Dkt. No. 26 ("Def.'s Reply"); the Report and Recommendation, Dkt. No. 28 ("Rep."); Defendant's Objections to the Report and Recommendation, Dkt. No. 29 ("Def.'s Obj."); Plaintiff's Response to Defendant's Objections, Dkt. No. 30 ("Pl.'s Resp."); and Defendant's Reply to Plaintiff's Response, Dkt. No. 31 ("Def.'s Reply, Dkt. No. 31").

over a two-year period. These charges form the basis for Betts's remaining Title VII claims for sex discrimination (Count Three), race discrimination (Count Four), and retaliation (Count Five). *Id*. ¶¶ 3–5; Mem. Op., Dkt. No. 10 at 36. The Court shall confine its discussion of the facts to those that are relevant to the disposition of WMATA's Motion for Summary Judgment.

1. Betts's First EEOC Charge

Betts presented her first charge against WMATA to the EEOC on April 29, 2013, by completing and filing EEOC Form 5 (the "First Charge"). *See* First Charge, Dkt. No. 23-4. The form Betts used to submit her First Charge allowed her to indicate whether she was presenting charges of discrimination based on race, color, sex, religion, national origin, retaliation, age, disability, genetic information, or "other" by checking a box next to each form of charged discrimination. *Id*. Betts indicated that she was charging discrimination based on race, sex, retaliation, disability, and "other," specifying that "other" referred to a hostile work environment. *Id*. Betts also checked a box indicating that this charged discrimination was continuing. *Id*.

The form Betts used to submit her First Charge also provided a section for Betts to explain "the particulars" of her charged discrimination. *Id*. In this narrative section, Betts alleged that, in May 2012, she notified her supervisors that she was pregnant, and that from that date on she had "been harassed and treated differently than males and non-pregnant employees with respect to requests for transfers to administrative and limited duty assignments, surrender of service weapon, and unfair performance evaluations." *Id*. Betts also alleged that she had "also been harassed in retaliation for [her] participation as a witness in a prior charge . . . filed with EEOC by another party." *Id*. Betts has identified the EEOC charge that she participated in as a charge of harassment brought by a female colleague in May 2012. *See* Pl.'s Stmt. of Facts in Dispute, Dkt. No. 24-2 ¶ 8. Betts explained that WMATA had "given [her] no reasons for the difference in treatment" and claimed, in relevant part, that she had been "discriminated against on the basis of [her] sex, female,

and retaliated against because of [her] participation in prior EEO activity." *See* First Charge, Dkt. No. 23-4.

Betts identifies two performance evaluations as adverse actions relevant to the charges of discrimination and retaliation alleged in her First Charge. The first is a February 2013 performance evaluation that Betts received shortly after returning from maternity leave.[2] *See* Rep. at 7; Pl.'s Resp. at 5. The second is a March 2013 performance evaluation. *See* Rep. at 7; Pl.'s Resp. at 5.

2. Betts's Secon EEOC Charge

Betts bypassed her chain of command in appealing the two performance evaluations at issue in her First Charge, and therefore she was investigated and received a written dereliction for violating General Order #240, which prohibits employees from bypassing their chain of command. *See* Rep. at 3. Betts contested the written dereliction, and on May 16, 2013, Chief Pavlik, the new chief of MTPD, ordered that her written dereliction be removed from her record. *Id*. Chief Pavlik also ordered that MTPD issue a final performance evaluation to Betts within 90 days, but Betts contends that she did not receive that final evaluation until January 17, 2014. *Id*.

Shortly after that, on January 30, 2014, Betts presented another EEOC Form 5 containing her second charge against WMATA to the EEOC (the "Second Charge"). *See* Second Charge, Dkt. No. 23-5. Like her First Charge, Betts's Second Charge checked the boxes indicating that she was presenting charges of continuing discrimination based on retaliation and a hostile work environment—unlike her First Charge, however, Betts's Second Charge did not check the boxes that would have indicated she was also bringing claims of race discrimination and sex discrimination. *Compare id. with* First Charge, Dkt. No. 23-4. In describing "the particulars" of Betts's alleged discrimination, Betts's Second Charge stated that she was "retaliated against based

[2] Betts went on maternity leave around October 2012 and returned to work on February 4, 2013. Dkt. No. 24-1 ¶ 15.

on being a witness" in relation to another EEOC charge. *Id.* Betts's Second Charge identified a March 14, 2013, performance evaluation in which she was allegedly "given another evaluation with a lower score . . . in response to a previous performance evaluation appeal," and the written dereliction she received on April 12, 2013, "for going out of [her] chain of command when [she] complained." *Id.*; *see also* Rep. at 3. Betts's Second Charge stated that "[n]o reason was provided for the above-mentioned treatment" and claimed that Betts was "retaliated against for engaging in a protected activity with respect to discipline in violation of Title VII." *Id.*

Betts amended her Second Charge on March 18, 2014. *Id.* Betts's amendment did not alter the content of her Second Charge as it was first filed. *Id.* Instead, Betts's amendment added two instances of alleged adverse action. *Id.* Specifically, Betts amended her Second Charge to include the fact that she was suspended without pay on February 20, 2014, and discharged on March 6, 2014. *Id.* Betts's amendment states that "[t]he reason given for [her] discharge was failure to cooperate with an internal investigation." *Id.* The internal investigation in question was an investigation into whether Betts kept case files in her car or at home. *See* Dkt. No. 24-1 ¶¶ 36–41. The Court shall describe the details of this investigation later on. *See infra* Section III.B.2.b.

3. <u>Betts's Third EEOC Charge</u>

Betts appealed her termination and, approximately one year later, received an arbitration award reinstating her to MTPD. Rep. at 3 (citing Dkt. No. 24-1 ¶ 46). This award came at the culmination of a proceeding where three arbitrators considered whether WMATA had "just cause" to terminate Betts. Rep. at 3 (citing Arbitration Opinion, Dkt. No. 7-4 at 3). The arbitrators heard arguments from WMATA claiming that it had cause to terminate Betts because of her "several and repeated failures to cooperate with its investigation" into her practice of keeping case files in her car, and that this refusal to cooperate violated "General Order #231 and her Oath of Office." *Id.* at 4 (quoting Arbitration Opinion at 21). And the panel heard Betts's arguments that WMATA

failed to prove it had cause to terminate her and that the "investigation was simply a pretext" to fire her. *Id*. (quoting Arbitration Opinion at 23). Ultimately, after considering witness testimony, documents, and briefing from the parties, the arbitrators concluded that WMATA "failed to prove that it had just cause to discipline [Betts], let alone terminate her." *Id*. (quoting Arbitration Opinion at 1–3, 39). The panel therefore reinstated Betts to MTPD.

Betts contends that she was not properly reinstated by MTPD upon her return. *Id*. (citing Dkt. No. 24-1 ¶¶ 46–68). Betts resigned on May 6, 2015. *Id*. On May 22, 2015, Betts presented an EEOC Form 5 containing her third charge against WMATA to the EEOC (the "Third Charge"). *See* Third Charge, Dkt. No. 23-6. Betts's Third Charge, like her Second Charge, checked the boxes indicating that she was presenting charges of discrimination based on retaliation and a hostile work environment. *Id*. In describing the particulars of her Third Charge, Betts alleged that WMATA (1) intentionally delayed her reinstatement until March 12, 2015; (2) failed to provide proper employee identification, keys to access the bathroom, and a radio to report suspicious activity upon her return; (3) failed to notify a District One official of her new duty assignment; (4) required Betts to use personal funds to complete the recertification process; (5) required Betts to complete the police recertification process, including a full background investigation; and (6) caused Betts to resign on May 6, 2015, effecting a constructive discharge. Rep. at 4 (citing Third Charge).

**B. Procedural Background**

Betts filed a five-count Complaint against WMATA in July 2021. *See* Compl., Dkt. No. 1. Betts's Complaint included claims of (1) hostile work environment based on sex, disability (based on her pregnancy), race, and retaliation in violation of Title VII and the Rehabilitation Act; (2) discrimination based on disability in violation of the Rehabilitation Act; (3) discrimination based on sex in violation of Title VII; (4) discrimination based on race in violation of Title VII; and (5) retaliation against protected activity in violation of Title VII. Rep. at 4 (citing Compl.).

WMATA filed a Motion to Dismiss or, in the alternative, for Summary Judgment, arguing (1) that Betts failed to exhaust her Title VII claims; (2) that Betts's claims were time-barred; and (3) that Betts failed to state a plausible claim for relief as to each count. *Id*. (citing Dkt. No. 5). This Court granted WMATA's Motion in part and denied it in part. *See* Order, Dkt. No. 9; Mem. Op., Dkt. No. 10. In a nutshell, the Court's ruling dismissed any claims brought by Betts outside of her (1) sex discrimination claim in Count Three, (2) race discrimination claim in Count Four, and (3) retaliation claim in Count Five, and only insofar as these three claims relied on (a) her February 2013, March 2013, and January 2014 performance evaluations, (b) her February 2014 suspension and March 2014 termination, and (c) the allegations raised in her Third Charge. *Id*. (citing Mem. Op., Dkt. No. 10).

WMATA then moved for summary judgment on Betts's three remaining counts. *See* Def.'s Mot., Dkt. No. 23. Betts opposed WMATA's motion, Dkt. No. 24, and WMATA replied, Dkt. No. 26. The Court then submitted WMATA's motion for a report and recommendation, *see* Order, Dkt. No. 27, and it was randomly referred to Magistrate Judge Upadhyaya, who recommended denying WMATA's motion for summary judgment. *See* Rep., Dkt. No. 28. WMATA filed objections to the Report, *see* Dkt. No. 29, and those objections are now ripe.

**C. The Report's Findings**

As indicated above, the Report recommends denying WMATA's Motion for Summary Judgment. *See* Rep. at 1. The Report made the following three determinations in coming to this conclusion: (1) the Report determined that Betts's First and Second Charges contained claims of race and sex discrimination, while her First, Second, and Third charges contained claims of retaliation; (2) the Report determined that Betts's 2014 suspension and termination were the only adverse actions related to her remaining claims; and (3) the Report determined that Betts had offered sufficient evidence for a reasonable jury to conclude that WMATA's asserted non-

discriminatory reason for suspending and terminating Betts was pretextual. The Court shall briefly elaborate on these findings below and address WMATA's objections in Section III.

1. The Report determined that Betts's First and Second Charges contained claims of race and sex discrimination, while her First, Second, and Third charges contained claims of retaliation.

The first threshold disagreement resolved by the Report concerned which of Betts's three charges—the First Charge, Second Charge, and Third Charge detailed above—made claims of sex and race discrimination.[3] The Report noted that Betts's Complaint and subsequent filings allege "that her suspension and termination, both captured in her Second Charge, constitute race and sex discrimination." *Id.* (citing Compl. ¶¶ 47, 54). WMATA, however, argues that Betts "has no claim for sex and race discrimination in her . . . Second Charge," because Betts only "checked the Charge's boxes for retaliation and 'other' for hostile work environment." *Id.* (quoting Def.'s Reply, Dkt. No. 26 at 14, and citing Def.'s Mem., Dkt. No. 23-1 at 3 (arguing that "[t]he Court limited Plaintiff's factual allegations in her Amended Second Charge to her February 2014 suspension and her March 2014 termination, as the basis for her remaining claim of retaliation").

The Report determined that Betts's Second Charge *did* make claims of sex and race discrimination, despite WMATA's arguments to the contrary. The Report explained that Betts's Second Charge made claims of race and sex discrimination despite Betts's failure to check the corresponding boxes for those claims because the circumstances made it "reasonable to infer that Betts intended that her Second Charge would build upon her First Charge, in which Betts did allege race and sex discrimination." Rep. at 9.

The Report, however, rejected Betts's argument that her Third Charge presented claims of discrimination. The Report explained that "Betts did not include any narrative about alleged

[3] The Report concluded, without much argument to the contrary, that each of Betts's three charges made claims of retaliation. *See* Rep. at 11.

discrimination in her Third Charge nor [did] she check the box for discrimination or a 'continuing action.'" Rep. at 10. Moreover, the Report highlighted that the race and sex discrimination counts in Betts's Complaint contain "no allegations from her Third Charge." *Id.* "Nor [did Betts's] December 15, 2021, letter to the EEOC regarding her Third Charge clearly allege race and sex discrimination." *Id.* Accordingly, the Report concludes that Betts's Third Charge set forth only retaliation claims. *Id.* at 11.

2. <u>The Report determined that Betts's 2014 suspension and termination were the only adverse actions related to her remaining claims.</u>

The Report concluded that "Betts's Second Charge clearly identifies two adverse actions: her suspension and termination." Rep. at 11–12 (citing *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011)). As to the remaining actions alleged in Betts's First, Second, and Third Charges, the Report concluded that Betts had failed to show that they constituted adverse employment actions. *See id.* at 11–16. The Report determined that Betts's performance evaluations do not constitute adverse employment actions because Betts "fails to raise a genuine issue that her evaluations caused her any financial or other concrete harm." *Id.* at 13. Similarly, the Report determined that the actions alleged in Betts's Third Charge do not constitute adverse actions because they "are more akin to the 'trivial harms' the Supreme Court considers 'petty slights or minor annoyances' that all employees experience, regardless of whether that employee has reported prohibited behavior." *Id.* at 15 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Accordingly, the Report concluded that "only Betts's suspension and termination in her Second Charge can sustain her remaining claims." *Id.* at 15–16.

3. The Report determined that Betts had offered sufficient evidence for a reasonable jury to conclude that WMATA's asserted non-discriminatory reason for suspending and terminating Betts was pretextual.

Following its conclusions on the threshold issues discussed above, the Report "turn[ed] to the central question: with respect to her suspension and termination, has Betts produced sufficient evidence for a reasonable jury to conclude that WMATA's asserted non-discriminatory reason was pretext for intentional discrimination or retaliation based on Betts's membership in a protected class?" Rep. at 16.

WMATA's asserted non-discriminatory reason for suspending and terminating Betts is that "[s]he is the only officer ever known to have refused to submit to and cooperate with an investigation by MTPD's Office of Professional Responsibility and Inspections ('OPRI')." Def.'s Mem. at 13 (citing Pavlik Decl., Dkt. No. 23-14 ¶ 25); *see also* Rep. at 17. The investigation in question concerned MTPD's discovery that Betts was "keeping approximately 30 sensitive police investigation files in the trunk of her car." *Id.*; *see also* Undisputed Facts, Dkt. No. 24-1 ¶ 38. WMATA argues that Betts was suspended in February 2014 because she "refus[ed] to answer questions asked of her" by the internal investigators. *Id.* (citing Arbitration Hearing Tr. (Sept. 23, 2014), Dkt. No. 23-28 at 58:13–72:12). Betts was then terminated, according to WMATA, because MTPD's investigation "sustained several charges against [her] warranting termination," Def.'s Reply at 15, including two charges of violating General Order #231, which subjects employees to termination if they "withhold information from, are untruthful, or fail to cooperate with an internal investigation," and one charge of violating the Metro Transit Police Oath of Office, which requires employees to swear that they will "obey [their] superiors in all lawful matters of duty performance," OPRI Investigation, Dkt. No. 23-27 at WMATA000349–51. WMATA also argues that Betts has not shown causation because the relevant decisionmaker—Chief Ronald

Pavlik, who terminated Betts—first learned of Betts's Second Charge a month after he terminated Betts. Def.'s Mem. at 14; Rep. at 17.

Betts argues that WMATA's asserted non-discriminatory reason—her failure to cooperate in the investigation—is pretext for discrimination and retaliation. Betts alleges that "she and another female detective, who also had a history of EEO activity, were singled out for taking case files home, even though white, male detectives with no EEO activity routinely took files home." Rep. at 17 (citing Pl.'s Opp'n at 19). The Report identified that "Betts asserts that Sergeant Boehm, who is a white man with no prior EEO activity, had a large stack of case files in his car." *Id*. (citing Betts Decl., Dkt. No. 7-3 ¶ 34[4]). The Report also noted that Betts argues that "WMATA attempted to elicit incriminating, written responses from her after she disclosed that she took case files home." *Id*. at 17–18 (citing Arb. Decision, Dkt. No. 7-4 at 11–14). Finally, "Betts asserts that her repeated complaints about her chain of command accumulated in continued retaliatory actions, such as the evaluations she appealed, the charges she filed, and, ultimately, her termination." *Id*. at 18 (citing Pl.'s Opp'n at 19; Arb. Decision, Dkt. No. 7-4 at 36–37).

While noting that "it is a close call," the Report concluded that Betts has produced sufficient evidence for a reasonable jury to conclude that WMATA's asserted non-discriminatory reason was pretext for intentional discrimination or retaliation. Rep. at 16. The Report concluded that Betts sufficiently supported her arguments "by citing her own affidavit, letters, deposition testimony, and an Arbitration Opinion and Award . . . in which an arbitration panel found that WMATA did not have just cause to terminate Betts." *Id*. at 18. The Court shall discuss Betts's arguments and evidence in more detail below.

[4] Where Betts attests that, "in April 2014, [she] was informed by Det. Beau Perrizo that when Stephen Boehm (white, male, no EEO activity) was promoted from Detective to Sergeant, he passed a stack of open cases to Det. Perrizo and there was a large stack of case files in Sgt. Boehm's car."

## II. LEGAL STANDARD

### A. Objections to a Report and Recommendation

"In considering objections to a magistrate judge's report and recommendation, district courts generally apply a de novo standard of review." *Mohammad Hilmi Nassif & Partners v. Republic of Iraq*, 759 F. Supp. 3d 30, 38 (D.D.C. 2024), *aff'd sub nom. Nassif v. Republic of Iraq*, 166 F.4th 1099 (D.C. Cir. 2026) (citing 28 U.S.C. § 636(b)(1); LCvR 72.3(c)). However, where a party "makes only conclusory or general objections, or simply reiterates [its] original arguments," district courts review the report and recommendation "only for clear error." *Bynum v. D.C.*, 424 F. Supp. 3d 122, 127 (D.D.C. 2020) (EGS) (quoting *Houlahan v. Brown*, 979 F. Supp. 2d 86, 88 (D.D.C. 2013) (FJS)); *see also Shurtleff v. EPA*, 991 F. Supp. 2d 1, 8 (D.D.C. 2013) (EGS); LCvR 72.3(b). Furthermore, a district court may adopt portions of a report and recommendation to which no party files an objection and treat arguments not raised through a timely objection as waived. *See Mohammad Hilmi Nassif & Partners*, 759 F. Supp. 3d at 38 (citing *Thomas v. Arn*, 474 U.S. 140, 152 (1985); LCvR 72.3(b); *Taylor v. District of Columbia*, 325 F. Supp. 3d 144, 144 n.3 (D.D.C. 2018) (DLF)).

After reviewing a magistrate judge's report and recommendation and any objections, a district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); LCvR 72.3(c).

### B. Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ("The court should state on the record the reasons for granting or denying the motion."). In making this determination, the court must "view the evidence in the light most favorable to [the nonmoving party] and draw all reasonable inferences in [their] favor." *Holcomb*

*v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if a dispute over it "might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 248). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries this initial burden, "the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the 'element[s] essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Bajaj v. Turner*, 778 F. Supp. 3d 151, 176 (D.D.C. 2025) (RDM) (quoting *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011)). The nonmoving party must provide "more than mere allegations or denials; instead, it must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Id*. (citing Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

### C. Title VII Exhaustion Requirement

Before initiating an action in federal court under Title VII, "an aggrieved party must exhaust [their] administrative remedies by filing a charge of discrimination with the EEOC." *Oviedo v. WMATA*, 948 F.3d 386, 393 (D.C. Cir. 2020) (quoting *Washington v. WMATA*, 160 F.3d 750, 752 (D.C. Cir. 1998)). "Properly exhausted claims encompass those that the EEOC charge and its accompanying documents detail with 'sufficient information to put the agency on notice of the claim and to enable the agency to investigate it.'" *Holmes v. Washington Metro. Area Transit Auth.*, 723 F. Supp. 3d 1, 13 (D.D.C. 2024) (JEB) (quoting *Crawford v. Duke*, 867 F.3d 103, 109 (D.C. Cir. 2017)). "Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (cleaned up). "Defendants have the burden to prove a failure to exhaust." *Holmes*, 723 F. Supp. 3d at 13 (citing *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997)).

## III. ANALYSIS

The parties object to some, but not all, of the Report's findings. At the outset, the Court shall **ADOPT** the Report **IN PART** with respect to its findings that the parties do not object to. *See Mohammad Hilmi Nassif & Partners*, 759 F. Supp. 3d at 38. Accordingly, the Court finds that Betts's First Charge sets forth race and sex discrimination claims, and her First, Second, and Third Charges set forth retaliation claims. The Court also finds that that the only cognizable adverse employment actions alleged by Betts are her 2014 suspension and termination.

The Court shall now consider the remaining issues raised by WMATA's Motion for Summary Judgment, of which there are two. The first is whether WMATA is entitled to summary judgment on Betts's race and sex discrimination claims on the grounds that Betts's failed to

exhaust these claims with respect to her 2014 suspension and termination. The Court answers this question in the affirmative. The second is whether WMATA is entitled to summary judgment on Betts's remaining retaliation claim because she has failed to sufficiently rebut WMATA's asserted legitimate, non-retaliatory reason for suspending and terminating Betts in 2014. Again, the Court answers this question in the affirmative. Accordingly, the Court shall **GRANT** WMATA's Motion for Summary Judgment.

**A. The Court shall enter summary judgment for WMATA on Betts's race and sex discrimination claims because Betts failed to exhaust these claims with respect to her 2014 suspension and termination, which are the only actionable adverse actions remaining.**

"[T]he theories of discrimination in a plaintiff's lawsuit are limited to the theories contained in the EEOC Charge [they] filed." *Ferguson v. Washington Metro. Area Transit Auth.*, 630 F. Supp. 3d 96, 111 (D.D.C. 2022) (CKK), *aff'd*, No. 22-7142, 2024 WL 2052016 (D.C. Cir. May 8, 2024) (cleaned up and citation omitted). While the administrative charge requirement "should not be construed to place a heavy technical burden" on the plaintiff, it is "not a mere technicality" and the Court "cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the . . . administrative process." *Stewart v. White*, 61 F. Supp. 3d 118, 129 (D.D.C. 2014) (CKK) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)). A plaintiff is "limited to pursuing those 'claims that are like or reasonably related to the allegations of the charge and growing out of such allegations;'" although "every detail of the eventual complaint need not be presaged in the EEOC filing, the substance of the claims must fall within the scope of 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id*. (quoting *Park*, 71 F.3d at 907).

As detailed above, Betts's suit involves three EEOC charges that she filed between April 29, 2013, and May 22, 2015. *See supra* Section I.A. The Court has concluded that Betts's First

Charge contained claims of race and sex discrimination, and that her First, Second, and Third Charges included claims of retaliation. The question is whether Betts's Second Charge also contained claims of race and sex discrimination. This is relevant because Betts's Second Charge contains the only adverse employment actions remaining in this case—her 2014 suspension and termination. Accordingly, Betts will be unable to survive summary judgment if the scope of her race and sex discrimination claims does not extend to her Second Charge, as doing so requires that she connect her claims to an adverse employment action. *See Ramsey v. Moniz*, 75 F. Supp. 3d 29, 49 (D.D.C. 2014) (BAH) (". . . for the plaintiff's discrete discrimination claim to survive, the plaintiff must have alleged an adverse employment action in her EEO complaint.").

WMATA argues that Betts cannot rely on the allegations in her Second Charge to support her race and sex discrimination claims because the Second Charge makes "no references to discrimination."[5] Def.'s Obj. at 4 (capitalization modified). Betts filed her Second Charge on January 30, 2014, and amended it on March 18, 2014. *See supra* Section I.A.2. WMATA argues that Betts's Second Charge did not set forth any discrimination claims because (1) Betts did not check the boxes for "sex" or "race" discrimination (but did check the boxes for "retaliation," "other (hostile work environment)," and "continuing action"), and (2) Betts did "not mention anything pertaining to race or sex discrimination" in the narrative section (although "she twice use[d] the word 'retaliation'"). Def.'s Obj. at 3. The narrative section of Betts's Second Charge reads, in full:

[5] According to Betts, WMATA must demonstrate that the Report's finding on this issue was based on "clear error" because WMATA "already raised this argument, at least in part, during its Motion briefing." Pl.'s Resp. at 8. The Court, however, determines that de novo review is appropriate. From the record, it appears that WMATA first addressed the issue at hand in its Reply in support of its Motion for Summary Judgment. *See* Def.'s Mem. at 3 (assuming without argument that Betts's Second Charge concerned only "her remaining claim of retaliation"); *id*. at 12–14 (same). And its argument here does more than "simply reiterate[]" the argument it presented in its Reply. *Bynum*, 424 F.Supp.3d at 127. Accordingly, the Court determines that the de novo standard of review that "district courts generally apply" is appropriate here. *Mohammad Hilmi Nassif & Partners*, 759 F. Supp. 3d at 38.

> I. I began my employment with the above-mentioned Respondent in November 28, 2005, in the position of Police Officer. I currently hold the position of Police Detective under Sergeant Charles Page. I believe I was retaliated against based on being a witness to EEOC Charge [number crossed out]. On March 14, 2013, in response to a previous performance evaluation appeal, l was given another evaluation with a lower score. Furthermore on April 12, 2013, I was disciplined for going out of my chain of command when I complained.
>
> II. No reason was provided for the above-mentioned treatment.
>
> III. I believe I was retaliated against for engaging in a protected activity with respect to discipline in violation of Title VII of the Civil Rights Act of 1964, as amended.
>
> IV. On February 20, 2014, I was placed on an suspension without pay and on March 6, 2014 I was discharged. The reason given for my discharge was failure to cooperate with an internal investigation.

*Id*. at 3. As WMATA points out, Betts "did not take the opportunity to check the boxes for race discrimination or sex discrimination when she amended, nor did she provide any additional narrative beyond a brief description stating that she was suspended on February 20, 2014, and terminated on March 16, 2014." Def.'s Obj. at 4.

In isolation, Betts's Second Charge cannot reasonably be read to include claims of discrimination. In the section of the Second Charge that asked Betts to indicate the basis for her allegations of discrimination, she declined to check the boxes for "race" and "sex" and instead checked only the boxes for "retaliation" and "other (hostile work environment)." Second Charge, Dkt. No. 23-5 at 2. More importantly, in the narrative section of her Second Charge, Betts "wrote nothing whatsoever" about race or sex. *Holmes*, 723 F. Supp. 3d at 14. Instead, Betts described her belief that she "was retaliated against for engaging in a protected activity with respect to discipline." Second Charge at 2. "There can be little doubt, therefore, that the charge [itself] lacked 'sufficient information' to put EEOC on notice of [Betts's] claims of discrimination—as distinct from her claims of retaliation and a hostile work environment—or to enable EEOC to

investigate those claims." *Holmes*, 723 F. Supp. 3d at 14 (quoting *Crawford*, 867 F.3d at 109 and citing *Robinson-Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 13 (D.D.C. 2008)); *see also Dunn v. Collins*, No. 21-cv-02845 (CJN), 2026 WL 32782, at *3 (D.D.C. Jan. 6, 2026) (finding that plaintiff failed to exhaust her claims of race discrimination where her EEO charge raised claims of sex discrimination but "did not raise any claims at all based on race").

Betts cannot overcome this reading of her Second Charge by pointing to the fact that she checked the "continuing action" box on the charge and mentioned her March 14, 2013, performance evaluation in the narrative section. *See* Rep. at 9. First, whatever the interpretation of the phrase "continuing action," it is not clear why a claim of continuing retaliation would provide any more notice of a discrimination claim than a claim of past retaliation. Furthermore, the term "continuing action," as it is used in the part of the form where claimants indicate the "date(s) discrimination took place," is most logically read to indicate that the alleged unlawful conduct is still occurring at the time of filing, not that the alleged unlawful conduct is part of a continuing pattern alleged in a prior, separate charge. Indeed, Betts used the same section of her Second Charge to indicate that the earliest date the alleged unlawful conduct took place was March 14, 2013. *See* Second Charge at 2.

This leads us to Betts's argument that her inclusion of the March 2013 performance evaluation in the narrative section of her Second Charge establishes that her Second Charge included claims of discrimination. At the outset, the Court has already ruled that Betts's claim regarding her March 2013 performance evaluation is time-barred from her Second Charge. *See* Mem. Op., Dkt. No. 10 at 20 (finding that Betts's "Second EEOC Charge was untimely with respect to the March 2013 performance evaluation and the April 12, 2013 dereliction reprimand"); *see also* Rep. at 7 n. 2 (stating that "[a]lthough Betts only references her March 2013 evaluation

in her Second Charge, it is actually Betts's January 2014 performance evaluation that is at issue"). "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice,'" and a claimant "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Morgan*, 536 U.S. at 114. But putting that aside, Betts has not shown why her mention of the March 2013 performance evaluation connects her Second Charge to her prior claims of discrimination. Betts alleged in her Second Charge that the "lower score" she received on her March 2013 evaluation came "in response to a previous performance evaluation appeal" that she had made. Second Charge at 2. In other words, Betts alleged that her March 2013 evaluation was the product of impermissible retaliation, not discrimination based on race or sex.

Nor can Betts's September 18, 2014, letter to the EEOC provide the information needed to read Betts's Second Charge to include claims of discrimination. *See* Rep. at 9–10 (citing Pl.'s Second EEOC Letter, Dkt. No. 7-19). In this letter, Betts alleges that she had been "subjected to constant discrimination, retaliation, and a hostile work environment by [her] supervisors" since May 2012. Pl.'s Second EEOC Letter at 1. It is true that an attachment to an EEOC complaint "can independently identify claims for resolution regardless of whether the attachment is also referenced in the body of the complaint itself." *Crawford*, 867 F.3d at 107. But Betts's September 18 letter was not an *attachment* to her Second Charge because Betts has not identified any evidence to rebut WMATA's assertion that the latter was "sent to the EEOC only and *not to WMATA*." Def.'s Reb. at 2 (emphasis in original). Betts's September 18 letter cannot 'clarify' the existence of a claim that is not included in the charge, and "it would be objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges with the EEOC is to put the charged

party on notice of the claims raised against it." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 408 (4th Cir. 2013) (quoting *Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999)); *see also Holtz v. Rockefeller & Co.*, 258 F.3d 62, 83 (2d Cir. 2001); *Cheek v. W. & S. Life Ins.*, 31 F.3d 497, 502–03 (7th Cir. 1994). Accordingly, Betts cannot use her September 18 letter to the EEOC to add claims of discrimination to her Second Charge.

In determining whether Betts's Second Charge included claims of discrimination, "the central question is whether the [charge] contained 'sufficient information' to put the agency on notice of the [discrimination] claim[s] and to 'enable the agency to investigate' [them]." *Crawford*, 867 F.3d at109 (quoting *Artis v. Bernanke*, 630 F.3d 1031, 1033 (D.C. Cir. 2011)). The Court answers that question in the negative. Betts's Second Charge does not make any mention of race or sex discrimination, and Betts does not identify any evidence to otherwise suggest that her Second Charge included such claims. Accordingly, the Court concludes that Betts's discrimination claims are limited in scope to the allegations in her First Charge.

* * *

Because Betts did not exhaust her claims of race and sex discrimination in her Second Charge, her claims are limited in scope to the allegations contained in her First Charge. For "a Title VII lawsuit must be limited to misconduct that the plaintiff complained of in a timely-filed administrative complaint before the EEOC." *Johnson v. Ashcroft*, No. 00-cv-2743, 2001 WL 34366564, at *3 (D.D.C. June 21, 2001), *aff'd*, No. 03-5221, 2003 WL 22890057 (D.C. Cir. Nov. 25, 2003) (quotation and citation omitted); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (explaining that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'");

*id*. at 113 (". . . discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

With Betts's claims of race and sex discrimination limited to the allegations contained in her First Charge, the Court must enter summary judgment in favor of WMATA on those claims. The Court "may not consider a discrimination claim that has not been exhausted." *Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008). Accordingly, "for [a] plaintiff's discrete discrimination claim to survive, the plaintiff must have alleged an adverse employment action in her EEO complaint." *Ramsey*, 75 F. Supp. 3d at 49. The Court has concluded that Betts's First Charge does not contain any allegations of an adverse employment action. *See supra* Section III at 13. Accordingly, the Court shall **GRANT** WMATA's [23] Motion for Summary Judgment with respect to Betts's claims of race and sex discrimination.[6]

**B. The Court shall enter summary judgment for WMATA on Betts's retaliation claim because Betts has not produced sufficient evidence for a reasonable jury to find that WMATA's asserted non-retaliatory reason was pretext.**

Title VII retaliation claims are assessed pursuant to the burden-shifting framework originally set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Broderick v. Donaldson*, 437 F.3d 1226, 1231 (D.C. Cir. 2006) (explaining that retaliation claims are subject to the *McDonnell Douglas* analysis). First, a plaintiff must make out a prima facie case of retaliation by showing that "(1) [they] engaged in a statutorily protected activity; (2) [they] suffered a materially adverse action by [their] employer; and (3) a causal connection existed

[6] Betts fails to meet her threshold burden of showing that a reasonable jury could conclude that her Second Charge contained claims of race and sex discrimination. But even if Betts had met this burden, the Court finds that WMATA is entitled to summary judgment on Betts's race and sex discrimination claims because Betts has failed to produce sufficient evidence for a reasonable jury to find that WMATA's asserted non-retaliatory reason is pretext. WMATA asserts that it suspended and terminated Betts because she repeatedly refused to cooperate in MTPD's investigation regarding Betts's practice of keeping case files in her car. As the Court shall explain in the following Section, Betts does not identify evidence that would permit a reasonable jury to conclude that MTPD's real reason for terminating Betts was discriminatory, whether that be discrimination based on race, sex, or in retaliation for Betts engaging in protected activity. *See infra* Section III.B.2.

between the two." *Stewart*, 2019 WL 4261067, at *7 (quoting *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)). Once the plaintiff has made a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the challenged adverse action. *Id*. (citation omitted).

"[I]f an employer asserts a legitimate, nondiscriminatory reason for an adverse employment action, the district court must conduct one central inquiry in considering an employer's motion for summary judgment or judgment as a matter of law: whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) (*Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008)). "Not only is the prima facie case irrelevant at this point, but 'the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.'" *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)) (emphasis in original).

"In considering this question, [courts] ask 'whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer.'" *Wheeler*, 812 F.3d at 1114 (quoting *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)) (emphasis in original). Courts should not "sit as a 'super-personnel department' that reexamines an employer's business decisions, *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999), and 'may not second-guess an employer's

personnel decision absent demonstrably discriminatory motive,' *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quotation marks omitted)." *Id.* "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

* * *

WMATA has asserted a legitimate, non-retaliatory reason for suspending and terminating Betts in 2014. WMATA asserts that it suspended and ultimately terminated Betts because she refused to cooperate in MTPD's investigation into her practice of keeping case files in her car, adding that Betts "is the only officer ever known to have refused to submit to and cooperate with an investigation by MTPD's Office of Professional Responsibility and Inspections ('OPRI')." Def.'s Mot. at 13 (citing Pavlik Decl., Dkt. No. 23-14 ¶ 25). Accordingly, the question before the Court is whether Betts has produced sufficient evidence for a reasonable jury to find that WMATA's asserted non-retaliatory reason was not the actual reason for her suspension and termination and that WMATA intentionally discriminated against Betts in retaliation for engaging in protected activity. *See Wheeler*, 812 F.3d at 1114.

Betts argues that her "history of reporting concerns, the continued harassment and discrimination she faced, and the way the investigation was conducted into her for having case files at home" show that WMATA's asserted non-retaliatory reason for suspending and terminating her is pretext for impermissible retaliation. *See* Pl.'s Opp'n at 21. Betts also argues that "she and . . . another woman with a history of prior EEO activity, were singled out for investigation and/or discipline regarding taking case files home to work on outside of the office, even though many other MTPD detectives did the same thing." *Id.* at 19.

To support these arguments, Betts cites "her own affidavit, letters, [and] deposition testimony," but "relies heavily" on an Arbitration Opinion "in which an arbitration panel found that WMATA did not have just cause to terminate Betts" in 2014.[7] Rep. at 18 (citing Arbitration Opinion, Dkt. No. 7-4 at 39); *see also* Pl.'s Opp'n at 21 ("All of WMATA's reasons it alleges are legitimate and non-discriminatory directly contradict the Grievance Committee's Arbitration Opinion and Award."). WMATA argues that the Court should not consider the Arbitration Opinion in determining whether Betts has sufficiently shown pretext because it is inadmissible hearsay. Def.'s Obj. at 8–11. The Court shall begin by addressing this threshold issue.

1. Betts may rely on material from the Arbitration Opinion to show pretext.

A non-moving party "cannot rely upon inadmissible evidence to survive summary judgment; rather, the non-moving party must rely on evidence that would arguably be admissible at trial." *Evans v. Sebelius*, 191 F. Supp. 3d 4, 7 (D.D.C. 2011) (RBW), *aff'd on other grounds*, 716 F.3d 617 (D.C. Cir. 2013) (citing *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)); *see also Ferguson*, 630 F. Supp. 3d at 109. "While a nonmovant is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence;" "[o]therwise, the objective of summary judgment—to prevent unnecessary trials—would be undermined." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). Accordingly, "[h]earsay evidence that cannot be converted to admissible evidence is not considered on summary judgment." *Markowicz v.*

[7] The Court notes the temporal proximity between the date Betts filed her Second Charge (January 30, 2014), and the date Betts was suspended (February 20, 2014). However, it is "well established that mere proximity in time—standing alone—is not sufficient to rebut an employer's legitimate proffered reason and/or to give rise to a reasonable inference that the actual motive for the challenged employment decision is an improper one." *Mount v. Johnson*, 174 F. Supp. 3d 553, 565 (D.D.C.), *aff'd*, 664 F. App'x 11 (D.C. Cir. 2016); *see also Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011)) ("The Court notes that temporal proximity alone would be insufficient to demonstrate a retaliatory motive at the summary judgment stage."); *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) (concluding that "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine").

*Johnson,* 206 F. Supp. 3d 158, 175 (D.D.C. 2016) (RC) (citing *Greer*, 505 F.3d at 1315); *see also Hernandez v. Pritzker*, 741 F.3d 129, 134 (D.C. Cir. 2013) (concluding that plaintiff's "own statement" about what "two colleagues told her" was "pure hearsay" and "count[ed] for nothing in an opposition to summary judgment" (internal quotation marks and citation omitted)).

The Supreme Court has held that, in employment discrimination cases, an "arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974). As the Report points out, "neither the Supreme Court or the D.C. Circuit have addressed the admissibility of the arbitrator's findings on hearsay grounds pursuant to Federal Rules of Evidence 801 and 802." Rep. at 20 n. 5. It appears, however, that courts have considered arbitral decisions to some degree on summary judgment. *See DeJesus v. WP Co. LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016) (crediting an arbitral decision without discussion); *Coleman v. Donahoe*, 667 F.3d 835, 855 (7th Cir. 2012) ("In short, while the arbitral decision is not binding, its factual predicates and analysis give some boost to [plaintiff's] claim that the [defendant's] asserted reasons for terminating her were pretextual."); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 549 n. 3 (6th Cir. 2008) ("If arbitration presents serious reliability problems from the use of hearsay, then the trial court should be able to accept or reject that evidence based on the degree of procedural fairness in the arbitral forum.").

Accordingly, the Court shall consider the Arbitration Opinion in determining whether Betts has met her burden of showing pretext. Any purported evidence from the Arbitration Opinion, however, "must be capable of being converted into admissible evidence." *Gleklen*, 199 F.3d at 1369. And it will only be "accorded such weight as the court deems appropriate."[8] *Gardner-Denver*, 415 U.S. at 60.

---

[8] "Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect

2. Betts has not produced sufficient evidence for a reasonable jury to find that WMATA's asserted non-retaliatory reason was pretext.

As the Court mentioned above, Betts relies primarily on the Arbitration Opinion to establish pretext. Betts's use of other evidence is limited to evidence that reinforces the findings she emphasizes from the Arbitration Opinion. Accordingly, the Court shall frame its discussion around the relevant findings from the Arbitration Opinion and reference any other relevant evidence within that framework.

Betts argues that "four findings of fact[] in the Arbitration Opinion" support her argument of pretext. Rep. at 18. These findings are: (1) that "WMATA had no written policy prohibiting or limiting detectives from taking case files home," *id*. (citing Arb. Op. at 10, 32); (2) that "WMATA attempted to elicit 'brief and incriminating' responses from Betts [during the investigation] to use against her," *id*. (quoting Arb. Op. at 33–34); (3) that "WMATA disciplined Betts with the most severe punishment available, *id*. (citing Arb. Op. at 33–37); and (4) that "WMATA engaged in this behavior all while 'likely' knowing of Betts's Second Charge," *id*. (quoting Arb. Op. at 10). The Court shall address these findings and any related evidence in turn. Upon doing so, the Court concludes that Betts has not met her burden of producing sufficient evidence for a reasonable jury to find that WMATA's asserted non-retaliatory reason is pretext.

a. *The Arbitration Opinion's finding that WMATA did not have a written policy against taking case files home and Betts's related evidence do not support Betts's claim of pretext.*

The first finding from the Arbitration Opinion highlighted by Betts—that WMATA did not have a written policy against taking case files home—relates to Betts's argument that she was "singled out for investigation and/or discipline regarding taking case files home" while other

to the issue of discrimination, and the special competence of particular arbitrators." *Gardner-Denver*, 415 U.S. at 60 n. 21.

MTPD employees with no prior EEO activity also took case files home but were not investigated.[9] Pl.'s Opp'n at 19. Betts can show pretext through comparator evidence—evidence that MTPD treated other employees with no prior EEO activity differently for the same behavior. *See, e.g.*, Moore v. Coca-Cola Bottling Co. Consol., 113 F.4th 608 (6th Cir. 2024). Betts identifies Lieutenant Stephen Boehm as a comparator, asserting in her affidavit that, "in April 2014, [she] was informed by Det. Beau Perrizo that when Stephen Boehm (white, male, no EEO activity) was promoted from Detective to Sergeant, he passed a stack of open cases to Det. Perrizo and there was a large stack of case files in Sgt. Boehm's car." Betts Decl., Dkt. No. 7-3 ¶ 34.

This evidence does little to further Betts's claim of pretext. Betts relies on the Arbitration Opinion's finding that Management was aware that detectives took case files out of the office and did not clarify its policy against taking case files out of the office until one of her supervisors, Sergeant Page, announced MTPD's policy against the practice on February 4, 2014, Arb. Op. at 32, which Betts was present for, *id*. at 11. *See also infra* Section III.B.2.b (explaining Page's announcement in more detail). But as the Arbitration Opinion explains, Betts "was not disciplined for taking case files—no matter the number—out of the office;" "she was disciplined for not cooperating with the investigation which Management initiated following her admission" to storing case files in her car. Arb. Op. at 33. In other words, even assuming that MTPD did not clarify its policy against storing case files out of the office until February 4, it is not clear how that would have any bearing on Management's decision to investigate Betts after she informed her supervisor—who Betts knew was investigating another detective at the time for storing case files out of the office—that she had continued to store case files in her car *after MTPD clarified its*

[9] Betts can show pretext through evidence that MTPD treated other employees with no prior EEO activity differently for the same behavior. *See, e.g., Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608 (6th Cir. 2024).

*policy against that practice* on February 4. *See* Arb. Op. at 11. Rather, this tends to cut against Betts's argument that she was 'singled out' for storing case files in her car.

Additionally, Betts does not provide adequate comparator evidence to support her argument that other detectives with no EEO activity were treated differently than her. Betts attempts to establish Boehm as a comparator through evidence that, in its current form, is hearsay. *See Hernandez*, 741 F.3d at 134 (concluding that "pure hearsay . . . counts for nothing in an opposition to summary judgment"). But even if Betts had admissible evidence related to Boehm, it would be unavailing because Boehm is not a comparator for Betts. The record—indeed, Betts's own declaration, *see* Betts Decl., Dkt. No. 7-3 ¶ 34—shows that Betts and Boehm had different roles and responsibilities, as Boehm was Betts's supervisor. *See* Arb. Op. at 6 (stating that "Lieutenant Stephen Boehm was [Betts's] second-level supervisor"). In most cases, a "plaintiff's supervisors are not proper comparators as a matter of law." *Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 22 (D.D.C. 2004) (RMU). Nor does Betts provide any evidence to show that Boehm committed a similar offense, as Betts was disciplined for refusing to cooperate in an investigation and Boehm was only said to have kept case files in his car, presumably before Page's February 4 announcement. *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses.").

Accordingly, the Court concludes that the first finding from the Arbitration Opinion highlighted by Betts—that WMATA did not have a written policy against taking case files home—and Betts's related evidence do not support a reasonable finding of pretext.

b. *The Arbitration Opinion's findings that WMATA attempted to elicit brief and incriminating responses from Betts during the*

*investigation to use against her and disciplined Betts with the most severe punishment available do not support Betts's claim of pretext.*

Betts uses the Arbitration Opinion's second and third findings—that WMATA attempted to elicit brief and incriminating responses from Betts during the investigation to use against her, and that WMATA disciplined Betts with the most severe punishment available—to argue that "the way [MTPD's] investigation was conducted into her for having case files at home" shows pretext. Pl.'s Opp'n at 21. The Court shall begin by detailing the Arbitration Opinion's findings regarding MTPD's investigation into Betts. After doing so, the Court concludes that these findings do not reasonably support a finding of pretext.

* * *

At the arbitration proceeding, one of Betts's supervisors, Sergeant Page ("Page"), "testified that, in early February 2014, 'numerous inquiries had come up and when we would go to look for [case files], we couldn't find them.'" Arb. Op. at 10 (quoting testimony). At the time, "[t]here was no written policy prohibiting or limiting detectives from taking case files home." *Id*. But on February 4, 2014, Page "made a roll-call announcement . . . 'letting everybody know that [they were] not supposed to take [case files] out of the office, . . . unless [it was] a case that [they] need[ed] for court[,] . . . [because case files] should be accessible at all times.'" *Id*. (quoting testimony). It is undisputed that Betts was present at the roll-call announcement. *Id*. at 11.

On February 5, 2014, Page began an unrelated inquiry into the possible improper storage of case files by another detective, with whom Betts was partnered that day. *Id*. After Page spoke with that detective, Betts informed Page that she also took case files home with her and, upon Page's request, gave him all the case files she had in her car, which added up to around 30 to 35 case files. *Id*. The next day, February 6, 2014, Page asked Betts to provide a statement as to why

she had so many case files in her personal possession. *Id*. Betts responded with the following email:

> At the request of Sergeant Charles Page, I am to provide a statement as to why I, "take cases home or leave them in the car." I, typically, take cases home that I am actively working on. My cases are usually loaded into the MTPD cruiser at the commencement of my tour of duty or when I leave the office, so as to work on them throughout the day, as well as assisting with calls for service. Furthermore, per Sergeant Charles Page, there is no established rule or regulation, stipulating that we are not allowed to take cases from the office.

*Id*. at 11–12. Later that day, Page asked Betts to answer four questions that he had drafted with Lieutenant Boehm ("Boehm"), another of Betts's supervisors. *Id*. at 12. Page typed the following four questions onto a single sheet of paper with approximately one inch between each question and gave Betts a hard copy:

> 1. What is the purpose of taking home or leaving in the cruiser trunk over thirty active case files on a daily base [sic]?
>
> 2. Are you aware that most of your case files pertain [sic] sensitive information i.e. NCIC printouts and Juvenile information?
>
> 3. Do you recall me stating back in December when you were out sick that case files should be maintained in the office in the event a situation arises and your case file is needed? You were out sick and we needed to access to [sic] your files, you advised, you had them at home with you.
>
> 4. Were you present in roll call Tuesday 2-4-2014 when I advised all Detectives present that case files must be stored in the office and accessible if needed by a supervisor and or [sic] other Detectives?

*Id*. at 12–13. Betts spent approximately four to five hours preparing her response to these questions, during which time she was not permitted to leave to eat lunch. *Id*. at 13. When Betts provided her response, it came as a separate "Memorandum" that contained, among other things, her recopied e-mail statement, the four questions typed verbatim, and the following paragraph-long statement, which she said was her answer to all four questions and was "being given under duress:"

> Some case files are comprehensive, albeit [sic] in the CID office at the Metro Supply Facility or with a detective. As I recall, while out on a medical leave of absence, I was, initially, contacted by Sgt. Page regarding the upcoming case review with Assistant Chief Parks, and the "UNST" case. In response to Question #4, yes, I was present. From my recollection, Sgt. Page specified cases that were in the adjudication process.

*Id*. at 14. Betts provided her Memorandum to Page but did not attach the original document containing the four questions. *Id*. Page instructed Betts to provide him with the original document,[10] and when Betts did so, it was revealed that Betts had "thoroughly crossed out" answers that she had handwritten under each question. *Id*. (explaining that Betts testified that she "used [the original document] as a draft to formulate the other typed document [i.e., the Memorandum]"). Page then gave the documents to Boehm, who "picked up the investigation at that point." *Id*. at 14–15.

The day after those events (i.e., February 7, 2014), Betts "called in sick" and "was then absent from the office until 2:30 p.m. on February 19, 2014." *Id*. at 15. On the day of her return, Boehm met with Betts, who declined to have a Union steward present, and instructed her to answer the same four questions that she was given on February 6, which were "now contained on two sheets of paper with two questions each and space for handwritten responses." *Id*. (noting that Betts was "also provided her with copies of her February 6 responses"). Betts told Boehm that "she had already answered them," and Boehm responded by explaining that he "did not feel that she answered those questions and now . . . would need her to answer them." *Id*. (quoting testimony). After asking Betts to answer the questions "a number of times," Boehm eventually "advised [Betts] that, 'if she refused to answer the[] questions, it would lead to discipline, up to and including termination.'" *Id*. (quoting testimony). Betts then proceeded to write, "see attached

[10] Page testified that he "wanted [the original document] to accompany the paperwork so no one could say this isn't what [he] asked [Betts]." Arb. Op. at 14 (quoting Page's testimony).

statement," under each of the four questions, attached a copy of her February 6 Memorandum, and gave it to Boehm. *Id*. Boehm "[became] convinced that [Betts] would not write anything more" and, with permission from Captain Earl Brown, placed Betts on suspension without pay and directed her to report to MTPD's Office of Professional Responsibility and Inspections ("OPRI") the next day. *Id*. at 16.

The next day, February 20, 2014, Betts sat for an interview with Captain Gaddis ("Gaddis"), head of OPRI. *Id*. (noting that Lieutenant Hanna and a representative from the Union were also present). At the Arbitration proceeding, Gaddis testified that, prior to the interview, he had been told that Betts "was the subject of the investigation and that she was stonewalling the investigation by not cooperating." *Id*. (quoting testimony). During the interview, Gaddis read Betts the "admonition" contained in General Order #231 and "advised [Betts] that he was conducting an internal administrative investigation, that he was a superior officer, that he was giving her a direct order, and that therefore 'she was compelled,' to provide verbal responses to the same four questions, and that her failure to respond could result in discipline up to and including termination." *Id*. Gaddis then asked Betts to answer the questions seven times, and each time Betts "steadfastly refused by sticking to a rehearsed script that she would have to refer to her statement, or that she already answered the questions in her statement." *Id*. at 17 (quoting Gaddis's written conclusions on the interview). After interviewing Betts and reviewing written statements from those that had previously interviewed her, Gaddis issued a recommendation that Betts be terminated for violating General Order #231 and the Oath of Office. *Id*. at 17–18 (quoting Gaddis's written recommendation, which reads, in part: "If every employee under investigation used the same uncooperative tactics that [Betts] used in this investigation, the integrity of the department would suffer along with the public the department serves.").

Chief of Police Pavlik reviewed Captain Gaddis's written report and concurred with his evaluation that Betts had been uncooperative and should be terminated. *Id.* at 18. By a memorandum dated March 6, 2014, MTPD terminated Betts's employment based on her violations of General Order #231 and her Oath of Office. *Id.*

* * *

Returning to Betts's use of the Arbitration Opinion as evidence of pretext, the arbitral tribunal explained that it was "persuaded" that the four questions Boehm initially asked Betts to answer were "poorly worded questions . . . not phrased to elicit necessary information as to what she had done . . . but to force [Betts] to issue brief and incriminating responses." Arb. Op. at 33. The Arbitration Opinion "note[d] that [Betts], by refusing to revise her answers to the four questions, might have been found to have disobeyed her superiors in direct violation of [her Collective Bargaining] Agreement, her Oath of Office and General Order #231." *Id.* at 36. But it found that "the total failure of Management to rephrase or ask [Betts] follow-on questions or to explain what was insufficient by way of her responses reveals its intentions and mitigates her own shortcomings in the investigation." *Id.* ("Management was obligated to advise her why it believed she was not cooperating in other than conclusory terms. It did not."). Accordingly, the Arbitration Opinion concluded that MTPD had not met "[t]he burden of proof of just cause" for Betts's termination. *Id.* at 37.

The Court finds that the events detailed in the Arbitration Opinion and the Arbitration Opinion's conclusion that MTPD lacked just cause to terminate Betts do not establish that WMATA's asserted non-retaliatory reason for suspending and terminating Betts is pretext. First, the legal backdrop to the Arbitration Opinion's conclusion is entirely different from the legal backdrop here. *See Gardner-Denver Co.*, 415 U.S. at 60 n. 21 (explaining that one of the

"[r]elevant factors" to consider when weighing the value of an arbitral decision is "the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII"). At the arbitration, MTPD had the burden of proving that it had "just cause" to discipline Betts under the terms of her collective bargaining agreement, while here, Betts has the burden of showing that WMATA's asserted non-retaliatory reason is pretext. In other words, the burden has flipped here, and the underlying standard is different. The Arbitration Opinion's ultimate conclusion, therefore, does not in itself address the relevant issue.

Second, the Court does not find it reasonable to read the facts asserted in the Arbitration Opinion to establish pretext. Betts argues that she was "singled out" for inquiry, Pl.'s Opp'n at 19, but the facts show otherwise. Management's investigation into Betts began because Betts informed her supervisor that she kept her case files in her car. Moreover, at the time Betts made this admission to her supervisor, she knew that her supervisor was conducting an inquiry into another detective for keeping case files in their car. And this was after Management directed the detectives, including Betts, to not keep case files out of the office. In short, Management's investigation of Betts began after Betts informed her supervisor, whom she knew to be investigating another detective for keeping case files out of the office, that she also continued to keep case files out of the office after she was directed not to. It would be unreasonable to think that Betts would not be asked some questions about this situation.

When it comes to the way Management conducted the investigation, the Arbitration Opinion concluded that both sides could have done better. *See* Arb. Op. at 36. But unlike the Arbitration Opinion, the Court is not tasked with determining whether Betts's "handling of the questions warrant[ed] discipline." *Id.* The Court is tasked with determining whether Betts has "produced sufficient evidence for a reasonable jury to find that" Betts's refusal to cooperate in

MTPD's inquiry "was not the actual reason" for her suspension and termination and that she was "intentionally [retaliated] against" for engaging in protected activity. *Wheeler*, 812 F.3d at 1114. The evidence regarding MTPD's inquiry does not allow the Court to answer that question in the affirmative. Betts was provided with multiple opportunities over an extended period of time to answer Management's questions, and she was repeatedly reminded that her refusal to answer the questions could lead to termination. Betts's refusal to cooperate with the investigation violated a known General Order and her Oath of Office. The final report on her conduct concluded that "[i]f every employee under investigation used the same uncooperative tactics that [Betts] used in this investigation, the integrity of the department would suffer along with the public the department serves." Arb. Op. at 17–18.

With that in mind, the Court does not find it reasonable to infer a retaliatory motive from MTPD's decision to terminate Betts. The Court is not authorized to act as a "super-personnel department that reexamines an entity's business decisions," *Barbour*, 181 F.3d at 1346, nor may it "second-guess an employer's personnel decision absent demonstrably discriminatory motive," *Fischbach*, 86 F.3d at 1183. As the Arbitration Opinion explained, "[t]he absence of case files from the . . . office not only risks compromise [sic] the security of information contained therein, but also means that the files are not available to other detectives and supervisors and might, thereby, interfere with Department operations." Arb. Op. at 32. Based on the evidence, MTPD determined that Betts's continued practice of keeping her case files out of the office after being directed not to warranted investigation due to the risks inherent in that practice, and it determined that Betts's subsequent refusal to cooperate in the investigation warranted suspension and, ultimately, termination because her lack of cooperation violated its general orders and her sworn oath. The details of MTPD's investigation into Betts provide no reason to think otherwise.

Accordingly, the Court concludes that MTPD's investigation of Betts and its ultimate disciplinary decision do not warrant an inference of pretext.

c. *The Arbitration Opinion's finding that Betts's employer "likely" knew of her Second Charge when it disciplined her is not supported by the record and, regardless, does not address whether the decisionmaker that disciplined Betts knew of the Second Charge.*

Finally, the fourth finding from the Arbitration Opinion—that Betts's employer "likely" knew of her Second Charge when it suspended and terminated her—relates to Betts's argument that she was disciplined because of her history of reporting issues with her superiors. The Court determines that this finding is not supported by the record, and even if it were, it would not address whether the decisionmaker that disciplined Betts knew of the Second Charge.

At the arbitration proceeding, Betts's Union argued that "[t]he most recent correspondence related to [Betts's First Charge]" was a January 3, 2014, letter from the EEOC to Betts that reads, in part: "Because the document that you submitted to us constitutes a charge of employment discrimination, we have complied with the law and notified the employer that you filed a charge." Arb. Op. at 9–10. The Arbitration Opinion, however, determined that the letter "pertain[ed]" to Betts's Second Charge, not her First Charge. *Id*. at 9. In its own words, the Opinion reasoned that

> the January 3, 2014, letter from EEOC pertains to a subsequent charge filed by Grievant; it clearly states at the top that it relates to a different charge number (see the description of "Charge 2" contained in the section entitled "Subsequent Events." [sic] Nonetheless, the January 3 letter states that, "Because the document that you submitted to us constitutes a charge of employment discrimination, we have complied with the law and notified the employer that you filed a charge." Thus, the Union's suggestion that the Employer knew of this second Charge is likely true.[11]

*Id*. at 9–10.

[11] As noted above, the Union's "suggestion"was that the Employer knew of Betts's First Charge, not her Second Charge.

The Court finds that the Arbitration Opinion's conclusion is not supported by the record. First, it is not clear how the January 3 EEOC letter could pertain to Betts's Second Charge when Betts's Second Charge was filed on January 30, 2014. *See* Second Charge. And the Court cannot glean any clarity from the letter itself because, as WMATA points out, the letter is "not in evidence in this Court." Def.'s Obj. at 13.

Furthermore, even assuming for the sake of argument that Betts's "Employer" knew of her Second Charge at the time she was disciplined, that conclusion does little to meet Betts's burden at this stage of the litigation. Here, Betts must "demonstrate that the *decision-maker*, not just some other *employee of the company* was aware of [her] protected activity." *Pierce v. Mansfield*, 530 F. Supp. 2d 146, 161 (D.D.C. 2008) (RMU) (quoting *Davis v. Ashcroft*, 355 F. Supp. 2d 330, 351 (D.D.C. 2005)) (emphasis in original). The decisionmaker here was Chief Pavlik, and the evidence in this case—which Betts has not rebutted—shows that Chief Pavlik first learned of Betts's Second Charge on April 8, 2014, more than a month after he terminated Betts. *See* Letter, Dkt. No. 23-29; Def.'s Obj. at 13.

The Court's "obligation to view the facts in the light most favorable to the nonmoving party only attaches if there is a genuine dispute as to those facts." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (citation and quotation omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* Accordingly, the Court concludes that the Arbitration Opinion's fourth finding does not support Betts's argument for pretext.

## IV. CONCLUSION

The Court concludes that WMATA is entitled to summary judgment on Betts's three remaining claims. WMATA is entitled to summary judgment on Betts's claims of sex

discrimination and race discrimination because Betts did not exhaust these claims with respect to the adverse employment actions in this case (i.e., her suspension and termination). WMATA is entitled to summary judgment on Betts's retaliation claim because it has asserted a legitimate, non-retaliatory reason for suspending and terminating Betts, and Betts has not produced sufficient evidence for a reasonable jury to find that WMATA's asserted non-retaliatory reason was not the actual reason for her suspension and termination and that WMATA intentionally discriminated against Betts in retaliation for engaging in protected activity.

Accordingly, it is hereby **ORDERED** that WMATA's [23] Motion for Summary Judgment is **GRANTED**. A separate Order shall accompany this Memorandum Opinion.

**SO ORDERED.**

**Dated:** September 14, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge